# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re:<br><br>GORDON PROPERTIES, LLC,<br><br>     Debtor. | Case No.   09-18086-RGM<br>(Chapter 11) |
| GORDON PROPERTIES, LLC,<br><br>       Plaintiff,<br><br>vs.<br><br>FIRST OWNERS' ASSOCIATION OF<br>FORTY SIX HUNDRED CONDOMINIUM,<br>INC.,<br><br>      Defendant. | Contested Matter<br>Objection to Proof of Claim No. 2 |

## MEMORANDUM OPINION

The issue before the court is the amount of condominium fees that Gordon Properties, LLC, the debtor, owes to First Owners' Association of Forty Six Hundred Condominium, Inc., the condominium unit owners' association.  The association filed a proof of claim asserting a claim of $315,673.36 for unpaid condominium fees for 2003 through 2009.  Proof of Claim 2.  The debtor objected, challenging the validity of the assessments, asserting that the association improperly apportioned the assessments, and claiming a setoff for improper user fees assessed against its storage spaces, unauthorized off-site owner fees imposed on the debtor and improper late fees charged by the association.

1

## A.  General Background

## 1.  The Legal and Physical Structure of the Condominium

This case is a study in complexity.  The threads of complexity began on November 16, 1975 at 3:30 p.m. when the Declaration and Bylaws creating the condominium were recorded in the Clerk's Office of the Circuit Court for the City of Alexandria, Virginia.  The condominium is a mixed-use condominium consisting of three types of units:  Residential Units, Commercial Units and Street-Front Commercial Units.  There are three principal physical structures, none of which is connected to the others: a sixteen-floor high-rise building, a gas station and a restaurant.  The Residential Units are located on the fifth through sixteenth floors of the high-rise building.  The Commercial Units are located on the third and fourth floors of the high-rise building and the two Street-Front Commercial Units – a gas station and a restaurant – are located in two separate structures fronting on a major road.  There are 396 Residential Units which hold a 74.48411% interest in the common elements; 54 Commercial Units which hold a 10.32775% interest in the common elements; and two Street-Front Units which hold a 15.18814% interest in the common elements.[1]  The debtor owns the restaurant Street-Front Unit which has an 11.32% interest in the common elements.

The combination of a high-rise building, a gas station and a restaurant, all in stand-alone structures not dependent on the others, is unusual in a condominium.  Bryan Sells, one of four

---

[1]Ex. 10, Second Corrective Amendment to Condominium Instruments for Forty Six Hundred Condominium dated June 30, 2011 at 254-255.  The amendment was necessary because, during the course of litigation, it was discovered that there were obvious typographical errors in the Declaration relating to votes allocated to two units.  Although the intention was to have a total of 1,000 votes, only 996 votes were allocated in the Declaration due to the typographic error.  The amendment corrected this 36-year-old error.

The Circuit Court found that the debtor's Street-Front Unit had an 11.32% interest.  The amendment reduced it to 11.71891%.  This court will use the 11.32% interest in this Memorandum Opinion because that was the applicable percentage at the times in issue.

members of the debtor, testified that the sixteen-floor high-rise building was originally rental apartments and was one of the first condominium conversion projects in Virginia. The original idea was to include only the high-rise building in the condominium. The stand-alone gas station and restaurant would not have been part of the condominium had the City of Alexandria not required additional parking spaces. According to Mr. Sells, the developer intended to build an additional separate parking structure to satisfy the zoning requirement but the structure could not be built, possibly due to wetland issues. In order to satisfy the zoning requirement, the gas station and the restaurant were added to the condominium. The additional parking spaces associated with them satisfied the parking space requirement.[2]

The combination of the three disparate structures created differing interests between the gas station and restaurant Street-Front Unit owners on the one hand and the Residential and Commercial Unit owners in the high-rise building on the other and also between the Residential Unit owners and the Commercial Unit owners. The condominium documents – the Declaration and Bylaws (Exs. B and 10) – endeavor to minimize the differing interests. One obvious issue is sharing the costs of operating and maintaining the entire property. In a condominium that consists of only residential units in a high-rise building, there is a common interest in maintaining the structural integrity of the building and in the operation of the property as a whole. There may be disagreement as to the maintenance required, the quality of the services to be provided and the ultimate amount to be spent, but in the end, all of the common expenses are assessed proportionately among all the units according to a fixed formula set out in the condominium documents and all share in the benefits.

---

[2]The reasons for including the two disparate Street-Front Units in the condominium is interesting but not important in deciding the issues presented. The issues are determined by the Condominium Act and the condominium documents.

3

Here, however, the Street-Front Unit owners have as little interest in the maintenance and operation of the high-rise building as the Residential Unit owners and the Commercial Unit owners have in the maintenance and the operation of the restaurant and the gas station. The condominium was a marriage of convenience, nothing more. But for the need for additional parking spaces to satisfy a zoning requirement, the Street-Front Units would not be a part of the condominium. They would be stand-alone properties responsible for their own maintenance and operation and have no voice or responsibility for the maintenance and operation of the high-rise.

The method adopted in the Declaration and Bylaws to address this fundamental issue was the creation and assignment of limited common elements. In a condominium, the costs of operation and maintenance are allocated among the unit owners based on the nature of the expense and each units prorata interest in the condominium. Costs associated only with a unit itself are borne by the individual unit owner. Costs associated with the common elements are borne proportionately by all unit owners. There is a third category of expenses, more properly, a subcategory of the expenses related to the common elements. The essence of common elements is that all unit owners share in the benefits associated with them. Generally, all unit owners in a high-rise benefit from the structural aspects of the building itself, for example, the structural support columns in the building, the swimming pool (if there is one), the elevators, the trash chutes, the parking spaces and other similar items. All of these are common elements. Some common elements, however, may be reserved for fewer than all unit owners, for example, parking spaces, an elevator, or a balcony. Va.Code (1950) §55-79.41. These are the limited common elements. The costs of maintaining and operating them is apportioned among the unit owners who benefit from them, that is, the unit owners to whom the limited common element is assigned. Va.Code (1950) §55-79.83A and B. The

4

condominium documents in this case utilize the difference between common elements and the limited common elements to resolve some of the differing interests between the three constituent groups of unit owners.[3]

In this condominium, the only common element not a limited common element is the ground itself – other than the land included in the metes and bounds descriptions of its Street-Front Units. All structures are limited common elements. The high-rise building is, except for those portions defined as units, a limited common element appurtenant to the Residential Units or the Commercial Units or both, but not the Street-Front Units.

Sections III and IV of the Declaration effectuates this regime. Section IV provides that:

IV. <u>GENERAL COMMON ELEMENTS</u>. All portions of the Condominium Project not described above as a Limited Common element or set out as a Condominium Unit in Exhibit C are hereby declared to be a General Common Element. The owners of all Condominium Units shall bear the responsibility for the obligations set forth in Section V of this Declaration in the proportions set forth in Exhibit D.

Section III establishes the limited common elements. The limited common elements are divided into two groups of limited common elements: single-user limited common elements (divided into two types) and multiple-user limited common elements (divided into three types). The five types of limited common elements are: Parking Garage Limited Common Element (single-user); Storage Area Limited Common Element (single-user); Residential Limited Common Element (multiple-user); Commercial Limited Common Element (multiple- user) and Residential/Commercial Limited

---

[3]Sometimes common elements are called general common elements to distinguish them from limited common elements. Va.Code (1950) §55-79.41. The limited common elements are common elements, but restricted to the use by fewer than all unit owners. The use of the term "general common element" is helpful to distinguish limited common elements from all the other common elements. Va.Code (1950) §55-79.41. As used in this Memorandum Opinion, "common elements" and "common expenses" refers to those portions of the common elements that are not limited common elements and to expenses that are not attributable to the operation or maintenance of the limited common elements.

Common Element (multiple-user).  Declaration, Sec. III.  *See,* Ex. 7, Letter Opinion dated February 23, 2009 at 2-3.

The separation of the Residential and Commercial Units from the Street-Front Units to the maximum extent possible is evident from these provisions of the Declaration.  There are two types of single-user limited common elements.  These limited common elements are reserved for the use of a single condominium unit.  The first are the parking spaces.  The description of the Parking Garage Limited Common Elements is not unusual.  Essentially, the parking space itself is the limited common element and is appurtenant to the unit to which it is assigned.  The parking structure itself is not included in the definition.  Declaration, Sec. III(A)(1).  In most condominiums the parking structure is a general common element.  As will be seen, that is not the case here.  The Storage Area Limited Common Elements are treated similarly.  Declaration, Sec. III(A)(2).  In most condominiums, the structure in which they are located is a general common element.  Again, this is not the case in this condominium.

The extent of multiple-user limited common elements suggests that there is something different about this condominium.  There are three types of multiple-user limited common elements. One type of multiple-user limited common elements is the Residential Limited Common Elements. They are defined as:

> The owners of Units on the fifth through sixteenth floors (herein referred to as Residential Unit owners) shall have the exclusive use and shall bear the responsibility under Section V of this Declaration in the following Limited Common Elements: The elevators, elevator shafts and all equipment comprising the operation of the elevators not including the freight elevator, the halls, storage rooms, laundry rooms, mechanical rooms, carpets, light fixtures, trash disposal rooms, and all other components on the interior structure of the Building which constitutes the fifth through sixteenth floors excluding the Units on those floors (as described in Exhibit B) and the roof and columns and structural components having a supportive or functional relationship to other parts of the Building.  Such Limited Common

Elements shall be deemed appurtenant to the Residential Units and shall not be conveyed separately from the Unit to which it is appurtenant. Washers and dryers shall be the property of the owner thereof. The allocation of the responsibility for the obligations under Section V of this Declaration is set forth in Exhibit D.

Declaration, Sec. III(B)(1).

Similarly the Commercial Limited Common Elements are defined as:

The owners of Units on the third and fourth floors of the Building (herein referred to as Commercial Unit owners as distinguished from Street-Front Commercial Owners) shall have the exclusive use together with their patrons and guests and the owners thereof shall themselves bear the responsibility for the obligations under Section V of this Declaration for the following Limited Common Elements: The parking as designated in Exhibit C, the halls, storage rooms, laundry rooms, mechanical rooms, carpets, light fixtures, trash disposal rooms, and all other components of the interior structure of the Building which constitutes the third and fourth floors excluding Units on those floors (as described in Exhibit B), and columns and structural components having a supportive or functional relationship to the Building. Owners of Units on the third and fourth floors shall bear the responsibility for the obligations set forth in Section V of this Declaration as set out in Exhibit D. The use of and responsibility for such Limited Common Elements shall not be reassigned to another Unit or Unit owner.

Declaration, Sec. III(B)(2).

The provisions relating to the Residential and the Commercial Limited Common Elements endeavor to divide responsibility for various facilities between the Residential Units and the Commercial Units. Again, the essential structure of the high-rise building itself – "the columns and structural components having a supportive or functional relationship to the Building" – are excluded.

What comes next is what makes Forty Six Hundred Condominium different from most other condominiums and effectuates the separation, as much as possible, of the Residential and Commercial Units from the two Street-Front Units. Declaration, Sec. III(B)(3) makes the "remaining portions of all improvements to the Condominium Project except those improvements

on the Street-Front Commercial Units and not designated above" Residential/Commercial Limited

Common Elements.[4]  It states:

> The remaining portions of all improvements to the Condominium Project except those improvements on the Street-Front Commercial Units and not designated above as a residential, commercial, parking garage, or storage area [] Limited Common Element shall be deemed a Residential/Commercial Limited Common Element which shall include but not be limited to the roof and columns and structural components having a supportive or functional relationship to other parts of the building, the swimming pool area and bathhouse, including the walkway giving access thereto, the freight elevator, the health spa and sauna room as described in Exhibit B.  The owners of residential and commercial Units shall have the exclusive use of and bear the responsibility for the obligations under Section V of this Declaration for such Limited Common Elements.  The responsibility for the obligations under Section V shall be born[e] as set out in Exhibit D.  The use of and responsibility for these Limited Common Elements shall not be reassigned to another Unit or Unit owner.

Declaration, Sec. III(B)(3).  As is true with all limited common elements, the items are reserved for

the exclusive use of fewer than all unit owners, in this instance, the Residential and the Commercial

Unit owners.  These limited common elements may not be reassigned.

When all was said and done, the new configuration of the condominium (which included the

two Street-Front Units), ostensibly met the zoning requirement with respect to parking spaces.

While the letter of the law was satisfied, the spirit was not.  The condominium documents limited

parking on the condominium outside the two Street-Front Units to the owners of the Residential and

Commercial Units but, because the two Street-Front Units are defined by metes and bounds which

includes parking spaces, the Residential and Commercial Unit owners may not park in the Street-

---

[4]The boundaries of the condominium units are set out in Exhibit B, Identification and Boundaries of Units. Ex. 10 at 42 *et seq.*  As is common in a high-rise condominium, the boundaries of the Residential and Commercial Units are described in reference to the physical aspects of the units, for example, "the top side of the plaster ceiling slab." Ex. 10 at 48 and 51.  The two Street-Front Commercial Units are described differently.  They are described by metes and bounds.  *Id.* at 51-52.  The Street-Front Units are also shown graphically on the site plan together with the same metes and bounds.  The significance is that the Street-Front Units include the land within the metes and bounds descriptions. The rest of the land of the condominium – for example, the land upon which the high-rise building stands – is a general common element.

8

Front Units' parking spaces.  In short, the number of parking spaces available for Residential and Commercial Unit owners remained the same as before the addition of the gas station and the restaurant.  One problem is ostensibly solved with the introduction of complexity.

## 2.  The Judgment Against CSI

After the creation of the condominium, Bryan Gordon, the grandfather of the four members of the debtor, purchased the restaurant and a large number of units at the condominium. Unfortunately, he died prematurely.  He left his holdings to a trust for the benefit for his children for their lives and then to his grandchildren.  The trust terminated about 2002.  At that time, the condominium units were transferred to the debtor, the members of which are Mr. Gordon's  four grandchildren.

In addition to owning the condominium units, Mr. Gordon also established Condominium Services, Inc., CSI, which engaged in the business of managing condominium unit owner associations.  The creditor in this case, First Owners' Association, was a client for about 25 years until its contract was terminated early by the Board of Directors.  The matter was not handled well and litigation ensued.  One suit involved a claim by the association against both CSI and the debtor. It was tried before a jury which found for the association against CSI but not against the debtor.  The result was a judgment in favor of the association against CSI.  The proof of claim is for $448,446.44. *In re Condominium Services, Inc.,* Case Number 10-10581, Proof Claim 2.  CSI unsuccessfully appealed to the Supreme Court of Virginia.  *Condominium Services, Inc., v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.,* 281 Va. 561, 709 S.E.2d 163 (2011).

CSI is unable to pay this judgment.  Its cash flow is simply inadequate.  As a service business, it does not have significant tangible assets.  The debtor, on the other hand, has ample assets from which the judgment could be paid.  Its cash flow is not sufficient to pay the judgment  within a short time period.   The debtor, though, is not liable on the judgment.

### 3.  The Assessment Suit

After the board of directors terminated CSI, the board determined that the manner in which the Street-Front Units had been assessed since the beginning of the condominium was in error and issued a "corrective assessment" for the prior five years, the maximum permitted by the statute of limitations.  The assessment against the restaurant Street-Front Unit, together with late charges and interest, was $315,673.36.  Proof of Claim 2.  More litigation ensued.  The debtor sued the association seeking a declaratory judgment that the association had no authority to assess the Street-Front unit for common expenses; that the revised assessment methodology was wrong and the new assessment was improperly computed; that user fees against its storage spaces were not permitted; and other relief. Ex. 3, Complaint, *Gordon Properties, LLC, v. First Owners' Association of Forty Six Hundred Condominium, Inc.,* Circuit Court for the City of Alexandria, Virginia, Civil Case No. CL08-1432.  Ex. 3.  The association filed a counterclaim and an amended counterclaim seeking judgment for the new assessment.  Exs. 4 and 5.  The parties filed motions for summary judgment which were granted in part and denied in part.  Ex. 6.  The order states:

> ORDERED that .   .   . the court hereby construes the Declaration and Bylaws, together with Virginia Code §55-79.83(D) as granting the Association the authority to assess the Street-Front Commercial Unit owned by Gordon Properties, LLC for common expenses relating to the operation and management of the Association as described in Article VIII of the Bylaws of the Association; and that

10

the Street-Front Commercial Unit owned by Gordon Properties, LLC is responsible for 11.32% of those expenses .   .   . and it is

FURTHER ORDERED that Gordon Properties, LLC's Motion for Partial Summary Judgment on the Association's claim for a money judgment against Gordon Properties, LLC with respect to the Street-Front Commercial Unit is granted without prejudice because the Association's claim for a money judgment at law is premature

Ex. 6, Order entered January 30, 2009 at 2.

The Circuit Court struck the debtor's evidence as to the user fees assessed against the storage spaces. Ex. 9, Order entered July 27, 2009 at 3. It explained its reasons for denying the debtor's motion to reconsider in its Letter Opinion. It stated:

The Court denied this motion finding that the evidence established that the Association incurred expenses, albeit limited, with respect to the storage areas for which Gordon Properties was responsible, that under the Condominium Act, as well as the Declaration, unit owners can be assessed the expenses of maintenance and operation for single user limited common elements, and that Gordon Properties failed to present sufficient evidence upon which the jury could base a damage award. *See Sunrise Continuing Care, LLC v. Wright,* 277 Va. 148, 671 S.E.2d 132 (2009). Specifically, Gordon Properties presented no evidence as to either the amount of the expenses that it should be properly assessed for its use and maintenance of the storage areas or what would constitute a reasonable user fee with respect to the storage areas. For these reasons, Gordon Properties' motion for reconsideration and new trial is denied.

Ex. 8, Letter Opinion dated April 3, 2009 at 1-2.

The final judgment was entered on July 27, 2009, following two letter opinions both of which are referred to in the court's order of July 27, 2009. Exs. 7, 8 and 9. The debtor appealed to the Supreme Court of Virginia. The petition for appeal was denied.

In addition to the unique structure of the condominium, the voting strength that flows from the structure of the condominium weighs heavily in favor of the debtor. The debtor's Street-Front Unit has a significantly larger vote in condominium affairs, now 11.71891% of the entire vote, than

11

the 396 Residential Units, each of whom has on average 0.18809% of the entire vote and than the

54 Commercial Units, each of whom has on average 0.19125% of the entire vote.  The balance,

3.46923% is held by the gas station Street-Front Unit.  In addition, the debtor owns 38 of the 54

Commercial Units.  The net result is that the debtor controls about 19% of the total vote. The

quorum for meetings of the unit owners' association is 50%.  It is difficult to reach this number.  If

the quorum is barely met, the debtor controls about 38% of the votes present.

Other matters add to the complexity of the relations among the parties.  One  is CSI, a

subsidiary of the debtor,  which managed the affairs of the condominium for about 25 years.  The

relationship between CSI and the condominium ended in a law suit and a judgment the association

holds against CSI.  There is the increasing costs to operate and maintain the condominium.   The

2003 budget shows expenditures of $1,941,847 (including reserves) and total condominium fees for

Residential Unit owners of $1,574,066.  The 2009 budget shows total expenditures of $3,217,321

(including reserves) and total condominium fees for Residential unit owners of $2,575,451.  This

is a 65.7% increase in expenses (including reserves) over seven years.  Total condominium fees for

the same years  were $166,524 and $260,820 for the Commercial Units and $3,514 and $35,294 for

the Street-Front Units.[5]   There have been several lawsuits in the Circuit Court, two appeals to the

Supreme Court of Virginia, two bankruptcies,  multiple appeals to the District Court and to the Court

of Appeals and an arbitration.

There are many issues between the parties, but this case involves only one issue: How much

does the debtor owe the condominium association for condominium assessments from 2003 through

---

[5]The Street-Front Units' assessment of $3,514 in 2003 was under the prior method of allocation.  The 2009
Assessment of $35,294 was under the association's revised allocation.

2009.  The first step in resolving this, is to determine what the Circuit Court decided and the extent

that res judicata or collateral estoppel affect the litigation before this court.

## B.  Discussion

### 1.  Effect of Circuit Court Decisions

The first task is to determine what was decided by the Circuit Court and, therefore, what is

barred by the doctrine of res judicata.  The judgment was entered by a Virginia Circuit Court.  The

Virginia law of res judicata applies.  *In re Genesys Data Techs., Inc.,* 204 F.3d 124, 129 (4th Cir.

2000).

> In Virginia, a claim raised in a second action is barred by failure to raise the claim
> in a first action, where (1) the same defendants, or defendants in privity with one
> another, defend both actions, (2) the second "claim or cause of action" arises out of
> the same conduct, transaction, or occurrence as did the first, (3) the plaintiff could
> have raised the claim in the first action, and (4) a final judgment on the merits
> decided the first action. *See* Va. Sup.Ct. R. 1:6(a) (2006); *Martin–Bangura v. Va.
> Dept. of Mental Health,* 640 F.Supp.2d 729, 738 (E.D.Va.2009).

*Vuyyuru v. Jadhav,* 2011 WL 1483725 *5 (E.D.Va. 2001).  Rule 1:6(a) of the Rules of the Supreme

Court states:

> **Definition of Cause of Action.** A party whose claim for relief arising from
> identified conduct, a transaction, or an occurrence, is decided on the merits by a final
> judgment, shall be forever barred from prosecuting any second or subsequent civil
> action against the same opposing party or parties on any claim or cause of action that
> arises from that same conduct, transaction or occurrence, whether or not the legal
> theory or rights asserted in the second or subsequent action were raised in the prior
> lawsuit, and regardless of the legal elements or the evidence upon which any claims
> in the prior proceeding depended, or the particular remedies sought. A claim for
> relief pursuant to this rule includes those set forth in a complaint, counterclaim,
> cross-claim or third-party pleading.

The Circuit Court case was about the additional condominium assessments for 2003 through

2008.  But the resolution was not on the merits.  Relief was denied to the association because it had

not made the assessment that it sought to collect.  In its finding, the court stated that the claim "with

respect to the under-assessment of the Street-Front Commercial Unit . . . is premature because no

corrective assessment has been made by the Board."  Ex. 6, Order entered January 30, 2009 at 2

(ordering that the claim be dismissed as "premature.").  If res judicata applied, as the association

incorrectly asserts, its claim for the 2003 to 2008 additional condominium assessment would be

barred.  Its proof of claim would be disallowed.  It lost that case.  But, because the resolution was

not on the merits, the association – having now made the assessment – is not barred by res judicata

from attempting to collect it.

The debtor asserts a setoff  for user fees it paid on storage spaces.  The association prevailed

on this claim in the Circuit Court.  The court found that the association established that it had

incurred expenses, "albeit limited, with respect to the storage areas," that owners of the units to

which the storage spaces (which are limited common elements) can be assessed by the expenses of

maintenance and operation for them and that the debtor "failed to present sufficient evidence upon

which the jury could base a damage award."  Ex. 8, Letter Opinion dated April 3, 2009 at 1-2.  Once

having litigated this issue, the debtor is precluded from litigating it a second time as a setoff.

The off-site owners fees were not part of the prior litigation and are unrelated to the validity

or amount of the condominium assessments in issue.  They arise from a separate resolution of the

board of directors.  They are not barred by res judicata because they do not arise from the same

transaction as the assessments.

In addition to res judicata, collateral estoppel must be considered.  Collateral estoppel is

applicable when the same issue was decided in prior litigation between the parties.  The issue must

have been actually litigated and necessary to the decision in the prior case.  *Angstadt v. Atlantic Mut.*

14

*Ins. Co.,* 249 Va. 444, 446-447, 457 S.E.2d 86 (1995) ("The doctrine of collateral estoppel precludes

parties to a prior action and their privies from litigating in a subsequent action any factual issue that

actually was litigated and was essential to a valid, final judgment in the prior action.")  The Circuit

Court expressly determined that the association had the authority to assess the restaurant unit

condominium fees "for common expenses relating to the operation and management of the

Association as described in Article VIII of the Bylaws of the Association" and found that it was

responsible for 11.32% of those common expenses.  Ex. 6, Order entered January 30, 2009 at 1.

This issue was decided by the Circuit Court.  Further litigation is precluded.

The parties disagree on whether the Circuit Court determined the methodology by which

assessments must be allocated.  The Circuit Court established and applied a methodology for the

allocation of reserves in its Letter Opinion dated February 23, 2009.  It did not directly address the

allocation of common expenses other than reserves.  The Circuit Court was required to determine

the methodology for determining the allocation of reserves.  The debtor sought relief on this issue

in Count I of its complaint and was substantially successful on the issue.  The Circuit Court

discussed the matter at length and articulated the methodology and the basis for the methodology

in its February 23, 2009 Letter Opinion.  Ex. 7.  The provisions of the Declaration and the Bylaws

relevant to the reserve issue substantially overlap those relevant to the common expenses.  The

manner in which they are both computed is the same.  The  discussion and the methodology in the

Letter Opinion as it applies to the reserves is the same as the common expenses.  Whether further

litigation concerning the methodology for allocating common expenses is barred by the doctrine of

collateral estoppel as argued by the association or whether this court should determine it as argued

by the debtor is not important.  This court finds that the methodology enunciated by the Circuit

15

Court for determining reserves is equally applicable to the allocation of common expenses and will

be applied by this court.


## 2.  Evidentiary Matters

Before the issue of the manner in which the expenses of the condominium are allocated for

purposes of determining condominium fees is discussed, several evidentiary issues must be

addressed.  The debtor objected to the testimony of James L. Clagett and Jerry Terry as to how the

association calculated the debtor's assessment for the Street-Front Unit for 2008 and 2009 as

hearsay.  Mr. Clagett was the general manager of the association from June 2, 2010 and headed a

staff of eight full-time employees and five part-time employees.  He was not involved in preparing

the 2008 and 2009 budgets but identified them from the association's records.  Exhibits I and J.  He

relied on the association's records showing that the assessment was made and the amount of it.

Exhibits K and L.  The association argues that:

> Similarly, Mr. Clagett testified as to his personal knowledge of how the assessments
> were determined for those years.  That his knowledge is based upon his review of
> FOA's records and his own preparation of FOA budgets does not render it
> insufficient or in conflict with the hearsay rule.  A witness with knowledge of the
> policies and procedures of a company may testify to them without running afoul of
> the hearsay rule.  This is precisely what Mr. Clagett did.

First Owners' Association of Forty Six Hundred Condominium, Inc.'s Brief in Lieu of Closing

Argument at 20.  (Doc. 374).

Jerry Terry served on the board of directors from late 2008 for about three years.  He was

treasurer in 2009 and participated in the preparation of the 2009 budget which was done at the end

of 2008.  He testified that Bruce Steele did the assessment analysis and recommendation.  He

believed that the board followed his recommendation for the years from 2003 to 2009.  He did not

meet with Mr. Steele individually but only as a member of the board of directors and was orally told

that the analysis was in accordance with the Bylaws and the Circuit Court's decision. He asked Mr.

Steele to do a reallocation for the 2009 budget to correct the general manager and assistant general

manager's salaries. Mr. Steele did the recalculation.

Bruce Steele was the association's expert witness in both this case and the Circuit Court case.

Neither Mr. Clagett nor Mr. Terry computed the contested assessments. Mr. Clagett only knew of

the computations from the business records of the association and his conversations with others. Mr.

Terry was personally involved in preparing the 2009 budget, but none of the prior ones. However,

other than knowing that Mr. Steele computed the assessments by allocating the budget items among

the Residential, Commercial and Street-Front Units, he did not have personal knowledge of how that

was done. The objections to Mr. Clagett and Mr. Terry's testimony as to how the assessments were

computed – the methodology used – is sustained. They did not have personal knowledge of the

computation. The computations were done by Mr. Steele and were explained to Mr. Terry by Mr.

Steele. Mr. Clagett knew of them only from others. Their testimony that Mr. Steele did the

calculations is admissible. The business records Mr. Clagett testified to are admissible.

Fed.R.Evid. 801(c), 803(6), 1001-1003. The individual with personal knowledge of the

computations was the one who did them – Bruce Steele. He testified to them at length at trial.

The significance of the focus on the 2008 and 2009 calculations is that the debtor asserts that

Mr. Steele, who it acknowledges he made the calculations for 2003 to 2007, did not make the

calculations for 2008 and 2009. Thus, the debtor argues, there is no evidence as to the methodology

used to allocate the various budget items to the Residential, Commercial land Street-Front Units and

the 2008 and 2009 assessments must fail. Mr. Steele testified as to his methodology. Whether he

performed the 2008 and 2009 calculations is not critical.  The evidence supports the conclusion that his methodology was used in those two years.

The association objected to Kevin Cavanaugh testifying as an expert witness.  Mr. Cavanaugh testified to a methodology to allocate the budgeted items among the Residential, Commercial and Street-Front Units different from that articulated by Mr. Steele and contrary to that proposed by the association.  Mr. Cavanaugh is a certified public accountant whose practice focuses on homeowner and condominium associations.  He does financial consulting and tax preparation for them.  He has reviewed thousands of association budgets and has conducted many association audits.  He estimated that 20% of his practice was tax preparation and the rest audits.  His education, knowledge and experience are more than sufficient to qualify him as an expert in condominium budgeting and allocation of assessments.

The association takes issue with his opinion of the allocation of certain expenses on an 80/20 basis.  It asserts that the split was "based on guess work and speculation," that it was not based on any "industry standard" and that he had no experience managing a condominium.  First Owners Brief in Lieu of Closing Argument at 18.  These, of course, go to the weight that should be given his testimony, not whether he was qualified as an expert.  Qualification precedes the opinion given.  The objection will be overruled.

The association also objects to Thomas Williams testifying.  He was a rebuttal witness intended to rebut Mr. Clagett's testimony that there is no way that his salary can be apportioned reasonably among the various jobs he performs and, therefore, divided between the work he performs for the limited common elements appurtenant to the Residential and Commercial Units and for the condominium as a whole.  Mr. Williams was a proper rebuttal witness.  It was not necessary

18

that he be identified in the witness list.  The weight to be given to his testimony is an entirely different matter.

Finally, the association objected to Bryan Sells' testimony as to the value of the storage areas for which user fees were assessed.  The debtor asserted that the user fees were unreasonable in light of the value of the storage areas and the minimal costs of servicing them.  While testimony of value is opinion testimony, an owner has the ability to testify as to the value of his property.  Here, Mr. Sells is one of the managing members of the debtor which owns the storage space and is qualified to testify as to its value.  *United States v. 10,031.98 Acres of Land,* 850 F.2d 634, 636 (10th Cir. 1988); *South Central Livestock Dealers, Inc. v. Security State Bank of Hedly, Tex.,* 614 F.2d 1056, 1061 (5th Cir. 1980).

The association objects to the admissibility of Exhibits 20 and 21 on the grounds that they are hearsay.  The exhibits are requests under Va.Code (1950) §55-79.84H and Bylaws Article IX, §6 for the amounts claimed by the association to be outstanding on the debtor's condominium units and, in the case of Exhibit 20, the association's response.  They were not offered for the truth of the amounts stated, but only to show that a request was made and, in the case of Exhibit 20, a response was given.  Offered for this purpose, they are not hearsay.   The effect of the requests is another matter.  The objection is overruled.[6]

### 3.  Assessment Methodology

---

[6]The association adds footnote 3 on page 18 of its brief, stating:  "FOA maintains all other objections made at trial."  The court's order setting the briefing schedule required that any evidentiary objection made at trial that the court took under advisement had to be addressed in the brief or the objection would be deemed waived.  Order dated February 28, 2012.  (Docket Entry 355).  To the extent that there are any other such objections that were not addressed in the association's brief, they are waived, notwithstanding its footnote.

The association argues that the expenses identified in subsections (b), (c), (d) and (i) of Article VIII of the Bylaws are the common expenses that are to be allocated among the three types of units, the Residential, Commercial and Street-Front Units.  It argues that this derives from the language of the January 30, 2009 order which identifies "common expenses relating to the operation and management of the Association as described in Article VIII of the Bylaws."  The order nowhere refers to subsections of Article VIII.  It only refers to common expenses relating to operation and management.  The association excludes subsections (a), (e), (f), (g), (h) and (j).  Some of those subsections address costs of operation that benefit limited common elements appurtenant to the Residential or Commercial Units and not the Street-Front Units, such as the recreational facilities. Others that the association did not include could have involved expenses that relate to the Street-Front Units but to date have not.

The association's  argument has the effect of expanding common expenses that may be assessed against the Street-Front Units by failing to examine the expense itself and simply attempting to pigeonhole it into one of the subsections of Article VIII.  The Circuit Court did not need to – and did not – determine what the particular common expenses were in its January 30, 2009 order.  It referred to them in a generic form leaving it to the parties to examine each expense to determine whether it was a common expense to be allocated in its proportionate share to the Street-Front Units.  As used by the Circuit Court, the term "common expense" means an expense of the association that is not for the benefit of a particular unit or limited common element.  It limited the expenses to those found in Article VIII, but did not include all those found in Article VIII.  Of those found in Article VIII, those that are for the benefit of a particular unit or for the operation or maintenance of limited common elements, are excluded from "common expenses" that may be

20

allocated to the Street-Front Units.  The rest are to be allocated among all units – the Residential,

Commercial and Street-Front Units.

Each expense must be examined to determine its proper category.  If the expense is for the

benefit of a particular unit, it is allocated to that unit.  The unit owner is assessed for the expense.

If it is for the benefit of a single-user limited common element, it is charged to the owner to whom

the limited common element is assigned.  If the expense is allocated to a multiple-user limited

common element, it is assessed among all the unit owners to whom the limited common element is

assigned in their prorata shares.  The expenses relating to the Residential Limited Common Elements

(multiple-users) are allocated among all of the Residential Unit owners.  The expenses related to the

Commercial Limited Common elements are allocated among all of the Commercial Unit owners.

The expenses related to the Residential/Commercial Limited Common expenses are allocated among

the Residential Unit owners and the Commercial Unit owners.  The Street-Front Unit owners do not

share in any of these expenses.

The Circuit Court followed this process with respect to the reserves in its February 23, 2009

Letter Opinion.  The Circuit Court stated:

> In order to comply with the Declaration and By-Laws, [the association],
> whether through its financial manager or otherwise, must utilize an accounting
> system which will accurately record and report all maintenance and operating
> expenses and reserve expenses and assign each expense, as and when incurred, to
> whichever of the six categories of Common Elements, as described in Section III and
> IV of the Declaration, for which those expenses were incurred.

Ex. 7, Letter Opinion dated February 23, 2009 at 6-7.  The Letter Opinion refers to six categories

in this paragraph.  The six categories are described earlier in the Letter Opinion as five types of

Limited Common Elements and the General Common Elements. *Id.* at ¶I.2.  The key, as stated by

the Circuit Court, is to accurately record the maintenance and operating expenses.

Mr. Steele was the association's expert.  He did not prepare the 2003 to 2008 budgets.  He was retained in 2009 as an expert witness in the Circuit Court litigation and again in 2012 in this matter to determine what the assessments for 2003 through 2008 should have been for the restaurant Street-Front Unit.  He testified that all the expenses of the association were common expenses but that the expenses relating to the operation and maintenance of the limited common elements should be assessed against the units to which the limited common element was assigned.  He did this by examining the budgets for 2003 through 2008 and identifying the limited common element expenses. Everything else was a general common expense.  He called these Section D expenses, from Va.Code (1950) §55-79.83D.[7]  He determined whether an expense was a limited common expense by examining the line item description in the budget, not the underlying bills or contracts that, when aggregated, constitute the line item.  With one exception, the payroll, he did not split any line item into a limited common expense and a general common expense or even among the various categories of limited common expenses.   In performing his analysis, he had the five budgets and the brief narrative descriptions of the line items in the budgets.  He did not have any budget backup or other financial statements.

Mr. Cavanaugh, the debtor's expert performed a similar but fundamentally different analysis.  The difference between Mr. Cavanaugh and Mr. Steele was disaggregating the line item

---

[7]Va.Code (1950) §55-79.83D states:

The amount of all common expenses not specially assessed pursuant to subsection A, B, or C hereof shall be assessed against the condominium units in proportion to the number of votes in the unit owners' association appertaining to each such unit, or, if such votes were allocated as provided in subsection B of § 55-79.77, those common expense assessments shall be either in proportion to those votes or in proportion to the units' respective undivided interests in the common elements, whichever basis the condominium instruments specify. Such assessments shall be made by the unit owners' association annually, or more often if the condominium instruments so provide. No change in the number of votes in the unit owners' association appertaining to any condominium unit shall enlarge, diminish, or otherwise affect any liabilities arising from assessments made prior to such change.

totals.  Mr. Cavanaugh opined that looking behind the line item total was necessary to determine what portion of the line item was a common expense and what was a limited common element expense.

The treatment of the payroll illustrates the difference between Mr. Steele's and Mr. Cavanaugh's calculations.  Both agreed that the payroll should be broken down into a common expense portion and a limited common expense portion.  They both recognized that the administrative staff performed multiple duties, some of which were attributable to the common elements and should be common expenses allocated among all unit owners and some of which were attributable to the limited common elements and should be allocated among the applicable units owners, that is, those to whom the applicable limited common element was assigned.  The 2003 budget did not contain a separate line item for the payroll.  The payroll was included in the Management Contract line item.  The total budgeted expense was $632,784.  The narrative description for the Management Contract states:

> The management contract with CSI for full service management includes the following personnel:
>
> Property Manager
> Resident Manager
> Asst. Resident Manager
> Building Engineer
> 2 Maintenance Personnel
> 1 Custodial Personnel
>
> Contract cleaning personnel to clean common areas
> Desk Personnel 24/hour coverage – 3 full time, 5 part time
> All paid leave and overtime pay is included in the management fee.  CSI provides and maintains units for personnel living onsite.  CSI also provides full benefits including medical, dental and life insurance and a 401(k) plan.  All employees are bonded at the expense of CSI.  CSI provides all uniforms.  CSI pays for and maintains all telephones and telephone service for the resident manager's office, front desk and intercoms in employee units, boiler room, maintenance shop, exercise

23

and party rooms and housekeeping room.  CSI provides, insures and maintains the truck used to haul trash and pays for all gas for the truck and lawn mowers.  CSI provides full financial services including collection of assessments, assisting owners with accounts, paying bills, mailings, managing cash, producing financial statements and advising the Board on financial matters.   The contract also covers preventive maintenance to each unit three times per year, processing of payroll for security guards and assisting the Association's auditor in performing the annual audit.

Ex. 11, First Owners Assn. of 4600 Duke Budget Narrative (2003) at 1868-1869.[8]

Based on the budget narrative, Mr. Steele allocated 3/12.5 of the Management Contract line item amount of $632,784 to the common expenses.  He selected the fraction 3/12.5 because there were 12 and a half employees, ten full-time and five part-time.  Three of those worked in the office. He allocated the three office-based employees to the general common expenses and the remaining employees to limited common element expenses. He acknowledged that the office staff had multiple responsibilities, but without time records of how they spent their time he could not allocate their time between general common expenses and limited common expenses.  He acknowledged that if he had the requisite records that would allow him to disaggregate the office employee's work, it would be appropriate to do so and he would have done it.  It was not the practice for office employees to keep time records and he had no basis to make such an allocation.  He acknowledged that the condominium was unique, that its assessment allocation process was different from other condominiums.  With respect to the 2003 management contract which included the payroll expenses, he would allocate $151,868 to common expenses of which 11.32% or $17,191.48 would be assessed against the restaurant Street-Front Unit.  There was no narrative to the 2004 budget that recited how many people were included in the management contract but he applied the same fraction to the total cost of the management contract.  Ex. 12.

---

[8]CSI is Condominium Services, Inc., the debtor's affiliate and also a debtor before this court.

The 2005 budget was prepared by a different management company.  Unlike the 2003 and 2004 budgets, the management contract and the payroll were separate line items.  There were in addition to the payroll line item, separate line items for payroll taxes, unemployment taxes, and group health insurance.  Mr. Steele included  $134,414 for salaries of three individuals and $51,065 for the management contract as common expenses.[9]  The $51,065 expense was the full cost of the management contract.  These calculations are not consistent with the 2003 and 2004 calculations for the payroll and management contract expenses.  The three separately enumerated employees do not constitute 3/12.5 of the combined payroll, related expenses and management contract line items which would have been consistent with the 2003 and 2004 calculations.  Nor is the management contract treated the same.  Because both the payroll and the management contract were included in a single line item for 2003 and 2004, 3/12.5 of the management contract was allocated as a common expense.  In 2005, all of the management contract was allocated as a common expense.  Had the same allocation been made in 2005 as in the prior two years, only $12,255.60 of the management contract would have been include as a common expense.

The 2006 budget has a separate line item for the management contract.  Salaries are broken into six types of employees: administrative salaries, maintenance salaries, porter salaries, front desk salaries, security payroll and temporary help.[10]  There are also separate line items for payroll taxes, unemployment taxes and group health insurance.  Mr. Steele treated the entire management contract

---

[9]The three employees and their salaries were not separately set out in the 2005 budget or its narrative description.  Ex. 13.  They were separately identified in Exhibit T although the source of the three salaries is unclear.  Nor is it clear if payroll taxes, health insurance and other employer costs were included in Mr. Steele's calculation.  The salaries totaled $134,414 on Exhibit T.  Exhibit T was submitted by the association as an aide to the court to assist in keeping track of the budget testimony.  It was not admitted into evidence.  Ex. T at 3.

[10]There is a seventh line item, "Rent – Employees."  The narrative states that this is the "Allowance for three association-rented units for critical live-on staff."

and administrative salaries as common expenses.  He did not allocate any portion of the payroll

taxes, unemployment taxes or group health insurance as common expenses notwithstanding that the

budget narrative stated that  the payroll taxes "related to gross wages paid by the Association" were

included.  Ex. 14 at 1934, 1940 and 1941.   Otherwise, the budget narrative  was not helpful in

allocating the administrative staff payroll between common expenses and limited common expenses.

The administrative salaries are more than 3/12.5 (24%) of the total payroll in 2006.  Without

considering any allocable portion of payroll taxes or group health insurance, the 2006 percentage

was 27.809%.  Again, the management contract was included in its entirety.  The 2007 and 2008

budgets generally follow the format and treatment of the 2006 budget.

The association endeavored to prove that no management company has its administrative

employees keep time records as to the various tasks they perform so that the cost of their services

can be allocated between the common expenses as the limited common element expenses.  Mr.

Clagett, the association's manager, testified that he could not make such an allocation because his

job duties varied from day-to-day and year-to-year.  Mr. Clagett was very careful in his testimony.

He took his time in answering questions asked by both the association's counsel and the debtor's

counsel.  His words were carefully chosen.  He gave the appearance to the court that he did not want

to offend either party with his answers.  When asked if he felt his job was in jeopardy, he stated that

he had been told that if the debtor obtained control of the board, he would be dismissed.  It is

necessary to take care in evaluating Mr. Clagett's testimony.  On the issue of whether he as the

general manager could allocate his time between work that benefitted the limited common elements

– that is, the operation of the high-rise building – and work that benefitted all unit owners, the court

places little weight in his testimony.  The association's position was that this could not be reasonably

26

done and he supported that position.  As was brought out in his testimony, he was present and knew

what he did and what the other two administrative staff employees did.  He had minutes of meetings

of the board of directors that reflected work he was responsible for.  He prepared written and oral

reports to the board on his work.  He knew what major projects he was involved in, such as the

renovation of a party room in the high-rise building, a limited common element.  He steadfastedly

maintained that he could not allocate his time without detailed time records which he did not keep.

However, his personal knowledge and the documents available to him would have enabled him to

make a reasonable estimate of the allocation of his time, if he had chosen to do so.

Mr. Cavanaugh testified that it was possible to make an allocation and that he used a 20%

allocation to common expenses and 80% to limited common element expenses at this condominium.

This was based on his experience noting that at this condominium there were no physical common

elements so the common element expenses would be those that were administrative in nature for the

general operation of the condominium as a whole.   Specific duties, such as supervising the

maintenance staff or overseeing the refurbishing of a exercise room or a social room would be

chargeable to the limited common elements because of the nature of this condominium.   In other

condominiums these would be general common expenses, not limited common expenses.   He

testified that a reasonably reliable estimate of the allocation between the two was possible.   The

debtor sought to buttress this conclusion with the testimony of Thomas Williams, a community

manager of 24-years experience.  He had previously worked for CSI and managed the debtor's rental

units.  He testified that an allocation could be made but did not make one.

Mr. Steele's allocation of the management contract and of the payroll expenses between

common expenses and limited common expenses was inconsistent over the five budgets that he

reviewed.  In two budgets, 2003 and 2004, he allocated only a portion of the management contract as a common expense.  In the remaining three years, he accepted the line item description and allocated the entire cost of the management contract to the general common expenses.  None was allocated to the limited common expenses.  In the first two years, he allocated the payroll based on the number of people employed in the office and outside the office.  In the remaining three years, he simply applied the administrative staff line item without further allocation and did not allocate any portion of the payroll taxes or expenses to the administrative staff although they clearly should have been included.  In the first two budgets, he made no attempt to distinguish the actual salaries of the administrative staff.  It is not known if the administrative staff's salary was more or less than 3/12.5 of the total salary expended.

Mr. Cavanaugh agreed that the non-administrative staff salary was not a common expense. In examining the job positions, he opined that the positions related to the operation of the high-rise building and that they did not benefit the Street-Front Units.  The line item descriptions and the narratives fully support this opinion.  The front desk and porter payroll line items were for the sole benefit of the high-rise building.  Mr. Clagett, the general manager of the association, testified as to his duties.  It is plain from his testimony that much of his work only benefitted the Residential and Commercial Units.  Some, such as organizing the annual meeting, benefitted everyone.  A reasonable allocation of Mr. Clagett's and the administrative staff's time can be made between general common expenses and limited common expenses.  It is not necessary that the administrative employees keep daily detailed time records to make this allocation.  A reasonable estimate based on past practices, historical duties and experience is an acceptable basis for such an allocation.  Mr. Steele's allocation does not accomplish this.  He admits that if he had more information he could

have allocated the administrative salaries more precisely.  In later years when the salaries were separated from the management contract, various components of the association's costs were itemized, components that Mr. Steele should have had available for the 2003 and 2004 budgets.  It is also clear that he put all three administrative employees in the general expense category when, in fact, they were primarily performing duties benefitting the limited common elements.  His allocation is not proper and is insufficient to establish the proper allocation of expenses of this line item – one of the largest in the budgets.  Mr. Cavanaugh's allocation of 20% to common expenses and 80% to limited common expenses can be accepted.  His allocation is based on the information he had available and his experience with condominiums and homeowner associations.

The cost of the management contract also must be allocated.  It is clear that some of the contract benefitted the Residential and Commercial Units while other aspects benefitted all units. Mr. Steele made an allocation for 2003 and 2004 based on the number of people employed on the administrative staff but made no allocation in 2005, 2006 or 2007.  This approach is incorrect. There is no justification for allocating some, but not all of the management contracts.

Mr. Cavanaugh would allocate 20% of the costs of the management contracts to general common expenses and 80% to the limited common expenses based on the work performed.  In an analogous situation, preparing tax returns for non-assessment income in condominiums and homeowner associations, he allocates 5% of the management contract to non-assessment income and deducts it as an expense that produces income.  The 5% allocation is generally accepted.  While analogous, it is not the same.  Here, he is allocating common expenses between general common expenses and limited common expenses, not allocating expenses against non-assessment income for

tax purposes. In addition, the structure of this condominium is substantially different from most others. But, apply a similar analysis, he would allocate the management contract on an 80/20 basis.

Mr. Steele does not attempt to allocate any other line item between common expenses and limited common expenses. In every other instance, he characterizes the entire line item as either one or the other. Just as he endeavored to allocate the payroll line item, he should also have reviewed and, where appropriate, allocated the line item itself between the applicable categories. This exercise is not simply to determine what the Street-Front Units assessments are, but also the Residential and the Commercial Unit assessments. Each expense must fall in one of several categories: Residential Limited Common Element Expense, Commercial Limited Common Element Expense, Residential and Limited Common Element Expense, General Common Expense and two types of single-user Limited Common Element Expense. As the Circuit Court held in its Letter Opinion, the association must "accurately record and report all maintenance and operating expenses and reserve expenses and assign each expense, as and when incurred, to whichever of the six categories of Common Elements, as described in Section III and IV of the Declaration, for which those expenses were incurred." Ex. 7, Letter Opinion at 8. Only when this is done can the assessments be properly made as to all units.

Following this analysis, the budgets include categories that do not appear on their face to be appropriate general common expenses. For example, there are income taxes of $18,000 in 2008. Ex. 17 at 6. Income taxes are based on non-assessment income. Condominium assessments are not taxable income to the association. The 2008 budget shows $354,100 of non-assessment income. Ex. 17 at 1. A cursory review shows that almost all, if not all, is derived from limited common elements. The largest single item of non-assessment income is from antenna rent derived from the

antennas located on the highest point of the condominium, the high-rise building which is a limited common element.  The second largest item of income is for in-unit repairs provided by the staff.  There are costs associated with the in-unit repairs that will set off the income.  The $18,000 income tax expense that Mr. Steele charged against the general common expenses is misallocated.[11]  The allocation of income from antenna located on the roof of the high-rise to the Residential/Commercial Limited Common Elements is proper.  The income derived from the limited common elements benefits the owners of those limited common elements, but the income is also charged with the expenses associated with producing it – including income taxes on it.  As presented by the association, the antenna income benefits the Residential and Commercial Unit owners, but burdens the Street-Front Unit owner with 11.32% of the income tax associated with the income.

The insurance expense is another expense that must be allocated.  The entire $85,000 premium for the 2003 multi-peril insurance policy was allocated as a common expense.  In 2004 it was $106,250; in 2005, $94,470; and in 2006, $108,390.  Beginning in 2007, insurance is broken down into several types of insurance: $72,000 for the master policy; $4,000 for directors and officers liability insurance; and $28,000 for excess property insurance.  In 2008 there are insurance losses of $20,500; commercial property insurance for $68,000; general liability insurance for $16,000; directors and officers liability insurance for $4,500; crime insurance for $1,300; and an umbrella policy for $17,200.  The parties stipulated that the condominium's hazard insurance policy does not cover the Street-Front Units.  They carry their own hazard insurance.  Nonetheless, the association

---

[11]There is an income item of $29,000 for rental income of two association-owned units.  Ex. 17 at 1.  The income most likely is attributable to the common elements because the unit themselves are owned by the association.  However, there are expenses that setoff the income.  There were real estate taxes of $3,000 and condominium assessments of $13,000.  Ex. 17 at 4 and 6.  The maximum net non-assessment income is $13,000.  Only a portion of the $18,000 budgeted for income taxes is attributable to this non-assessment income.

argues that there may be some circumstance in which the Street-Front Units could share in a distribution from the insurance policy. The scenario is remote; however, the association argues that since there is a possibility – however remote – that the Street-Front Units may share in some distribution from the insurance policy that the entire cost of the policy is a common expense to be borne by all unit owners.

When the various types of insurance are examined more closely, it is apparent that some of the cost of the insurance is a common expense. For example, the insurance premiums for the directors and officer's liability policy is a common expense. The directors manage the condominium as a whole. The hazard policy, though, because it expressly excludes the Street-Front Units, is not a common expense. To the extent that there is a potential benefit to the Street-Front Units, the premium would be prorated; however, if the benefit is remote and negligible, that portion of the premium would be negligible as well. The association argues that it should be included in its entirety.

The treatment of the insurance illustrates the association's faulty approach. It asserts that if there is any benefit in an expense, the total line item expense is a common expense. It also argues that some are too difficult to prorate accurately. Merely because there may be  a benefit to the Street-Front Units does not make the entire expense a common expense. It must be reasonably allocated. This does not mean that the allocation must have surgical precision. It must be reasonably based on facts that allow the allocation to be made reasonably accurately. In the case of the salary of the general manager and other administrative staff, a survey of the work performed from time to time, a review of the major projects undertaken and other similar information can form a basis for the allocation.

32

The debtor goes through an elaborate analysis of common expenses. It first examines the expense to determine whether it falls within Va.Code (1950) §55-79.83A, common expenses associated with the maintenance, repair, renovation, restoration or replacement of a limited common element. If it does, it is assessed against the owner or the owners of the units to which the limited common element was assigned. If not, the expense is examined to determine whether it falls within Va.Code (1950) §55-79.83B, any other common expense benefitting less than all the condominium unites or caused by the conduct of less than all those entitled to occupy a unit. If it does, it is assessed against the condominium units involved. If not, the expense is examined to determine whether it falls within Va.Code (1950) §55-79.83C, common expenses incurred in making off-site amenities available or providing metered utility services to some or all of the units. If it does, then it is assessed against each condominium unit involved based on consumption of such services. If not, then it is examined to determine whether it falls within Va.Code §55-79.83D. This is the catch-all provision. If it does not fall under Va.Code §55-79.83A, B or C, it falls under D and is assessed against all units proportionately as provided in the condominium documents.

In the end, every expense falls under one of these sections and every line item in the budget will be allocated to one or more of the categories. The only thing certain is that no limited common expense will be assessed against the Street-Front Units because no limited common element is assigned to them. Bylaws Article VIII, §1 is a non-exhaustive list of common expenses that the association may incur. Each must be examined to determine if it is an expense to be allocated as a limited common expense or as a general common expense.

There is one last matter.  In making an assessment, the association's income must be considered.[12]  The condominium assessment is the net amount necessary to pay the projected expenses after taking into account the projected income.  The income must be allocated – or as Mr. Cavanaugh testified, matched – against the category that produces it after also matching the expenditures necessary to produce the income.  For example, the income from the antennas on the high-rise building are allocated to the Residential/Commercial Limited Common Element expense category.  The antennas are attached to and are on the high-rise building, which is a limited common element.  The Street-Front Units do not bear any expense in maintaining them and reap no benefit from their income.

The treatment of the income and expenses related to the three condominium units owned by the association depends on the use of the units.  If they are rented out to third parties in an effort to make a profit, the income and expenses are general common expenses allocated to all unit owners.  If, however, they are used as housing for critical employees whose services may be required for the benefit of the high-rise units at any time of the day or night, the units are essentially a part of the salary of the employees.  Assuming that the employee's salaries are reduced to reflect this benefit, the net expense of the units would be chargeable to the Residential and Commercial Unit Owners.

## C.  Conclusion

---

[12]The association asserts that the consideration of association income is precluded by the Circuit Court's decision.  The Circuit Court did not address this issue.  It was only concerned in its allocation methodology with allocating reserves.  The claim for condominium fees was dismissed as premature.  Association income is included in every budget presented at trial.  The condominium assessments are the net amount necessary – after deducting income – to pay the association's bills.  The Circuit Court did not address income because it was not a part of the allocation of the reserves.

A proof of claim constitutes prima facie evidence of the validity and amount of a claim. Fed.R.Bankr.P. 3001(f). However, the prima facie validity of a proof of claim may be overcome, in which case the burden of proof is on the claimant. *In re Wizard Software, Inc.,* 185 B.R. 512, 521 (Bankr.E.D.Va. 1995); *C–4 Media Cable South, L.P. v. Reds T.V. and Cable, Inc. (In re C–4 Media Cable South, L.P.),* 150 B.R. 374, 377 (Bankr.E.D.Va.1992). The debtor overcame the prima facie validity of the association's proof of claim by showing that the association did not properly allocate the association's income and expenses in making the assessments against the Street-Front Unit. The information necessary to do so was not available to Mr. Steele and the assumptions upon which he relied are not valid.

The burden of proof shifted to the association to show the amount owed to it by the debtor. If failed to bear its burden. The evidence does not allow the court to determine how much the debtor owes the association for properly assessed condominium fees for 2003 through 2009. The court does not have sufficient information to review each line item and prorate it among all the applicable categories. The court is simply unable on the evidence presented to determine whether the debtor paid too much or too little during those years. The burden of proof was on the association and it failed to meet it.[13]

Proof of Claim 2 of First Owners' Association of Forty Six Hundred Condominium, Inc., will be disallowed in its entirety.

Alexandria, Virginia
August 23, 2012

/s/ Robert G. Mayer
Robert G. Mayer

---

[13]The debtor asserts setoffs against the association's claim. Since the claim is disallowed, there is nothing to setoff and the issues raised need not be addressed.

United States Bankruptcy Judge

Electronic copy to Donald F. King

Mail copies to:

Michael S. Dingman
Reed Smith LLP
3110 Fairview Park, Suite 1400
Falls Church, Virginia 22042

Robert M. Marino
Redmon Peyton & Braswell, LLP
510 King Street, Suite 301
Alexandria, Virginia 22314

 First Owners' Association of Forty Six Hundred Condominium, Inc.
4600 Duke Street
Alexandria, Virginia 22304

17894