# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| GORDON PROPERTIES, LLC, and CONDOMINIUM SERVICES, INC., | Case No. 09-18086-RGM (Chapter 11) |
| Debtors. | |
| GORDON PROPERTIES, LLC, and CONDOMINIUM SERVICES, INC., | |
| Debtors, | |
| v. | Contested Matter (Motion to Approve Settlement Docket Entry 498) |
| FIRST OWNERS' ASSOCIATION OF FORTY SIX HUNDRED  CONDOMINIUM, INC., | |
| Creditor. | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the Joint Motion and Memorandum for Order Approving

Settlement Agreement Between Debtors and First Owners' Association of Forty-Six Hundred

Condominium, Inc., and for Related Relief (Docket Entry 498).  For the reasons stated below and

on the record on September 12, 2013, the motion will be denied.

## I.  Background

## A.  The Parties

<u>First Owners' Association.</u>  The three parties to the settlement agreement are First Owners'

Association of Forty-Six Hundred Condominium, Inc. ("FOA") and the two debtors – Gordon

Properties, LLC and Condominium Services, Inc. ("CSI").  The condominium which was formed

in 1975 consists of a sixteen-floor high-rise building and two separate structures fronting on Duke

Street (the "street-front" units) – a gas station and a building presently used as a  restaurant.  There

are a total of 450 condominium units.  The high-rise building consists of 396 residential units and

52 commercial units.  Each street-front structure and described land is a separate condominium unit.

UST Ex. 10. Declaration, Exhibit B, at 273-283.

Gordon Properties.  Gordon Properties owned 41 condominium units when this case was

filed on October 2, 2009.  It owned 31 residential units with an aggregate scheduled value of

$5,546,161; nine commercial units with an aggregate scheduled value of $1,237,324; and the

restaurant street-front unit with a scheduled value of $3,258,715.[1]  Gordon Properties holds about

19% of the votes in the condominium of which about 11% appertains to the restaurant unit.  For the

condominium as a whole, the vote appertaining to individual residential units varies between

0.1050% and 0.3421% and for commercial units averages 0.1917%.  UST Ex. 10. Declaration,

Exhibit D, at 336-339.  Gordon Properties had $337,436.67 in a commercial checking account when

the case was filed.  Gordon Properties is owned by four individuals: Bryan Sells, Lindsay Wilson,

Elizabeth Greenwell and Julia Langdon.  Ms. Langdon is under a disability.  Richard Mendelson and

Lindsay Wilson are her court-appointed conservators.

Gordon Residential Holdings, LLC ("Residential Holdings") is a related entity to Gordon

Properties.  Its owners are the same as the owners of Gordon Properties.  Tr. 8/23/2013 at 285.  It

---

[1]Gordon Properties sold two units early in the case.  It sold Unit 1319, a residential unit, for $199,000.  Order Granting Motion to Sell Real Property entered on October 29, 2009.  (Docket Entry 33).  The unit was unencumbered. Motion for Approval of Sale of Real Property at ¶3.  (Docket Entry 15).  The second unit was Unit 1220, also a residential unit, which sold for $175,250.  Order Granting Motion to Sell Real Property entered on December 17, 2009. (Docket Entry 54).  It was also unencumbered.  Motion for Approval of Sale of Real Property at ¶3.  (Docket Entry 45).

owns Unit 1518 which was conveyed to it by Gordon Properties in 2007. *Id.* at 282, 286.  The unit

is unencumbered. *Id.* at 286.  Brian Sells, the managing member of Gordon Properties, testified that

the purpose of the transfer was to provide a clear basis for Gordon Properties to hold three seats on

FOA's board of directors.[2]   *Id.*   at 282-284.   FOA's bylaws provide that at least one

---

[2]JUDGE MAYER:   When did Residential Holdings acquire its unit?

THE WITNESS:   I don't remember as I'm sitting here today.  I think 2007.  But there are so many dates in this litigation.

JUDGE MAYER:   What was the occasion that it purchased the unit?

THE WITNESS:   I'm not sure.

JUDGE MAYER:   Why did you do it?  What occasioned the purchase?

THE WITNESS:   So that there would be an entity that owned only residential units.

JUDGE MAYER:   Why is that significant?

THE WITNESS:   Because there is a restriction in the documents on residential unit owners and commercial unit owners and the numbers of each that can serve on the board.

JUDGE MAYER:   What is that restriction?

THE WITNESS:   I think there has to be at least one and can only be up to two commercial owners.  I don't remember the exact language.

JUDGE MAYER:   And it's your understanding that Gordon Properties would be a commercial landlord limited to one or two seats?

THE WITNESS:   Well, there is certainly a question about that because Gordon Properties owns residential and commercial so there is a question about whether it would, quote, unquote, count as a commercial unit owner even if the officer or agent of Gordon Properties ran sort of as the representative of one of Gordon Properties' residential units.  And Gordon Residential eliminates that confusion.

JUDGE MAYER:   So the intent on that particular issue was to assure that there would be at least two seats on the board and avoid the limitation on the commercial unit owners sitting on the board?

THE WITNESS:   Well, I would say at least three because commercial unit owners can have two.

JUDGE MAYER:   It's not one or two. It's two, to the best of your recollection?

THE WITNESS:   I think it's no more than two.  And I think there has to be one.  So a minimum of one and a maximum of two, I believe.  The gallery is nodding their heads so I have that right.

JUDGE MAYER:   So the purpose of the Residential Holdings acquiring a residential unit would be so that it, in its own right, could have a representative on the board of directors while Gordon Properties might be subject to the one or two restrictions arising from the commercial positions on the board?

THE WITNESS:   Might be, yes.

JUDGE MAYER:   And this was to eliminate that confusion and to assure that that could be done?

THE WITNESS:   Yes. There may have – I'm sorry, Your Honor. There may have been other reasons as well but that's the one that I recall.

JUDGE MAYER:   And Residential Holdings is owned by the four of you, your sister and your two cousins?

THE WITNESS:   Yes.

JUDGE MAYER:   Who funded the purchase?  Where did the money come from?

THE WITNESS:   It's been so long, I don't recall but –

JUDGE MAYER:   Is it mortgaged?

(continued...)

director must be the owner of a commercial unit, but no more than two directors may be owners of

commercial units.  Bylaws §Art. V, §1.  Jt. Ex. 2; UST Ex. 10.  Since Gordon Properties owned

---

[2](...continued)

| | |
|---|---|
| THE WITNESS: | No, it is not. |
| JUDGE MAYER: | Did the cash come from Gordon Properties? |
| THE WITNESS: | Well, no.  Unit 1518 was previously owned by Gordon Properties. |
| JUDGE MAYER: | 1518 is the Residential one? |
| THE WITNESS: | Yes. |
| JUDGE MAYER: | And it was owned by Gordon Properties? |
| THE WITNESS: | Yes. |
| JUDGE MAYER: | And it was transferred in 2007 to Gordon Residential? |
| THE WITNESS: | Correct.  I think I have the year on that correct. |
| JUDGE MAYER: | So basically – and the 1518 was unencumbered at that time so there was really no cash, you didn't need to go out for financing or anything like that? |
| THE WITNESS: | That's my recollection, Your Honor. |
| JUDGE MAYER: | And you own one unit yourself in your own name? |
| THE WITNESS: | I do. |
| JUDGE MAYER: | And when did you acquire that? |
| THE WITNESS: | I think that was 2009.  It might have been 2008. |
| JUDGE MAYER: | And why did you acquire that? |
| THE WITNESS: | It was in part to own an asset and in part to further get around the – I think it was to get around the poison pill that had been adopted. Although I may actually have the timing on that incorrect. The poison pill may have been adopted in reaction to that. I'm not really sure. |
| JUDGE MAYER: | Well, there was a 2009 resolution you're referring to. |
| THE WITNESS: | Correct. |
| JUDGE MAYER: | Which restricted – aggregated all three of those types, individual, corporate, brother/sister companies or whatever? |
| THE WITNESS: | Correct. |
| JUDGE MAYER: | And that's the one that was repealed on a point of order and there is some question as to whether that was effective and the board, after you became president, plainly repealed it as the board of directors? |
| THE WITNESS: | Correct.  And of course there was also the other reason for me buying a unit and for 1518, now that I think about it – I haven't thought about this in a long time – but it's because the holdover board of FOA had this habit and that habit was every election, it would find some basis for finding that Gordon Properties was delinquent and therefore unable to vote.  And by having a regular old unit, both the 1518 and the 703, my own personal unit, it made it more difficult for them to do that. |
| JUDGE MAYER: | So in addition to the other issues, number of board seats, it got around the delinquency provision in the bylaws that we addressed in an earlier opinion? |
| THE WITNESS: | Right.  And I specifically remember I think it was the 2009 special meeting.  We asked for a special meeting in 2009 and had the special meeting and that's when the board composed those retroactive assessments that were the subject of the claim objection.  And even though the demand letter said they were due on I think it was the first of June and the special meeting was June 25th, the lawyer, FOA's lawyer at the meeting said that they were 30 days delinquent. |

Tr. 8/23/2013 at 282-288.

commercial units, the bylaw restriction would limit it to two seats on the board of directors. The

creation of Residential Holdings and the transfer to it of one residential unit circumvented the

bylaws provision limiting Gordon Properties to two seats on the board of directors and permitted

its representative to be elected to the board as a residential unit owner. In fact, Gordon Properties

and Residential Properties ran about seven candidates for the board of directors at the 2011 annual

meeting, asserting that a non-natural unit owner could designate any number of officers and directors

as its representatives. The Circuit Court of the City of Alexandria enjoined Residential Holdings

from holding more than one seat on the board of directors and this court subsequently ruled that a

non-natural unit owner may only hold one seat on the board of directors. Order entered June 15,

2012. (*Gordon Properties, LLC v. First Owners Ass'n of Forty Six Hundred Condominium, Inc.,*

(Bankr.E.D.Va. Adv. Proc. No. 11-1020, Docket Entry 210).

Mr. Sells purchased Unit 703, a residential unit, in his own name to circumvent the

delinquency provision in the bylaws. Bylaws Art. IV, §7. Tr. 8/23/2013 at 286-287.

After Residential Holdings acquired Unit 1518 and Mr. Sells acquired Unit 703, the board

passed Policy Resolution 2009-03 which aggregated all related entities for purposes of membership

on the board of directors and limited the aggregated entities to one seat on the board. While there

are several unit owners who own two units, the Policy Resolution was directed to Gordon Properties.

Condominium Services, Inc. CSI is a condominium and homeowner management company

wholly owned by Gordon Properties. Gordon Properties valued its investment in CSI at $696,066.74

on its schedules. CSI listed assets of $9,894 and liabilities of $436,802. Schedules B, Personal

Property, and F, Creditors Holding Unsecured Nonpriority Claims. *(In re Condominium Services,*

*Inc.,* Case No. 10-10581-RGM, Docket Entry 21). It also scheduled 15 management agreements

with various condominium and homeowner associations. *Id.* Schedule G, Executory Contracts and Unexpired Leases. CSI's gross income in 2009 was $284,005 and in 2008 was $126,760. *Id.* Statement of Financial Affairs, Question 1.

### B. FOA's Board of Directors.

FOA is governed by a seven-person board of directors. Bylaws, Art. V, §1. The members of the board of directors are elected by the unit owners at their annual meeting. Each director is elected for a two-year term. The terms are staggered so that three expire in one year and four expire in the alternate years. *Id.* Bylaws Art. V,§5. From October 2006 through June 15, 2012, none of the members of the board of directors was affiliated with Gordon Properties. The last election before the October 5, 2011 election was held in October 2006 because no quorum was achieved for the annual meetings held in 2007, 2008, 2009 or 2010. The two-year term of all directors elected in 2005 and 2006 had expired, but they remained in "office until their successors have been elected and hold their first meeting."[3] *Id.* The election at the 2011 annual meeting which was held on October 5, 2011, was held under the supervision of this court. The results of the court-supervised 2011 election were contested. After the contests were resolved by this court, six of the seven candidates with the most votes were affiliated with Gordon Properties. Gordon Properties and FOA agreed prior to the resolution of the election contests that Gordon Properties would be limited to two seats on the board of directors and Residential Holdings to one seat.[4] As a result of this agreement

---

[3]The membership of the board of directors changed between October 2006 and the October 2011 election through resignations. The vacancies were filled by the remaining directors. *Id.* Bylaws, Art. V, §6.

[4]The Circuit Court for the City of Alexandria enjoined Residential Holdings from having more than one seat on the board of directors pending resolution of an arbitration hearing on the matter.

6

and the state court injunction, this court held that Brian Sells, Lindsay Wilson, Elizabeth Greenwell,

Dennis Howland, Lucia Hadley, Dr. F.J. Pepper and Alec Zoghaib were elected.  Four of the newly

elected directors were affiliated with Gordon Properties:  Brian Sells, Lindsay Wilson, Elizabeth

Greenwell and Dennis Howland.[5]   Order entered 6/15/2012.   On July 23, 2013, on further

consideration, the court held that a non-natural unit owner could designate only one individual to

represent it.   Dennis Howland was replaced by Elizabeth Moore.   Order entered on July 23, 2012,

*Gordon Properties, LLC v. First Owners Ass'n of Forty Six Hundred Condominium, Inc.*,

(Bankr.E.D.Va. Adv. Proc. No. 11-1020, Docket Entry 239).  The organizational meeting of the first

new board was held on June 17, 2012.[6]  Officers were elected.  The first board meeting was held on

June 19, 2012.  UST Ex. 16.[7]   Five directors were present: The four Gordon Properties-affiliated

directors and Dr. Pepper.   Ms. Hadley and Mr. Zoghaib were not present.   Three matters of

significance to this case were passed at the meeting.   The board appointed a Special Litigation

Committee.  Administrative Resolution No. 2012-02.  UST Ex. 2.  It terminated the attorneys who

had represented FOA throughout the litigation against Gordon Properties and CSI.  It repealed

Policy Resolution 2009-03 which aggregated all units owned by related persons and entities for

---

[5]Lindsay Wilson and Dennis Howland were representatives of Gordon Properties.  Elizabeth Greenwell was
the representative for Residential Properties.  Brian Sells qualified by his personal ownership of Unit 703.

[6]The board as determined by the order entered on June 15, 2012, which consisted of four Gordon Properties-
affiliated representatives, is referred to as the "first new board."  The board membership changed by the order entered
on July 23, 2012. Mr. Howland was replaced by Ms. Moore leaving three Gordon Properties-affiliated representatives.
The board elected at the October 3, 2012 annual meeting consisted of the four members elected for two-year terms in
October 2011 – Brian Sells, Lindsay Wilson, Elizabeth Greenwell and Lucia Hadley – and three new directors: Jonathan
Halls, William Reichenbach and Martina Hernandez.  Mr. Halls resigned about April 16, 2013.  Tr. 8/23/2013 at 271;
Jt. Ex. 9 at 4.  David Fochtman was elected by the remaining directors to fill the vacancy.  Tr. 8/23/2013 at 272; Jt. Ex. 9
at 4.

[7]United States Trustee Exhibit 16 is an incomplete copy of the minutes of the meeting.

purposes of determining the number of seats that the entities could hold on the board of directors

and limited that to one seat.

The 2012 annual meeting was held on October 3, 2012.  Three new directors were elected:

Martina Hernandez, Jonathan Halls and William Reichenbach.  The three Gordon Properties-

affiliated directors and Ms. Hadley remained on the board to complete their two-year terms.  The

annual meeting and the organizational meeting that immediately followed the annual meeting are

discussed more fully below.  A new SLC was appointed at the organizational meeting on October 3,

2012.  The SLC participated in two days of mediation which resulted in a settlement on December

11, 2012.  The three members of the SLC signed a consent in lieu of a meeting on December 11,

2012, approving a settlement.  The settlement agreement was not reduced to writing until January

2013.  It was considered by the board of directors on January 15, 2013.


## C.  The Claims

CSI managed FOA for many, many years.  It was terminated by FOA in 2006.  Litigation

ensued that resulted in a judgment in favor of FOA against CSI in the amount of $453,533.12.[8]  CSI

appealed the judgment to the Virginia Supreme Court which affirmed the trial court on April 21,

2011.  *Condominium Services, Inc. v. First Owners' Ass'n of Forty-Six Hundred Condo., Inc.,* 281

Va. 561, 709 S.E.2d 163 (2011).  FOA sought to substantively consolidate the Gordon Properties

and CSI cases.  This would assure that its judgment against CSI would be paid in full.  Gordon

Properties prevailed in the bankruptcy court.  FOA successfully appealed the matter to the District

Court where a motion to reconsider is now pending.

---

[8]The judgment was for $91,125.00 for conversion; $275,000.00 for punitive damages on the conversion award;
and $70,667.00 for breach of contract.  The balance of the claim is for interest.

FOA concluded that it had improperly under-assessed Gordon Properties' street-front unit and recalculated the assessment for the prior five years – the maximum permitted by the Statue of Limitations.  It filed a proof of claim in this case to which Gordon Properties successfully objected. *Gordon Properties LLC v. First Owners Ass'n of Forty Six Hundred (In re Gordon Properties, LLC),* 2012 WL 3644788 (Bankr.E.D.Va. 2012).   An appeal is pending in the District Court. Gordon Properties has a motion pending for an award of its attorney's fees.  It requests $198,950.00. (Docket Entry 684).  The matter is pending in the bankruptcy court.    While Gordon Properties did not pay the asserted assessment pre-petition, it paid its post-petition and seeks a refund of the amount it paid.  The settlement agreement gives it a credit of $225,000.

FOA's bylaws prohibit a unit owner who is delinquent in the payment of his condominium fees for more than 30 days from voting at the annual meeting.  Gordon Properties successfully asserted that FOA enforced this provision post-petition in violation of stay and was awarded its attorney's fees incurred in the matter, $277,063.17.  The matter is pending on appeal in the District Court.

Gordon Properties also complained about FOA's assessment of fees against its storage units in the high-rise building asserting that the fees were excessive and not properly computed.

Gordon Properties appealed the bankruptcy court's decision that a unit owner which is not an individual is limited to one seat on the board of directors.  That matter is on appeal to the District Court.   A suit is pending in state court seeking to determine the validity of Policy Resolution 2009-03.  It was referred to arbitration.  Both the state court case and the arbitration are pending.

Gordon Properties has asserted claims against the former board members arising from their conduct relating to enforcement of the bylaws provisions.  It filed a suit in state court against them.

FOA also filed a suit against the directors. Both suits were voluntarily dismissed. Several unit owners filed suit against the three Gordon Properties' owners asserting breach of their fiduciary duties as directors of FOA. That suit was voluntarily dismissed. Travelers Casualty and Surety Company which issued a Non-Profit Management and Organization Liability Insurance Policy denied coverage under its policy. Jt. Ex. 6 at 71-74. The Gordon Properties-affiliated owners have sought indemnification from FOA in connection with this suit. Jt. Ex. 9. Minutes of April 16, 2013 Meeting at 5. The former and current directors of FOA who were sued by Gordon Properties may have indemnification claims against FOA.

## II.  The Settlement Agreement

The parties agreed that:

1.  They would dismiss all pending litigation with prejudice and dismiss all appeals.

2.  The order of this court relating to the number of seats Gordon Properties may hold would be vacated without prejudice to any unit owner contesting the qualification of any particular individual to sit on the board.

3.  CSI would pay FOA $225,000 in full satisfaction of FOA's judgment against it. FOA would pay Gordon Properties $225,000 in full satisfaction of its claim for its post-petition over-assessment of its street-front unit. These claims would be paid by mutual setoff.

4.  FOA would pay Gordon Properties $377,000 in full satisfaction of Gordon Properties' claim for damages for violation of the automatic stay and for attorney's fees related to the claim objection to condominium fees. The amount would be paid in ten semi-annual payments without interest of $37,700.

10

5.  FOA would agree that it would make any future assessments in accordance with the condominium documents and the opinions of the Circuit Court and this court.  The parties would agree that the 2013 budget "identifies the proper budget categories and has been prepared in compliance with" the court-approved methodologies.  There would be an annual assessment cap on the street-front unit of $30,000 which could not be exceeded except with the prior written consent of the owner of the unit, which consent would not be unreasonably withheld.  FOA would not impose on Gordon Properties, Bryan Sells individually or Residential Holdings "any user fee, assessment .  .  . or any other charge" in excess of $200 a year.

6.  FOA would not object to dismissal of Gordon Properties' or CSI's bankruptcy case and would not object to and would vote to accept a plan of reorganization.

7.  In the event of further litigation to enforce the settlement agreement, the prevailing party would be entitled to recover its attorney's fees.

### III.  Standard for Approving a Settlement

The Virginia Supreme Court stated, "The importance of encouraging compromise and settlement is unquestioned in our jurisprudence."  *Mansfield v. Bernabei,* 284 Va. 116, 125, 727 S.E.2d 69, 75 (2012).  The time and expense that has been expended by the parties to these disputes well illustrates the wisdom of this principle.  The dynamics and parties affected by settlements in bankruptcy cases is different from the those in non-bankruptcy two-party cases and are subject to bankruptcy court review and approval.  Fed.R.Bankr.P. 9019.  The bankruptcy court's role in approving a settlement is rooted in the Supreme Court's decision in *Protective Committee for*

11

*Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157

(1968).  The Supreme Court stated:

> Compromises are 'a normal part of the process of reorganization.'  In administering
> reorganization proceedings in an economical and practical manner it will often be
> wise to arrange the settlement of claims as to which there are substantial and
> reasonable doubts.  At the same time, however, it is essential that every important
> determination in reorganization proceedings receive the 'informed, independent
> judgment' of the bankruptcy court.  .  .  .  The fact that courts do not ordinarily
> scrutinize the merits of compromises involved in suits between individual litigants
> cannot affect the duty of a bankruptcy court to determine that a proposed
> compromise forming part of a reorganization plan is fair and equitable.  There can
> be no informed and independent judgment as to whether a proposed compromise is
> fair and equitable until the bankruptcy judge has apprised himself of all facts
> necessary for an intelligent and objective opinion of the probabilities of ultimate
> success should the claim be litigated.  Further, the judge should form an educated
> estimate of the complexity, expense, and likely duration of such litigation, the
> possible difficulties of collecting on any judgment which might be obtained, and all
> other factors relevant to a full and fair assessment of the wisdom of the proposed
> compromise.  Basic to this process in every instance, of course, is the need to
> compare the terms of the compromise with the likely rewards of litigation.

*Id.* 390 U.S. at 424-425; 88 S.Ct. at 1163 (citations omitted).  While *TMT Trailer Ferry* was decided

under the Bankruptcy Act of 1898, the principles continue to apply under the Bankruptcy Code of

1978.  "The nature of a bankruptcy case imparts upon the bankruptcy court a duty to scrutinize

settlements in a more exacting manner than would be warranted in a two party context."  *In re*

*Merry-Go-Round Enterprises, Inc.,* 229 B.R. 337, 347 (Bankr.D.Md. 1999).  The Court of Appeals

for the Sixth Circuit elaborated in *Reynolds v. Commissioner of Internal Revenue* stating:

> In considering a proposed compromise, the bankruptcy court is charged with an
> affirmative obligation to apprise itself of the underlying facts and to make an
> independent judgment as to whether the compromise is fair and equitable. *In re*
> *American Reserve Corp.,* 841 F.2d 159, 162-63 (7th Cir. 1987).  The court is not
> permitted to act as a mere rubber stamp or to rely on the trustee's word that the
> compromise is "reasonable." *Id.* at 162.

*Reynolds,* 861 F.2d at 473.

It is not necessary for the bankruptcy court to conduct a "mini trial." *In re WorldCom, Inc.,* 347 B.R. 123, 137 (Bankr.S.D.N.Y. 2006). "The Court need only 'canvass the issues' to determine if the 'settlement falls below the lowest point in the range of reasonableness.'" *Id.* (quoting *In re Teltronics Serv., Inc.,* 762 F.2d 185, 189 (2nd Cir. 1985)).

These standards are applied by this court. *In re Frye,* 216 B.R. 166 (Bankr.E.D.Va. 1997); *Wood v. Cumulus Broadcasting LLC (In re Wood),* 2008 WL 2244972 (Bankr.E.D.Va. 2008). *Frye* describes the analysis required to approve a settlement. The trustee entered into an oral settlement agreement and noticed it for approval under Fed.R.Bankr.P. 9019. Before approval of the settlement by the court, the counterparty sought to withdraw from the settlement. The bankruptcy court held that there were two separate questions that must be addressed:

> There are two issues to be addressed. First, whether the oral agreement . . . between the parties is binding . . . Second, should the trustee be granted the authority to compromise the claim.

*Frye,* 216 B.R. at 168.

"In order to grant the trustee the authority to compromise a claim, an agreement or at least a proposed agreement must be in place between the parties." *Id.* at 170. To satisfy this requirement, the bankruptcy court first found that state law governed whether there was an oral contract. It then had to determine, if it found that there was a settlement agreement, whether it was legally enforceable. In determining whether there was a settlement agreement, it discussed the elements of contract formation – offer, acceptance, consideration and clarity. Concluding that the requisite elements were present, it then inquired whether it was enforceable. It found that the oral agreement was enforceable and proceeded to the second step in the approval analysis.

13

The second step was to determine whether to approve the settlement under Rule 9019.  The court stated:

> In order to approve a compromise, this court must look at various factors and determine whether the compromise is in the best interest of the estate and whether it is fair and equitable.

*Id.* at 174.  The test is in the conjunctive: The proposed settlement must be both (1) in the best interest of the estate and (2) fair and equitable.  The court listed four typical factors to determine whether the proposed settlement agreement was in the best interests of the estate:  the probability of success in litigation, the potential difficulties in collection, the complexity of the litigation including the cost, inconvenience and delay, and the "paramount interest of the creditors."   It prefaced the list with the statement that "These factors include" – a preface that indicates that the listed factors are not the only factors that may be considered.

After the bankruptcy court found that proposed settlement was in the best interest of the estate, it examined the second prong of the Rule 9019 test.  "The trustee then has the burden of persuading the court that the compromise is fair and equitable and should be approved."  *Id.* at 174.  In *Frye,* the task was not particularly difficult.  The trustee compromised a $200,000 judgment that was on appeal to the Supreme Court of Virginia for $100,000.  Before the bankruptcy court approved the compromise, the Virginia Supreme Court reversed the judgment and remanded it for a new trial.

*In re Riggs,* 2006 WL 4667128 (Bankr.D.Md. 2006) follows the same analysis.  There, the court stated that it:

> must decide the following questions, based on the evidence presented: (1) whether the parties entered into a contract to settle the pending litigation between them, (2) if a contract exists, whether it is enforceable, and (3) if the contract is enforceable,

14

whether the Court should approve it under Rule 9019 of the Federal Rules
Bankruptcy Procedure.

*Id.* at *4.

### A.  Is the Settlement Agreement a Valid and Enforceable Agreement?

### 1.  Was the Settlement Agreement Approved
### by the Affirmative Vote of a Majority of the Disinterested Directors?
### (Va.Code (1950) §§13.1-371(A)(1)  and (B))

### a.  Burden of Proof.

The first question is whether the settlement agreement is a valid and enforceable agreement?

The resolution of this issue focuses on FOA, more particularly, whether its board of directors

properly approved the settlement agreement.  The burden of proof is on the trustee who in this case

is the debtor in possession, Gordon Properties.  *Frye,* 216 B.R. at 170.  Gordon Properties is seeking

approval of the settlement agreement on behalf of the bankruptcy estate as a whole.  This is

complicated by the nature of the issue presented, director's duties.  Va.Code (1950) §§13.1-870 and

-871.  The Virginia Supreme Court addressed the differing burdens to invalidate a corporate action

under the Virginia Stock Corporation Act in *Izadpanah v. Boeing Joint Venture,* 243 Va. 81, 412

S.E.2d 708 (1992) (applying Va.Code (1950) §13.1-690 and §13.1-691).  It held that:

> a party challenging the actions of the board of directors has the burden of proving
> that the challenged action was not undertaken in accordance with the directors' good
> faith business judgment of the best interests of the corporation.  Code §13.1-690(D).
> However, when a conflict of interest as defined in § 13.1-691 exists, such as
> Izadpanah presented here, the burden shifts to the directors to show that their actions
> complied with the requirements of that section. *Giannotti v. Hamway,* 239 Va. 14,
> 24, 387 S.E.2d 725, 731 (1990).

*Izadpanah,* 243 Va. at 83, 412 S.E.2d at 709.  Generally, a trustee is not required to show that a

counterparty's board of directors complied with Va.Code (1950) §13.1-870.  The burden rests on

the party seeking to show the invalidity of the corporate act.  §13.1-870(D) ("A person alleging a

violation of this section has the burden of proving the violation.").  However, if the party objecting

to the settlement shows that there is a conflict of interests, then Va.Code (1950) §13.1-871 becomes

applicable and the trustee must show that one of the requirements of §13.1-871 is satisfied.

*Wometco Enterprises, Inc. v. Norfolk Coca-Cola Bottling Works, Inc.,* 528 F.2d 1128, 1129 (4th Cir.

1976).  As a practical matter, one expects that the corporation will be aligned with the trustee in this

regard.

A conflict of interests transaction is defined in §13.1-871(A) as "a transaction with the

corporation in which a director of the corporation has an interest that precludes the director from

being a disinterested director."  Va.Code (1950) §13.1-871(A).  "Disinterested director," in turn, is

defined in Va.Code (1950) §13.1-803:

> "Disinterested director" means . . . a director who, at the time action is to be taken
> . . . does not have (I) a financial interest in a matter that is the subject of such
> action or (ii) a familial, financial, professional, employment or other relationship
> with a person who has a financial interest in the matter, either of which would
> reasonably be expected to affect adversely the objectivity of the director when
> participating in the action . . . . The presence of one or more of the following
> circumstances shall not by itself prevent a person from being a disinterested director:
> (a) nomination or election of the director to the current board by any person, acting
> alone or participating with others, who is so interested in the matter or (b) service as
> a director of another corporation of which an interested person is also a director.

As applied to this case, Gordon Properties as the debtor in possession does not have the

burden to show that the FOA's board of directors' action in approving the settlement agreement

complies with §13.1-870; but, because the transaction is patently a conflict of interests transaction,

it has the burden of showing that one of the requirements of §13.1-871 has been satisfied.

There is one further detail.  The mere allegation of a conflicts of interest is not sufficient.

The objecting party must actually show that there is a conflict of interests.  *Willard v. Moneta*

*Building Supply, Inc.,* 258 Va. 140, 154 n13, 515 S.E.2d 277, 286 n13 (1999).  Here, the United

States Trustee objected to the approval of the settlement agreement.  She has the burden of showing that this is a conflict of interest transaction by showing that there was at least one director who was not disinterested.  That fact is obvious in this case and Gordon Properties acknowledges it.  The United States Trustee's burden was easily met.  Even if the United States Trustee had not objected to the settlement agreement, in this case the burden would shift to the debtor in possession, Gordon Properties, simply because of the obviousness of the conflict.

Part of Gordon Properties' case rests on the number of disinterested directors. Were there three or four?  More particularly, was Ms. Hadley a disinterested director?  In proving that the transaction satisfied §13.1-871(A)(1), that the transaction was approved by the disinterested directors, Gordon Properties has the burden of establishing who was and who was not a disinterested director and how each voted.  *Id.*

### b. Gordon Properties Position

Gordon Properties asserts that the settlement agreement was approved by the FOA board of directors at its January 15, 2013 regular board meeting by a vote of two disinterested directors.  The minutes recited that Ms. Hernandez and Mr. Reichenbach voted in favor of the settlement agreement; that Mr. Halls abstained; and that Ms. Hadley was not present.  The three Gordon Properties-affiliated directors, Mr. Sells, Ms. Greenwell and Ms. Wilson, all abstained.  They assert that Ms. Hadley was not a disinterested director.  Thus a majority of the disinterested directors approved the settlement agreement under §13.1-871(A)(1) and (B).[9]

---

[9]As a fall-back argument, Gordon Properties asserts that even if Ms. Hadley is a disinterested director, the majority of the disinterested directors voting approved the transaction.  The statute does not support that construction. Section 13.1-871(B) provides that the safe harbor provision is applicable only if the transaction receives "the affirmative (continued...)

### c.  Was Ms. Hadley a Disinterested Director?

The transaction under consideration is the board of director's January 15, 2013 vote on the approval of the proposed settlement agreement dated December 11, 2012.[10]  Ms. Hadley's disinterestedness is determined at the time the vote was taken.  Va.Code (1950) §13.1-803.  The vote was taken between 9:15 p.m. and 9:30 p.m. on January 15, 2013.[11]  Jt. Ex. 7 at 8.  At that time, did Ms. Hadley have "a financial interest in a matter that is the subject of such action . . . which would reasonably be expected to affect adversely the objectivity of the director when participating in the action?"  Va.Code (1950) §13.1-803.

Gordon Properties asserts that she did.  It asserts that:

At the time of the January 15 meeting and ratification vote, Ms. Hadley had a financial interest in the Settlement Agreement.  Not only did the Settlement Agreement specifically carve out certain claims against her personally, Ms. Hadley also was a named defendant in two separate lawsuits involving the subject matter of the settlement – the first by Gordon Properties for the same improper conduct that resulted in the sanctions and damage award against FOA which are the subject of the Settlement Agreement, and the second by FOA for breach of fiduciary duty for having participated in the unlawful scheme that led to its obligation to pay the sanctions and damage award.  Ms. Hadley participated in the conduct that violated the automatic stay, leading to the sanctions and damage award against FOA, and leading to the breach of fiduciary claims against her by both Gordon Properties and FOA.  Moreover, the Settlement Agreement that Ms. Hadley was being asked to vote

---

[9](...continued)
vote of a majority of the disinterested directors on the board of directors."  The statute is clear.  The votes must be "affirmative" votes, not abstentions or absences.  And, it is a "majority of the disinterested directors on the board of directors," not just those present at the meeting.  Here, if Ms. Hadley is a disinterested director, two voted in favor and two did not vote.  The settlement agreement received the support of two of four disinterested directors, that is, half of the disinterested directors, but not a majority.

[10]Ms. Hadley's disinterestedness was discussed at other board meetings in other contexts, principally in whether she could serve on the Special Litigation Committee that was suppose to control the litigation and, if possible, settle it.  While those issues are closely related, this case concerns one specific transaction – the approval of the settlement by the board of directors on January 15, 2013.  Ms. Hadley was not on the SLC and did not negotiate the settlement agreement.

[11]Her presence or absence at the vote is irrelevant.

18

        upon would end the appeal of that judgment, thereby preserving the claims against
her by both Gordon Properties and FOA.

Joint Objections to Examiner's Report at 5-6 (footnotes omitted) (Docket Entry 662).

        Gordon Properties offered no evidentiary support for its assertions except copies of the complaints in the two suits it referred to and references to the opinions, orders and other papers filed in the various proceedings in this and other courts.[12]  Jt. Ex. 10 and 11.  The reference to the "carve out [of] certain claims against her personally" referred to the claims included in the two suits.  The starting point is to examine the two lawsuits notwithstanding that the complaints are only allegations and themselves are insufficient to show that Ms. Hadley was not a disinterested director.  The sufficiency of the allegations can be tested against the prior proceedings in this court.

        Both suits raised similar issues.  They revolve around the 2009 and 2010 annual meetings, the bylaws provision prohibiting delinquent members from voting and the impact of the automatic stay.  Gordon Properties' essential assertion in both cases was that FOA was enforcing its bylaw provision that prohibited unit owners delinquent for more than 30 days from voting and that this violated the automatic stay.  Bylaws Art. IV, §7.  Jt. Ex. 2.

        This court addressed both meetings, the 2009 meeting in *Gordon Properties, Inc. v. First Owners Ass'n of Forty Six Hundred Condominium, Inc.,(In re Gordon Properties, LLC),* 435 B.R. 326 (Bankr.E.D.Va.2010) *aff'd* 2011 WL 2159715 (4th Cir.2011), and the 2010 meeting in *Gordon Properties, LLC v. First Owners Ass'n of Forty Six Hundred Condominium, Inc., (In re Gordon Properties, LLC)*, 460 B.R. 681 (Bankr.E.D.Va. 2011).  In the first case, FOA was the only

---

[12]Gordon Properties noted that its suit against Ms. Hadley was non-suited prior to the January 15, 2013, meeting and vote, but that "the cause of action was still alive on January 15 because the period for re-filing had not yet expired." *Id.* at 5 n. 8.  The original statute of limitations expired in early October 2012, but Virginia procedure extends the statute of limitations for six months after a suit is voluntarily dismissed.  It appears that no suit was filed within the six-month period and that the statute of limitations has now run as to Gordon Properties.

defendant.  In the second case, six of the seven members of the board of directors – one of whom was Ms. Hadley– and the chair of the elections committee were also defendants.  The individual defendants were dismissed because this court did not have jurisdiction over the claims asserted against them.  Memorandum Opinion (Docket Entry 43) and Order (Docket Entry 47).  There was, therefore, no adjudication of any of the matters asserted against the individual defendants.

The 2009 annual meeting was addressed in the first case, Adv. Proc. No. 09-1304.  The meeting was duly called and the members assembled.  The chair of the Election Committee, Kevin Broncato,  advised the president who was chairing the meeting, Dewanda F. Cuadros, that there was no quorum.  Mr. Broncato and Jane Brungart sought recognition to make a motion, Mr. Broncato to move that the meeting be adjourned *sine die* and Ms. Brungart to move that the meeting be briefly adjourned to a date certain so that additional members could be contacted and an attempt be made to obtain a quorum.  Mr. Broncato's motion essentially cancelled the annual meeting and left the incumbent board, all of whose two-year terms had expired and were holding over until their successors were elected, in office until the 2010 annual meeting.  The Chair recognized Mr. Broncato and declared, on a voice vote, that his motion carried.  In fact, Ms. Brungart, Ms. Hernandez and Ms. Wilson all voted against the motion.  They accounted for a very clear majority of the votes present at the meeting.  The meeting was adjourned *sine die*.  This court found that while the meeting had been improperly conducted, it was not an attempt to enforce the bylaws provisions and, therefore, the automatic stay had not been violated.  This court opined that the bylaws provision, if enforced, would constitute a violation of the automatic stay.  The District Court noted that this finding was not essential to the decision and would not be binding on the parties in any future proceeding.  The court is unable to find Ms. Hadley's name in the complaint or the

amended complaint (Docket Entries 1 and 15), the court's Memorandum Opinion (Docket Entry 35) or the transcript of the hearing held on December 18, 2009. (Docket Entry 33). She was not a witness at the hearing.

The second suit, Adv. Proc. No. 11-1020, addressed the 2010 annual meeting. Unlike the 2009 annual meeting, the 2010 annual meeting was cancelled days before it was scheduled to be held. A flyer was circulated throughout the building stating that an HDTV would be given away at the end of the 2010 annual meeting to a unit owner who attended the meeting. The unit owner would be selected from a drawing of all those present in person or by proxy. The flyer asked that proxies be completed and mailed to an address. The building manager called FOA's attorney because he was concerned about the effect of the flyer on the meeting. The board met a few days later and its attorney orally opined that the flyer could constitute an unlawful lottery. He opined that it would be impossible to determine which proxies might be tainted by the flyer and that the better practice would be to postpone the meeting. He also noted that the board was on the horns of a dilemma with respect allowing Gordon Properties to vote at the annual meeting. On the one hand, he opined, the bylaws prohibited it since Gordon Properties had not paid the corrected assessment. On the other hand, refusing to allow Gordon Properties to vote could violate the automatic stay. The board requested a written opinion which counsel provided and met again several days later to consider the written opinion and the matter. Counsel advised, in writing, that:

> [W]e believe that the solicitation is improper and may violate state and local laws. Any proxies obtained via the solicitation are invalid. Accordingly, the Board should postpone the meeting to reissue new proxy forms to ensure the validity of all proxies to be used at the Annual Meeting.

With respect to the dilemma, counsel advised:

> Notwithstanding the Association's efforts to obtain a binding court decision on this
> issue, the conflict between the apparent holding by Judge Mayer in the Bankruptcy
> Court and the clear provisions of the Association's Bylaws poses an insoluble
> dilemma for the Board and the Association which almost forces the Association to
> choose among alternatives which are all fraught with risk. Avoiding the dilemma by
> postponing the meeting also poses a risk that a unit owner may challenge the
> postponement itself, but we believe that this alternative poses the least risk to the
> Association.

*Gordon Properties, Inc. v. First Owners' Ass'n,* 460 B.R. at 689.  The board accepted the advice and postponed the 2010 annual meeting.  The meeting was never rescheduled.

The court found that FOA violated the automatic stay.  The board of directors knew of the bankruptcy, knew of the automatic stay and knew that the effect of the postponement of the annual meeting could be a means to bring pressure on Gordon Properties to collect the revised assessment.

The two lawsuits on which Gordon Properties base Ms. Hadley's interest in the settlement agreement contain no new material allegations not contained in the two adversary proceedings. There is no specific allegation as to Ms. Hadley.  The complaints do not even allege that Ms. Hadley was present at the 2009 annual meeting.

Gordon Properties' argument has difficulties.  First and foremost, Ms. Hadley does not gain anything by this settlement agreement.  The claims that Gordon Properties asserts against her and that FOA may assert against her were "carved out" of the settlement agreement itself.  She receives no financial benefit by approving the settlement agreement.  Gordon Properties acknowledges this, but responds that her liability is "locked in."  By this, it means that the opportunity for the decisions adverse to FOA to be reversed is forever lost because all appeals and suits will be dismissed. Gordon Properties assumes that Ms. Hadley's ability to escape liability is thereby foreclosed, that it will simply be a matter of repeating the same evidence this court heard and that the same result will be obtained.

It is not likely that the doctrines of claim preclusion or issue preclusion will be applicable in any suit against Ms. Hadley. She was not a party to either adversary proceeding.[13] The cases are substantially different. The two adversary proceedings were stay violation cases. The claims against Ms. Hadley and the former directors are breach of the standards of conduct for directors. A board that errs in a decision that creates a liability on the corporation does not *ipso facto* create personal liability on the directors for making the erroneous decision. While what transpired at the 2009 annual meeting is not substantially in doubt – the conduct at the 2009 annual meeting and the board's action in postponing the 2010 annual meeting are fairly well documented – the challenge is showing that the conduct was a breach of Ms. Hadley's duties as a director to FOA.

Gordon Properties construes the results in the adversary proceedings in the light most favorable to itself and the objectives it seeks to achieve. With respect to the 2009 annual meeting, Gordon Properties fails to see the difference between an act of the board of directors and the independent acts of individuals who may have been directors at the time. The essence of the ruling in the adversary proceeding dealing with the 2009 annual meeting is that the improper conduct was the conduct of the chair, not of FOA or its board of directors. There was insufficient evidence to show that FOA through its board directed or orchestrated the conduct. There was testimony that members of the board deliberately failed to register so that they would not be counted for quorum purposes. There was testimony that this was discussed among the membership. But, there was insufficient testimony to show that individual members agreed upon this strategy much less that the board adopted it. There was no evidence that Ms. Hadley had anything to do with it. There was no evidence at the hearing on the approval of the settlement agreement that supported Gordon

---

[13]She was dismissed in the second adversary proceeding at the beginning of the case because this court had no jurisdiction over the claims against her.

Properties' assertions against Ms. Hadley as to the 2009 annual meeting.  Nor has Gordon Properties

directed the court's attention to anything in the record of this case or any adversary proceeding –

records with which the court is familiar – that supports its allegations as to the 2009 annual meeting.

The court concludes that the allegations in the lawsuits as to Ms. Hadley that relate to the 2009

annual meeting are without sufficient evidentiary basis to find that she has an interest in the

settlement agreement arising from the assertions against her relating to the 2009 annual meeting to

cause her not to be disinterested.

The allegations with respect to the 2010 annual meeting face a different challenge, the safe

harbor provisions of Va.Code (1950) §13.1-870.[14]  Officers and directors of corporations are

responsible for the proper management of their corporations.  When things do not go well for the

corporation or for those who deal with the corporation or when members or shareholders disagree

with the decisions of the board or would like the board to follow a different course of conduct, the

---

[14]Va.Code (1950) §13.1-870 provides:

A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.

B. Unless a director has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

　　　1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;

　　　2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or

　　　3. A committee of the board of directors of which the director is not a member if the director believes, in good faith, that the committee merits confidence.

C. A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.

D. A person alleging a violation of this section has the burden of proving the violation.

directors and officers are increasingly likely to be named as defendants in suits asserting breach of their duties to the corporation.  While it is necessary and desirable to hold directors and officers accountable, it is also necessary that directors and officers have sufficient flexibility to make appropriate corporate decisions without fear of being sued.  The issue is "the balance struck, under various circumstances, between the need to hold directors and officers accountable to shareholders, and the need to provide flexibility within which corporate managers can make business decisions, in good faith, without fear of liability."  Adamski & Brodsky, Law of Corporate Officers and Directors: Rights, Duties and Liabilities, §1:1 ( 2013).  Corporate law reflects this tension.  Section 13.1-870 is part of the balance.  It provides a safe harbor for actions taken by the directors of FOA.

Section 13.1-870 sets out the general standard of conduct for directors: the "good faith business judgment of the best interests of the corporation," §13.1-870(A).  It expressly enables directors to rely on various reports and opinions, particularly professionals and other experts, including lawyers and accountants.  A director may also rely on a committee of the board of directors.  §13.1-870(B).  Reliance cannot be blind reliance.  Reliance is protected unless the director "has knowledge or information concerning the matter in question that makes reliance unwarranted."  §13.1-870(B).  A director may rely on a committee of the board of directors if the director "believes, in good faith, that the committee merits confidence."  §13.1-870(B)(3).

Section 13.1-870 was designed especially for disputes like the ones in this case where one party, Gordon Properties, is using every means available to influence FOA's board of directors to moderate its position toward it and come to a resolution of the disputes between them in a manner acceptable to it.  In this regard, it has filed at least two suits against individual directors who voted to take action that was unacceptable to it and continues to hold out the prospect of further suits.

25

Gordon Properties is certainly entitled to hold the board members individually liable if they breach their duties as directors. But the directors are also entitled to make their decision in their good faith business judgment of the best interests of the corporation without fear that they will be sued. Section 13.1-870 addresses the tension between these rights.

The allegations relating to the circumstances surrounding the cancellation of the 2010 annual meeting follow *Gordon Properties, LLC v. First Owners Ass'n of Forty Six Hundred Condominium, Inc.,* 460 B.R. 681 (Bankr.E.D.Va. 2011). As a result of these acts, Gordon Properties concludes that Ms. Hadley and others violated their duties to FOA as directors. It is important to note, however, that the claims made in the adversary proceeding tried before this court and the allegations made by Gordon Properties and FOA in their suits against the directors are very different. FOA was the only defendant in the adversary proceeding. The individual directors were dismissed early in the proceeding. Gordon Properties' suit and FOA's suit are against the directors individually. The adversary proceeding is unlikely to have any claim preclusive or issue preclusive effect on an action against the individual directors. More importantly, the adversary proceeding sought to determine whether the action of the board of directors violated the automatic stay. The two suits sought to determine whether the individual directors are liable for making that decision.

Some of the factors that led this court to decide that there was a violation of the automatic stay were the prior efforts of the board to collect the correct assessment including the prior suit in state court; the enforcement of the bylaws provision prior to the filing of the bankruptcy petition; the prior decision of this court – although not a binding determination – that enforcement of the bylaws provision would violate the automatic stay; the knowledge of the filing of the bankruptcy

case; the knowledge of the automatic stay; and counsel's advice that postponing the annual meeting might be a violation of the automatic stay.

The focus in this case is the ability of a director to rely on the advice of counsel. Section 13.1-870(B)(2) expressly protects a director if he relies on the advice of counsel provided that the director "believes, in good faith" that the advice is "within the person's professional or expert competence" unless he has "knowledge or information concerning the matter that makes reliance unwarranted." Va.Code (1950) §13.1-870(B) and (B)(3). While the complaints omit any reference to the advice of counsel, FOA's complaint refers to this court's decision which discussed the advice of counsel.

Advice of counsel is not a defense to a stay violation although it may be a factor in fashioning a remedy or making an award of damages.[15] This court stated:

> It is also important to emphasize that while advice of counsel may be relevant in determining a sanction, it is not relevant in determining whether there has been a stay violation. "Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful'." *Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989) (quoting *INSLAW, Inc. v. United States (In re INSLAW, Inc.),* 83 B.R. 89, 165 (Bankr.D.D.C.1988)); *Fleet Mortg. Group, Inc. v. Kaneb,* 196 F.3d 265, 269–70 (1st Cir.1999) ("A good faith belief in a right to the property is not relevant to a determination of whether the violation was willful."); *In re Manuel, 212 B.R. 517* (Bankr.E.D.Va.1997) ( "The court accepts [the creditor's] evidence that he did not believe he was in violation of the stay by failing to dismiss the garnishment. However, his belief does not preclude a finding of willful violation."). A party's violation of the automatic stay may be unknowing or may be knowing and willful. In either case, the automatic stay is violated. His conduct may be the result of advice of counsel, but it is the conduct that violates the stay.

*Gordon Properties, LLC v. First Owners Ass'n of Forty Six Hundred Condominium, Inc.,* 460 B.R. 681, 691-692 (Bankr.E.D.Va. 2011).

---

[15]The court denied Gordon Properties' request for punitive damages and awarded only attorney's fees, which were substantial.

Counsel's advice laid out the dangers that the board faced with respect to the automatic stay.

With respect to the flyer, counsel stated in his summary response:

> [W]e believe that the solicitation is improper and may violate state and local laws. Any proxies obtained via the solicitation are invalid. Accordingly, the Board should postpone the meeting to reissue new proxy forms to ensure the validity of all proxies to be used at the Annual Meeting.

*Id.* at 689.

With respect to the enforcement of the bylaws voting provision, counsel's summary response

stated that without a final decision on the enforceability of bylaws voting provision,

> the Board is placed in the untenable position of potentially violating the stay, and subjecting the Association to sanctions and other penalties if [the debtor] is not allowed to vote, or allowing [the debtor] to vote in violation of the Bylaws and the Condominium Act and potentially having to throw out the results of any election if the appellate court subsequently agrees that enforcement of the Bylaws as to [the debtor] does not violate the automatic stay. Notwithstanding the Association's efforts to obtain a binding court decision on this issue, the conflict between the apparent holding by Judge Mayer in the Bankruptcy Court and the clear provisions of the Association's Bylaws poses an insoluble dilemma for the Board and the Association which almost forces the Association to choose among alternatives which are all fraught with risk. Avoiding the dilemma by postponing the meeting also poses a risk that a unit own may challenge the postponement itself, but we believe that this alternative poses the least risk to the Association.

*Id.* at 689-690. Based on this evidence, together with the other evidence presented, the court found

that there was a violation of the automatic stay.

Finding that the board violated the automatic stay is not the same thing as finding that the

board breached its duties to FOA in making that decision. Section 13.1-870 is designed to protect

directors faced with difficult decisions, particularly when confronted with what counsel

characterized as "an insoluble dilemma." In deciding whether a director violated his duty, Virginia

courts look to the good faith decision-making process rather than the quality of the decision itself.

The Virginia Supreme Court stated:

> [I]n Virginia, a director's discharge of duties is not measured by what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision. Instead, a director must act in accordance with his/her good faith business judgment of what is in the best interests of the corporation.

*Willard v. Moneta Building Supply, Inc.,* 258 Va. 140, 151, 515 S.E.2d 277, 284 (1999) (applying Va.Code (1950) §13.1-690).

> The Supreme Court elaborated on the standard:

> [W]e agree with the circuit court's judgment that [the directors] engaged in an informed decision-making process. Pursuant to Code § 13.1-690(B), a director can rely on information and opinions from, *inter alia,* legal counsel, accountants, and other experts unless the director has knowledge that such reliance is unwarranted. Thus, a director may use an informed decision-making process in discharging the duties of the office as long as the director does so in good faith. See *WLR Foods,* 65 F.3d at 1185. When a director resorts to such a process, the ultimate decision must still reflect the director's "good faith business judgment of the best interests of the corporation" in order to receive the benefit of the "safe harbor" afforded in Code § 13.1-690(C).

*Id.* 258 Va. at 152, 515 S.E.2d at 285.

The directors are not liable if they engage in an informed decision-making process in good faith. One aspect of an informed-decision making process is advice from professionals. It is the reliance on the advice, unless reliance is unreasonable, that is the key. The quality or the correctness of the advice is not material.

> Because the objective reasonableness of a director's decision or conduct is not a relevant inquiry under §13.1-690, we also conclude that the circuit court correctly held that [plaintiff] was not entitled to discover the substance of certain legal and financial advice that the [directors] received. *See WLR Foods,* 65 F.3d at 1187.

*Id.* 258 Va. at 153 n12, 515 S.E.2d at 286 n12. This court's discussion of counsel's advice would not be a part of a suit against a director who relied upon it. While Gordon Properties might assert that reliance was unreasonable, the assertion would likely not be well received. Counsel properly presented the competing positions and then recommended postponement until an appeal was

29

decided.  He warned the board that postponement posed its own risks.  Although he did not warn that postponement itself could violate the automatic stay, he warned about a unit owner objecting to the postponement.  There was nothing in the advice itself that made reliance unwarranted.

There was nothing wrong with the board wanting to collect what it believed was a legitimate condominium fee delinquency.  In fact, a board could be criticized for not making reasonable efforts to collect delinquent condominium fees.  Nor was there anything inherently wrong in enforcing the bylaw provision to bring pressure on Gordon Properties to pay the assessment.  Indeed, the director's responsibility is to collect condominium fees.  This responsibility was an inextricably entwined consideration when deciding what to do about the flyer, the annual meeting and enforcing the bylaws provision.  It does not matter whether Gordon Properties or other unit owners liked the decision or agreed with it, or if another board would have made a different decision, or what a reasonable person would have done in similar circumstances.

> A director's compliance with §13.1–690(A) is not measured against what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision.  *Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc.,* 258 Va. 140, 515 S.E.2d 277, 284 (1999).  In Virginia, the relevant inquiry focuses on the subjective beliefs of the director and on the process that the director employed to arrive at a defensible business decision.  *WLR Foods, Inc. v. Tyson Foods, Inc.,* 155 F.R.D. 142, 145–146 (W.D.Va.1994), *aff'd,* 65 F.3d 1172 (4th Cir.1995).  The procedural soundness of a business decision may be assessed by examining (I) the qualifications of the persons with whom the director consulted, (ii) the general topics, not the substance, of the information sought or imparted, and (iii) whether the advice was followed.  *Id.*

*Matson v. Alpert (In re LandAmerica Financial Group, Inc.),* 470 B.R. 759, 790 (Bankr.E.D.Va. 2012).  The board considered the collection of the delinquent fee in reaching its decision and took the course it thought was appropriate in light of the competing pressures.  The decision necessarily brought pressure on a debtor which was a violation of the automatic stay and resulted in liability.

30

Finally, there was no evidence at the hearing on the approval of the settlement agreement to supplement the record of the adversary proceedings and nothing pointed to in the record that sheds any light on the board's decision-making process, and in particular, Ms. Hadley's decision-making process or involvement.[16]   The court is unable on this record to find that Ms. Hadley had any exposure to liability for her participation in the actions of the board in postponing the 2010 annual meeting and concludes that she is a disinterested director.

The effect of concluding that Ms. Hadley was a disinterested director is that the January 15, 2013 vote was not sufficient to approve the conflict of interests transaction, that is, the approval of the settlement agreement, under Va.Code (1950) §13.1-871(A)(1).

## 2.  Was the Settlement Fair to FOA?
## (Va.Code (1950) §13.1-371(A)(3))

Absence of an Approved Settlement Agreement.    The settlement agreement was not approved by the required majority of FOA's board of directors.[17]   FOA's bylaws require a vote of the majority of the directors present at a meeting at which a quorum is present for a motion to pass. Bylaws Art. V, §14, Quorum.[18]   A quorum is a majority of the members of the board of directors,

---

[16]Ms. Hadley's individual conduct is what must be examined in the two suits, not solely the acts of the board of directors as a whole.  Va.Code (1950) §13.1-870 looks to the individual director's conduct.  It provides that "[a] director shall discharge his duties as a director" and "[u]less a director has knowledge . . . a director is entitled to rely." §13.1-870(A) and (B).  The statute looks to the individual director's conduct with respect to the board's actions.  After discussing *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693 (Del.Ch. 2005), Allen C. Goolsby noted, "[T]he Virginia statutory standard addresses each director rather than the board as a whole." Allen C. Goolsby, *Goolsby on Virginia Corporations* §9.7 (4th ed. 2011).

[17]The vote was two in favor, four abstaining and one absent.

[18]Article V, §14 of the Bylaws provides:

At all meetings of the Board of Directors a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at a meeting at which a

(continued...)

which at FOA is four directors.  Six members of the board of directors were present at the January 15, 2013 meeting.  While a quorum was present, only two of the directors present voted on the motion to approve the settlement agreement.  They do not constitute a majority of the directors present and the motion did not pass.

Gordon Properties implicitly argues that interested directors, here the three Gordon Properties-affiliated directors, should not be counted as part of the quorum and, therefore, a vote of two of the three directors present passed the motion.  The argument is not well taken.  Va.Code (1950) §13.1-871(B) provides that a quorum is present "if a majority of the disinterested directors vote to authorize, approve or ratify the transaction."  Here, the predicate has not been satisfied and the quorum remains at four directors.   The alternative quorum requirement is a part of  Va.Code (1950) §13.1-871(A)(1).  It is not a part of  Va.Code (1950) §13.1-871(A)(3) which the court is about to consider.

Section §13.1-871(A)(3), fairness to the corporation, is an alternative path to approval of the conflict of interests transaction.  While this analysis is not necessary in this case because there is no corporate act to review, it may be helpful to the board as it makes further efforts to settle the disputes with Gordon Properties.

Fairness Standard.  The Virginia Supreme Court applied the fairness test under Va.Code (1950) §13.1-691, the Virginia Stock Corporation counterpart to §13.1-871, in *Willard*.  It stated:

> No inflexible rule can be established by which to test the "fairness" of a transaction. It depends largely on the nature and circumstances of the business action. But generally, a director must act in good faith, and the transaction must, "as a whole, [be] open, fair and honest at the time it was consummated."  *Deford v. Ballentine Realty Corp.,* 164 Va. 436, 449, 180 S.E. 164, 169 (1935); *accord Adelman v.*

---

[18](...continued)
quorum is present shall be the acts of the Board of Directors.

> *Conotti Corp.,* 215 Va. 782, 789-90, 213 S.E.2d 774, 779 (1975).  In sum, a transaction in which a director has a conflict of interests should bear "the earmarks of an arm's length bargain" in order to be deemed "fair to the corporation" under Code § 13.1-691(A)(3).  *Pepper v. Litton,* 308 U.S. 295, 306-07, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

*Id.* 258 Va. at 155, 515 S.E.2d at 287.

The Supreme Court looked at the process the corporation followed when it applied the standard.  The transaction was a sale of the corporate assets.  When the directors accepted the offer, it was the only offer that had been presented to the board.  A competing offer was made subsequently, but was only open for three days and expired before a scheduled meeting of the stockholders.  The directors did not refuse to consider it, but felt that it should be considered at the special meeting of the stockholders that was already scheduled.  They encouraged the offeror to submit it to the stockholders at the meeting.  A renewed competing offer was made the day before the special meeting.  The stockholders were informed of it at the special meeting.  They had already received a copy of the revised competing offer and reports from professionals.  "Thus, the directors and stockholders of this closely held corporation possessed all the available information concerning the value and sale" of the company's assets.  *Id.*, 258 Va. at 155-156, 515 S.E.2d at 287.  The Supreme Court found that the directors "engaged in an informed decision-making process." *Id.*, 258 Va. at 152, 515 S.E.2d at 285.  It found that "the transaction was, 'as a whole, open, fair and honest at the time it was consummated'" and upheld the transaction.  *Id.* 258 Va. at 156, 515 S.E.2d at 287.

This court must examine the asserted approval of the settlement agreement to determine whether the transaction was, "as a whole, open, fair and honest at the time it was consummated." *Id.* 258 Va. at 156, 515 S.E.2d at 287.  This involves examining the decision-making process to determine whether it constitutes an "informed decision-making process."

Actions Taken by Gordon Properties and the Board of Directors.  The starting point is this court's order of June 15, 2012 which seated four Gordon Properties-affiliated directors and required the organizational meeting to be held within ten day as required by the bylaws.  When the order was entered, two significant legal hearings were imminent.  One was an appeal to the District Court from the decision of this court denying FOA's motion for substantive consolidation.  This was an important appeal to FOA.  The substantive consolidation motion sought to substantively consolidate Gordon Properties' bankruptcy case with CSI's bankruptcy case.  Gordon Properties is a solvent debtor while CSI is insolvent.  FOA held a judgment against CSI in the amount of $448,446.44.  Its collectability was largely dependent on the success of the motion.  The matter was fully briefed, FOA's reply brief having been filed on June 1, 2012.  Argument on the appeal was scheduled for June 29, 2012.  *FOA v. Gordon Properties,* E.D.Va., Case No. 12-cv-394-LMB Docket Entries 12 and 13.  The other was an arbitration hearing concerning Policy Resolution 2009-03 limiting Gordon Properties' ability to hold more than one seat on the board of directors which was scheduled to be heard shortly.  Reed Smith represented FOA in both matters.

The new board held its organizational meeting on June 17, 2012.  The first meeting of the new board of directors was held on June 19, 2012.  UST Ex. 16.    Five of the newly elected directors were present – the four Gordon Properties-affiliated directors and Dr. Pepper.  Two members of the condominium staff and fourteen unit owners were also present.  The board took two actions significant to this case.  It terminated Reed Smith and repealed or ratified the repeal of Policy Resolution 2009-03.

A special meeting of the board of directors was held five days later, on June 24, 2012.  UST Ex. 17.  All directors were present.  Ms. Hadley made a motion that Mr. Zoghaib seconded to rehire

34

Reed Smith to argue the District Court appeal. The motion was tabled by a vote of 4 to 3 with all the Gordon Properties-affiliated directors voting to table the motion and the three remaining directors voting against the motion to table. Ms. Hadley then made a second motion, also seconded by Mr. Zoghaib, to retain one lawyer from Reed Smith to argue the bylaws issue, apparently referring to the scheduled arbitration hearing.[19] The matter was tabled by the same vote. UST Ex. 17. The minutes of the special meeting are incomplete. They suggest that there was further discussion of the creation of the Special Litigation Committee. Ms. Hadley moved that "Mr. Sells' motion [be tabled] pending legal review." The motion failed on a 3-4 vote with all of the Gordon Properties-affiliated directors voting against it.

The board adopted the resolution appointing the first Special Litigation Committee at the June 24, 2013 meeting.[20] The resolution was drafted by Mr. Sells prior to the meeting. It purported to determine that two members of the board of directors, Ms. Hadley and Dr. Pepper, were not disinterested because of their status as defendants in actions filed by Gordon Properties and because they were members of the board when FOA was found to have violated the automatic stay. The resolution appointed one board member, Mr. Zoghaib and two non-board members, Ms. Brungart and Ms. Gilliam, to the SLC.[21] While Ms. Brungart was also on the prior board, she opposed many

---

[19]The bylaw that was referred to was Art. III, §7 which denies a delinquent unit owner the right to vote. This conflicted with the automatic stay in 11 U.S.C. §362(a) that prohibits post-petition collection actions. This court held on September20, 2011 that the enforcement of the bylaws provision violated the automatic stay. *Gordon Properties, LLC v. First Owners Ass'n of Forty Six Hundred*, 460 B.R. 681 (Bankr.E.D.Va. 2011). FOA was sanctioned $277,063.17 by order entered on June 27, 2012. FOA noted its appeal which is pending in the District Court, Case No. 12-cv-1052-TSE. Ms. Sarvadi of LeClair Ryan represented FOA in the bankruptcy court.

[20]The draft minutes of the meeting are incomplete. The adoption of the resolution was established by oral testimony.

[21]Ms. Brungart testified:

JUDGE MAYER:          What's [Mr. Zoghaib's] background, if you know?

(continued...)

of the prior board's actions.  She was not sued by Gordon Properties.  The resolution purported to

delegate "all the Board's power and authority to investigate and determine the Association's position

with respect to the Litigation."  UST Ex. 2.  The resolution also prohibited the SLC from hiring Reed

Smith who had represented FOA for several years and was knowledgeable and experienced in the

litigation.[22]  Interestingly, notwithstanding the delegation of the litigation to the SLC, Ms. Sarvadi

who represented FOA in the assessment litigation reported to the whole board on recent

developments in that case.  There was a "general discussion."  Mr. Sells inquired as to the cost of

an appeal and whether the additional condominium fees Gordon Properties had paid on its street-

front restaurant unit during the course of the litigation should be refunded by FOA to Gordon

Properties.  UST Ex. 18.

At the September 18, 2012 regular board meeting, there was further discussion about the

FOA-Gordon Properties litigation matters.  There was discussion of FOA's loan from Virginia

Commerce Bank which was apparently placed in a non-monetary default because of Gordon

Properties' execution on its judgment awarding it attorney's fees in the stay violation case.  Ms.

---

[21](...continued)

| | |
|---|---|
| THE WITNESS: | He had been on the board, had a lot of experience with the board, an intelligent man, easy to get along with, easy to talk with. |
| JUDGE MAYER: | What's his profession, if you know? |
| THE WITNESS: | I know he works at the Pentagon but he works something secret so I don't know. I can't fill that in.  I don't know.  I know he works at the Pentagon. |
| JUDGE MAYER: | Tell me about Ms. Gilliam. |
| THE WITNESS: | She is a business lady and she runs a travel agency in the building and she's very interested in the building and spends a lot of hours trying to help the building.  She's very good.  She didn't pay me to say that. |

Tr. 8/23/2013 at 176-177

[22]The resolution was further considered at a special meeting of the board held on September 3, 2012.  UST Ex.
18.  There was no evidence explaining the significance of the matters.

Brungart, a member of the SLC, reported to the board about the committee's actions.  The minutes

state:

> Jane Brungart, a member of the committee, reported the committee voted two to one,
> with she in the minority, to hire Mike Dingman, an attorney practicing with Reed,
> Smith and Redmon, to advise the committee during the mediation process.  She
> reminded the Board and those present that [Reed Smith, LLP] was the firm which the
> Board fired several months ago and she stated that she felt the owners should be
> aware that the firm was returning to work for FOA.  In response, Ms. Gilliam [also
> a member of the SLC] stated that the firm of Reed, Smith and Redmon was not being
> retained, but that the services of one of their attorneys, who was fully aware of the
> proceedings being mediated, would be used as needed by the committee.  She stated
> that [John] Donelan, the attorney hired by the SLC to assist in its work, would be the
> lead and that Mr. Dingman would assist when called upon by Mr. Donelan.

> President Sells asked if the committee was keeping minutes and whether these were
> available for review and Ms. Gilliam stated that summary memoranda of the results
> of each meeting were kept, although these are secured by attorney/client privilege
> and could not be reviewed by the general ownership.  President Sells reminded her
> that the SLC is not relieved of the obligation to keep proper minutes of their
> meetings and Ms. Gilliam stated the committee is acting in the same manner as the
> Board when holding an Executive Session.

Revised Draft Minutes at 6, UST Ex. 19.[23]

The revised draft minutes of the September 18, 2012 board meeting contain a discussion of

new litigation against present and past board members:

**Litigation Matter**

President Sells reports that, in conversation with Jennifer Sarvadi of LeClair Ryan,
he learned that the Board has ten days to make any legal clam of Breach of Fiduciary
Responsibility and intentional malfeasance concerning the actions of past and present
members of the Board of Directors in relation to their actions as Members of the
Board in 2010 when the Board canceled the 2010 Annual Meeting.  To secure the
rights of FOA to be recompensed for any bad acts on the part of these Members of
the Board, which were neither inadvertent or a normal course of business, the Statute
of Limitations requires that a filing be made with the Court regarding the intent to

---

[23]The minutes are a bit misleading.  Gordon Properties targeted two law firms, Reed Smith and Redmon, Peyton
& Braswell.  Michael Dingman was the principal attorney from Reed Smith.  Robert Marino was the principal attorney
from Redmon, Peyton & Braswell.

undertake action on behalf of FOA against those members within two years of those acts. In this particular time frame, he has been advised by Ms. Sarvadi that the Board would have to make a filing not later than September 28, 2012 to secure the rights of the Association. He noted that this does not mean that any action will be forthcoming, only that the rights of FOA have been recognized and reserved for possible action and he suggests that it would be in the best interest of the Association to pursue reserving those rights. He requested the Board give him permission to seek legal advice concerning this matter and to direct that a filing be made, if necessary. In making this request he noted that three of the seven members of the current Board of Directors served on the Board in 2012 *[sic]* and therefore have to consider their rights as well as their personal conflict of interest in dealing with this matter.

He also reported that Ms. Sarvadi had advised him that the Statute of Limitations for filing a claim of malpractice against legal counsel representing FOA during the same time period is three years and, thus, the Board has another year to decide whether to file that claim and therefore secure its rights.

In response to a question from Treasurer Gilliam as to whether this matter should properly be dealt with by the Special Litigation Committee under the resolution passed by the Board on June 24th, President Sells stated this was not one of the legal matters under the committee's jurisdiction as shown in the resolution.

**MOTION: President Sells moved that the Board of Directors authorize the President to engage the services of legal counsel to initiate, if appropriate, within the next ten days to reserve any FOA claim for breach of Fiduciary Responsibility and legal malpractice. The motion passed on a Roll Call Vote (3-2-1) with President Sells, Vice President Greenwell and Director Wilson in favor; Secretary Hadley and Director Pepper opposed; and, Director Moore abstaining.**

Revised Draft Minutes at 11-12, UST Ex. 19.

The 2012 annual meeting was held on October 3, 2012. Martina Hernandez, Jonathan Halls and William Reichenbach were elected to the three vacancies. Mr. Sells and Ms. Hernandez agreed before the meeting that Gordon Properties would vote for Ms. Hernandez and, at the request of Mr. Sells, that they would both vote for Mr. Reichenbach. Tr. 8/23/2013 at 242-244. The election committee oversaw a procedure by which interested unit owners may have their names put on the proxies that are distributed with the election package to unit owners and the pre-printed ballot for

38

the election of directors at the annual meeting.  Mr. Reichenbach did not seek to have his name

placed on the ballot or give anyone permission to write him in.  He was not present at the meeting

and was surprised to be elected.  Tr. 8/23/2013 at 110-111.  Mr. Sells was vague about why he

supported Mr. Reichenbach.[24]  He testified:

> Q.   And you were aware that he would be actively working to end the or to –
> that his position was that the litigation against Gordon Properties should end?
>
> A.   I don't remember what I was aware of at the time, but I was aware that we
> thought that he would be a good person to sit on the board.  I don't think I
> had had a conversation with him – maybe one conversation my entire life
> before that.

Tr. 8/23/2013 at 244.

An organizational meeting of the new board of directors was held immediately following the

2012 annual meeting.  The minutes recite that it began at 11:04 p.m.  Neither Ms. Hadley nor Mr.

Reichenbach was present.  UST Ex. 20.  Minutes of Organizational Meeting.  Mr. Sells was re-

elected president; Ms. Greenwell was re-elected vice president; and Ms. Wilson was elected

secretary and treasurer, all unanimously.  Mr. Sells raised two items of new business.  The first was

to restructure the SLC.  The minutes state:

**NEW BUSINESS**

Resolution for Special Litigation Committee

President Sells suggested the adoption of a resolution regarding the Special
Litigation Committee and to appoint the three newly elected disinterested board
members to the SLC.  Discussion centered around the fact that after the election that
evening, there were three duly elected directors on the board, none of whom are

---

[24]Mr. Reichenbach testified that he "made it known prior to the election that if I were to ever get involved in
the board, that it would be solely to try to settle the lawsuits."  Tr. 8/23/2013 at 112.  Ms. Brungart was his neighbor.
She "kept me informed and we would often discuss what was going on."  *Id.* at 113.  He felt that "the biggest thing I can
contribute is the fact that I had no personal interest in either side.  I had not known Mr. Sells.  I had no – there was no
animosity between me and his family.  I was a neutral party."  *Id.*

conflicted with regard to acting on behalf of FOA in legal matters, namely Martina
Hernandez, Jonathan Halls and William Reichenbach.  Mr. Halls declined when
asked about the possibility of him serving, citing the amount of time he is already
devoting to FOA with the Building and Grounds Committee and now service on the
BOD.  Mr. Halls suggested that Betty Gilliam serve in his place for purposes of
continuity.

**Motion: Ms. Wilson moved that the resolution be adopted as written and that
Martina Hernandez, Bill Reichenbach and Jane Brungart be appointed to the
SLC.  Discussion surrounded the fact that Ms. Brungart, who is already serving
on the SLC would provide helpful continuity.  The motion passed (4-1).  On roll
call, Ms. Hernandez, Mr. Sells, Ms. Greenwell and Ms. Wilson votes yes, and
Mr. Halls opposed.**

UST Ex. 20 at 2.

Mr. Sells drafted the resolution appointing the SLC.  It contains eight recitals, several of

which suggest that Ms. Hadley and Dr. Pepper, both board members who were defendants in suits

filed by Gordon Properties were not disinterested and could, therefore, not serve on the SLC.  This

analysis disqualified six of the seven board members.  The remaining board member, Alec Zoghaib,

and two non-board members, Betty Gilliam and Jane Brungart, were appointed to the SLC.  The

resolution found the three members to be disinterested; delegated "all of the Board's power and

authority to investigate and determine the Association's position with respect to the Litigation;"

authorized the president (Mr. Sells) to fill any vacancy that might occur on the SLC, and authorized

the committee to select and engage counsel, but prohibited it from selecting Reed Smith, LLP who

the board terminated that evening.  UST Ex. 2.  Ms. Brungart had previously served on the board

of directors.  In various suits filed by Gordon Properties against the former members, Ms. Brungart

was not a defendant.

The second motion was to seek expedited approval from this court for the employment of

CSI as temporary managing agent for FOA.  In the court's June 15, 2012 order, FOA was prohibited

40

from employing CSI without court approval.  CSI is wholly owned by Gordon Properties.  The

motion passed with four in favor and Mr. Halls abstaining.

The organizational meeting was adjourned at 12:05 a.m.

Several months before the annual meeting, Ms. Sarvadi was asked what business could be

transacted at an organizational meeting.  She testified:

> My recollection is that in the summer of last year in the late July or early August
> time frame, I was asked to give advice to the board with regard to what matters could
> be addressed at an organizational meeting. . . . I did some research and consulted
> with the folks at our firm, my former firm, who represent condominium associations
> and while there was no case law on point, in addressing the statute, there is nothing
> explicit, our advice at the time was that at the organizational meeting, there should
> not be other business than the election of officers.  And that had to do with notice
> requirements to the other board members who may or may not be present, as I recall.
> The governing documents of the association say that the first meeting of the board
> for organizational purposes might be held without notice to all members if they're not
> present for the annual meeting or something to that effect and that that was one of
> the factors we considered in that advice.

Tr. 8/23/2013 at 201-202.

> JUDGE MAYER:    . . . And your opinion was elect officers and then go back
> to your regular scheduled meetings with proper notice?
> [Ms. Sarvadi]:    Correct. Whether it's a special meeting of the board under 10
> days notice required under governing documents or whether
> it's the next scheduled board meeting, they could undertake
> matters of new business.

Tr. 8/23/2013 at 204.

The inquiry came from Mr. Sells.  She testified:

> I believe it was an e-mail from Mr. Sells where he asked for me to give an opinion
> on whether other business could be conducted at an organizational meeting and
> whether an organizational meeting should have had. And that was in the end of July
> or early August time period.

Tr. 8/23/2013 at 210.

Mr. Sells' recollection differed.

JUDGE MAYER:      What was the advice you got from Ms. Sarvadi with respect
to the organizational meetings?

THE WITNESS:      You know, I heard Ms. Sarvadi's testimony and I don't recall
events in the same way that she does and it may be because
I wasn't included on some of those e-mails.  The advice that
I got from Ms. Sarvadi, as I recall it, was that there was some
question about what can happen at an organizational meeting.
I do remember the issue she's talking about when you issued
your revised order taking Dennis [Howland] off the board and
putting Elizabeth Moore on the board, there was some
question about whether the board needed to have another
organizational meeting.  And Ms. Sarvadi may have given
advice at that time but I think if she did, it was not advice to
me. . . .

But the advice that I was talking about is there was some
question about the October 3rd meeting and whether or not
other business could be transacted at that meeting, namely,
the appointment of the SLC.  Or whether the business was
limited to appointing officers.  And my recollection of her
advice was that there was no clear answer to that subject, that
question.

JUDGE MAYER:      And you asked that in reference to the upcoming October 3rd
meeting?

THE WITNESS:      No, I don't recall asking that in advance of the meeting but
rather I seem to remember it coming up afterwards.  And this
is all now at some distance.  I hope I'm remembering the
sequence right but as I sit here today, that's my recollection
of it.  And Your Honor, it could have happened earlier
because the same issue was present at the June 17th meeting
and the same thing happened with that.  Both of them – both
boards acted to ratify what happened at the organizational
meetings at the very first next board meeting.

Tr. 8/23/2013 at 257-258.

The board ratified the actions taken at the October 3, 2012 organizational meeting at its

regular meeting on October 16, 2012.  Jt. Ex. 4 at 9.  The minutes state that the board went into

executive session at 22:00, considered four matters and adjourned into open session at 22:05.  The

minutes then state:

> **RETURN TO OPEN SESSION**
>
> The following motions were reviewed in Executive Session and brought forward for approval in Open Session.
>
> Ratification of Actions Taken at October 3 Meeting
>
> **MOTION: Ms. Wilson moved that the Board ratify the actions taken at the October 3rd Organization Meeting.  The motion passed (5-2-0) on a Roll Call Vote with Ms. Greenwell, Ms. Hernandez, Mr. Reichenbach, Mr. Sells and Ms. Wilson in favor and Mr. Halls and Ms. Hadley opposed.**
>
> During discussion of the ratification Mr. Halls stated he was concerned about possible conflicts of interests when conflicted Board Members vote to appoint the Special Litigation Committee.  Further discussion pointed to the appropriateness of the appointment of the new duly elected Board Members, who are not in [a position] of conflict, as the appropriate candidates to serve on the SLC.

UST Ex. 21 at 9.

The board also moved to hire Joe Riviere of CSI as temporary manager.  The motion passed

5-2 with Mr. Halls and Ms. Hadley voting against the motion.  The minutes state that "Mr. Halls

stated he was concerned about the perception of conflicts of interest."  UST Ex. 21 at 508.

The board passed a third motion, to terminate LeClair Ryan as FOA counsel "when

appropriate contingent upon the court granting Ms. Sarvadi's motion to withdraw."  The motion

passed 6-1, with Ms. Hadley voting against it.  After consideration of one other motion, the meeting

was adjourned at 22:42.

The board again ratified the appointment of the second SLC at its April 16, 2013 meeting.

When asked by his counsel why the board ratified the appointment of the second SLC twice, Mr.

Sells testified:

> Well, to be honest with you, I had forgotten about the first ratification. That's the
> first thing. But the whole reason it was an issue was because the Sobol [sic] litigation
> that was challenging the appointment of those three to the special litigation
> committee, and so this was an attempt to eliminate FOA's liability on that.

Tr. 8/23/2013 at 62. The Sobel case was filed in the Circuit Court for the City of Alexandria about

November 29, 2012 and was removed to the bankruptcy court on December 6, 2012.  It was

voluntarily dismissed on May 29, 2013.

The resolution appointing the second SLC was substantially the same as the resolution

appointing the first SLC.  It appointed Jane Brungart, Martina Hernandez and William Reichenbach

to the reconstituted committee; found each to be "a disinterested person with respect to the

Litigation," authorized the president, Mr. Sells, to fill any vacancy that may occur; delegated the

same board power to the committee and authorized it to hire counsel except for Reed Smith.  Jt.

Ex. 3.

The SLC retained John T. Donelan as its counsel.  The parties participated in mediation on

two separate days.  An agreement was reached on the second day of mediation, December 11, 2012.

Tr. 8/23/2013 at 31.   The members of the SLC signed a consent in lieu of a meeting on

December 11, 2012, adopting a resolution to:

> settle all pending controversies between and among FOA, Gordon Properties, LLC,
> Gordon Residential Holdings LLC and Condominium Services, Inc. by endorsement
> of the SLC's counsel to a Settlement Agreement between and among the
> aforementioned parties

Jt. Ex. 5. At the time that they signed the consent, the settlement agreement had not been reduced

to writing.  It took three weeks for the agreement to be reduced to writing.  Tr. 8/23/2013 at 277.

The settlement agreement recites that it is "effective December 11, 2012."  Jt. Ex. 1 at 1.

44

On January 11, 2013, the board package for the January 15, 2013 regular meeting of the board of directors was sent by email to the seven directors.  Jt. Ex. 6; Tr. 8/23/2013 at 57.  The first page of the board package was the agenda for the meeting.  Approval of the settlement agreement was not on this agenda.  Item XV is listed as "Adjournment to Executive Session."  Page 51 of the board package was an agenda for the Executive Session.  It noted three items related to the litigation: Virginia Commerce Bank's request for additional collateral; the *Sobel v. FOA* insurance claim; and the settlement agreement.  Pages 75 and 76 of the board package are pages 1 and 3 of the four-page settlement agreement.  The 51 page attachment to the settlement agreement, a copy of FOA's 2013 budget adopted on November 27, 2012, was not in the board package.[25]  Paragraph 10 of the settlement provides that all future condominium assessments will be determined in accordance with the Condominium Act, FOA's condominium instruments and the decisions of the Circuit Court for the City of Alexandria and this court.  It then provides that:

> In this regard, the Parties agree that FOA's 2013 budget, a copy of which is attached hereto as Exhibit A, identifies the proper budget categories and has been prepared in compliance with the foregoing methodology.  Furthermore, FOA's 2013 budget shall be adopted by FOA as the template for future budgets and assessment calculations.

Jt. Ex. 1.

The minutes of the board of directors meeting of January 15, 2013, state that the board adjourned to executive session at 9:15 p.m.  The board reconvened in open session, approved the settlement agreement and a management agreement between CSI and FOA and adjourned at 9:30 p.m.  With respect to the settlement, the minutes state:

---

[25]Mr. Reichenbach testified that he and the other board members worked on the budget in November 2012.  Tr. 8/23/2013 at 119-120.

45

Settlement Agreement

**MOTION: Director Reichenbach moved that the Board of Directors ratify and accept the Settlement Agreement between Gordon Properties LLC and FOA dated December 2012. Ms. Hernandez seconded the motion. The motion passed with three votes in favor and no votes in opposition. The votes were as follows: Bill Reichenbach voted Yes; Martina Hernandez voted Yes; Jonathan Halls, Elizabeth Greenwell, Brian Sells, and Lindsay Wilson abstained.**

Jt. Ex.7 at 8. Ms. Hadley was not present at the meeting. The result was two disinterested directors in favor of the settlement agreement; one disinterested director abstained; three interested directors abstained; and one director, Ms. Hadley, absent. Mr. Donelan, the attorney retained by the SLC, was not present at the board meeting.

Purpose and Legal Effect of the Special Litigation Committees. The two SLCs were created "[i]n order to avoid any appearance of influence or control by the Gordon Properties-related Board members." Jt. Motion at ¶15. "The SLC was given the exclusive authority to, *inter alia,* negotiate and approve a settlement of the pending disputes with the Gordon Properties Parties, and engage counsel to represent it in the litigation with Gordon Properties." Jt. Motion at ¶15. Mr. Sells testified:

Q.   Now, why did you propose and the board adopted this resolution to appoint a special litigation committee? What was the purpose of it?

A.   Are you asking now generally or this specific one?

Q.   Well, let's talk in general as to why you felt a special litigation committee was necessary.

A.   Because the board – because I could not – the Gordon Properties-related board members could not have any – could not direct FOA's counsel in litigation with FOA. So we wanted to distance ourselves from that process so that it would be truly adversarial and that FOA would have its own authority and way of litigating on the other side. That's sort of generally what a special litigation committee is for in this instance is to create a disinterested body to control litigation with Gordon Properties.

46

Tr. 8/23/2013 at 48-49.

Administrative Resolution 2012-06 which was adopted on October 3, 2012 and reconstituted

the SLC provides that:

> The Board of Directors delegates to the Special Litigation Committee all of the
> Board's power and authority to direct and manage and determine the Association's
> position with respect to the Litigation, including, but not limited to, the power to
> direct FOA's counsel, and to settle the Litigation on terms deemed reasonable and
> in the best interest of the Association.

Jt. Ex. 3 at ¶4.

The idea of a board committee to which the board's authority to manage and settle the

litigation is delegated is certainly a good idea.  Adamski & Brodsky, Law of Corporate Officers and

Directors, §8:1.  It would remove, at least minimize, the conflict of interest considerations that are

inherent in the present circumstances.  The attempt was legally insufficient.  As a matter of law, the

authority that FOA's board sought to delegate to the SLC could not be delegated to the SLC because

the SLC was not a board committee.

Va.Code (1950) §13.1-853(B) requires all corporate powers be exercised by or under the

authority of the board of directors.  A board committee may "exercise the authority of the board of

directors" delegated to it, with certain limitations.  Section 13.1-869(D).  However, the board

committee must be composed solely of board members.  Va.Code (1950) §13.1-869(B) provides that

"a board of directors may create one or more committees and appoint ***members of the board of***

***directors*** to serve on them." (emphasis added).  In addition, §13.1-869(F) provides that in the event

of absence or disqualification of a member, the members present may unanimously appoint ***another***

***director*** to act."

47

This does not mean that a board of directors may not appoint advisory committees that do not consist solely of members of the board of directors, or even no directors, for example, in a homeowner's association or a condominium there may be a buildings and grounds committee that oversees the day-to-day maintenance of the common grounds and makes recommendations to the board of directors for improvements, changes in use of the common grounds or rules and regulations on the use of the common grounds. The board, not the committee, must promulgate the rules and regulations. There may be a budget committee that is charged with drafting and recommending a budget to the board of directors. However, the committee cannot adopt the budget or set the assessments. That requires board action. A board committee, however, may take the action on its own authority which is delegated from the board of directors without further approval of the entire board of directors. Adamski & Brodsky, Law of Corporate Officers and Directors,§2:2.

In this case, the first SLC consisted of one board member and two non-board members. The second SLC consisted of two board members and one non-board member. Neither constituted a board committee and the attempted delegation of managing and settling the litigation matters was ineffective. In addition, the first SLC consisted of only one board member. A board committee must have two or more members. Va.Code (1950) §13.1-869(A). There was another defect. Section 13.1-869(F) provides the method by which vacancies may be filled. The Administrative Resolution delegated that power to Mr. Sells as president which is not an acceptable method. While the SLC could not independently of the board of directors exercise the power to settle the litigation, its efforts were not in vain. It could negotiate a settlement agreement and present it to the board for its consideration. In effect that is what was done when the board considered the settlement agreement at its January 15, 2013 meeting.

48

Retention of Counsel.  Controlling an opponent's access to legal counsel is inconsistent the an open, fair and honest process.  Gordon Properties-affiliated directors first interfered with FOA's legal representation within two days after they took their seats and became an absolute majority of the board of directors.[26]  They fired Reed Smith and Redmon, Peyton and Braswell.  The action was taken on the eve of two important court hearings and left FOA without representation in the matters. One was argument of an appeal in the District Court.  Oral argument was scheduled in the District Court on FOA's appeal of this court's denial of its motion to substantively consolidate the Gordon Properties and CSI bankruptcy cases for June 29, 2012.  *FOA v. Gordon Properties*, E.D.Va. Case No. 12-cv-394, Docket Entry 13.  Counsel properly filed his motion to withdraw on June 20, 2012 which were granted on June 21, 2012.  *Id.* Docket Entries 14, 15 and 18.  Jennifer Sarvadi of LeClair Ryan who represented FOA in the objection to its proof of claim but not in the substantive consolidation matter made a limited appearance and requested a continuance as directed by FOA's board of directors.  The continuance was denied on June 28, 2012, the District Court stating:

> With no good cause having been given for the termination of original counsel so close to oral argument and after the matter had long since been fully briefed by the parties, the Court finds that good cause for this late-requested continuance is not shown.

---

[26]The June 19, 2012 minutes of the board of directors state:

**Termination of Legal Services:** Mr. Sells made the following motion:

To terminate Reed Smith and Redman, Peyton & Braswell effective immediately and to direct counsel from LeClair Ryan to seek a continuance of all filing and hearing dates pending hiring of replacement counsel.

On advice of Legal Counsel, the Board agreed to hold in abeyance a vote on the motion until after the Executive Session portion of the agenda.

UST Ex. 16 at 6.  The minutes end with the board going into executive session.  The motion was passed.

*Id.* Docket Entry 21.  Faced with the appeal going forward without counsel, the board asked Ms. Sarvadi to argue it.  She did so successfully.[27]

The second legal proceeding was the arbitration hearing on Policy Resolution 2009-03 which limited Gordon Properties to one seat on the board of directs and was scheduled to be heard shortly. That hearing was cancelled and has never been held.

The Gordon Properties-affiliated directors sought to control the SLC's access to counsel of its choice by prohibiting it from retaining counsel who had previously represents FOA, which was

---

[27]Ms. Sarvadi testified about the argument on the appeal:

| JUDGE MAYER: | Do you recall the appeal on the substantive consolidation matter? |
|---|---|
| THE WITNESS: | Yes, Your Honor. |
| JUDGE MAYER: | And were you counsel of record in that matter when the briefs went in? |
| THE WITNESS: | When the briefs went in, no, sir, I was not. |
| JUDGE MAYER: | When did you become counsel of record? |
| THE WITNESS: | I became counsel of record either the Tuesday night or the Wednesday morning before Judge Brinkema's hearing on Friday the 29th. |
| JUDGE MAYER: | And why did you become counsel of record at that point? |
| THE WITNESS: | There was a request made, I understand, by the special litigation committee to the board to allow them to rehire Mr. Dingman for the limited purpose of arguing that appeal, which request I was told by Ms. Gilliam had been denied by the board. There had been a motion by Ms. Hadley for the same purpose which had been denied.  I had been directed by the board to note only a special appearance for the purpose of seeking a continuance and I filed the motion as directed which was denied by Judge Brinkema who also noted that she would be allowing Gordon Properties to argue the merits of the appeals ex parte if no attorney showed up. So ultimately, permission was granted by the board for me to do what I could to get ready and to present the argument on the 29th of June. |
| JUDGE MAYER: | Had you participated much in that appeal? |
| THE WITNESS: | Only in those three days, Your Honor, in preparing for the argument between that Wednesday and appearing Friday morning on the 29th. So when Mr. Dingman was terminated, the SLC immediately began to consider its options in finding either new counsel or seeking a modification of their decision.  So I had asked Mr. Dingman to forward his file to me so I could get it to whomever was going to be handling the appeal and ultimately I ended up reviewing the matter and arguing it on Friday. I think the hearing was 45 minutes long and so I was asked by the Court a number of questions and I answered them as I could. |
| JUDGE MAYER: | And you were successful? |
| THE WITNESS: | The judge said the briefs were – well presented the issues so I won't take any credit there. |

Tr. 8/23/2013 at 205-207.

an indirect way of prohibiting the SLC from retaining Reed Smith or Redmon, Peyton and Braswell.

The committee wanted to retain Reed Smith. At the June 24, 2012 meeting of the board of directors,

the three disinterested directors sought to retain Mr. Dingman with respect to the impending

argument in the District Court and "one attorney from Reed Smith" to argue try the arbitration

matter. Both motions were blocked by the Gordon Properties-affiliated directors who tabled both

motions.[28] UST Ex. 17. At the September 18, 2012 board meeting, Ms. Brungart, a member of the

SLC, reported that the SLC had voted two to one, with her in the minority, to "hire Mike Dingman."

Ms. Gilliam defended the SLC's action. Mr. Sells then inquired whether the SLC was keeping

minutes of its meeting and "reminded" the committee that it was required to keep minutes. UST Ex.

19. Ms. Gilliam was removed from the SLC less than three weeks later, on October 3, 2012. The

SLC was never able to retain Reed Smith.

---

[28]Ms. Brungart testified:

| | |
|---|---|
| JUDGE MAYER: | Did you make any effort to discuss continuing representation with Mr. Dingman or Reed Smith? |
| THE WITNESS: | Well, early on, and I'm not sure of the date but we got a paper from President Bryan Sells saying that we could not employ any lawyer who had worked previously with FOA so that cut out Mr. Dingman and – so that was the end of that. |
| JUDGE MAYER: | How did you feel about that restriction? |
| THE WITNESS: | I didn't think it was quite fair because Mr. Dingman was very familiar with the court cases and the litigation and the terms and, you know, to just dismiss him or cut him out of our consideration I didn't think was fair because he was very experienced. Now, Mr. Donelan caught on very fast and got up to speed and has been a terrific help but Mr. Dingman already knew every – you know, he didn't have to be brought up to speed, in other words. But we couldn't consider him. |

Tr. 8/23/2013 at 168-169

Q.    Mr. King asked you some questions regarding Reed Smith and whether there was a basis to fire them. Would you have liked, as a member of the special litigation committee charged with making decisions about litigation, to make that decision yourself, about whether to fire them or not?

A.    Yes, sir, because we understood that was our role, that was in our purview to do that.

Tr. 8/23/2013 at 199.

51

Gordon Properties acknowledges in Footnote 12 of the Joint Motion that the SLC was not at liberty to select Reed Smith as its counsel.  It seeks to justify that restriction by claiming that, "The Board, in the exercise of its business judgment, concluded that the most likely path to a negotiated resolution of the disputes was to engage counsel who had no prior connection with any of the Parties and who could bring a fresh approach to the negotiations."  Jt. Motion at 8 n12.  There are many factors that a client should consider in changing counsel.  The accumulated knowledge of counsel, the quality of the representation to date, whether a fresh look at the case would bring a new perspective that could bring the matter to resolution, the availability of replacement counsel,  the status of the case and pending deadlines and hearing, to name a few.  In this case, there were many matters that had to be addresses.

Changing counsel in a case that had gone on as long as this case and been fought as ferociously in so many courts was an important decision.  The minutes do not reflect any substantive discussion on the issue of dismissing counsel.  There was no independent review of Reed Smith's performance; no report to the board.  Gordon Properties dismissed Reed Smith at the very first opportunity it had and, a week later blocked the attempt to rehire the firm.  There is no indication that there was any significant discussion of either matter.  There is no evidence of an informed decision-making process with respect to the board's dismissal of Reed Smith.

The reasons put forward are not convincing.  Gordon Properties' counsel suggests a change in FOA's counsel was "the most likely path to a negotiated resolution of the disputes" and that new counsel with no prior connection with the parties could bring a fresh approach to the negotiations.

Resolution by agreement is a desirable goal.[29]  The statement can be interpreted as an improper

purpose for dismissing Reed Smith.  It can be interpreted to say that Gordon Properties wanted to

maneuver FOA into a position where it could get a more favorable settlement from FOA by

removing an important member of FOA's team, its lawyers.  Mr. Sells put forward a second reason.

He testified that Reed Smith's advice as to the 2010 annual meeting constituted malpractice.  The

truth of the allegation is not clear from the record before the court.

      Gordon Properties' Influence of the SLC.  A newly elected director immediately saw another

problem:  Gordon Properties-related directors participating in the appointment of the SLC.  At the

October 16, 2012 board meeting, Ms. Wilson sought board ratification of the actions taken at the

organizational meeting.  Mr. Halls "stated he was concerned about possible conflicts of interests

when conflicted Board Members vote to appoint the Special Litigation Committee."  He suggested

that Ms. Gilliam who was already serving on the SLC be appointed, but his suggestion was rejected

in favor of Ms. Brungart who was also already serving on the SLC.  The votes of the three Gordon

Properties-affiliated directors were the determining factor.  The final vote was five to two with the

Gordon Properties-affiliated directors  all voting in the majority.  The disinterested directors were

evenly split, Ms. Hernandez and Mr. Reichenbach in the majority and Ms. Hadley and Mr. Halls in

the minority.

      The minutes of the board's meetings and other evidence leave the impression that Ms.

Brungart was selected over Ms. Gilliam because Ms. Gilliam was more independent of Gordon

---

[29]This statement implies that FOA's counsel was the roadblock to a reasonable settlement.  There is nothing in the record that supports this assertion.  However, Ms. Brungart's testimony about the formation of the second SLC can be understood to say that Gordon Properties was the roadblock.  She testified that she thought the first SLC worked well together.  "The three of us worked very well together but we weren't able to accomplish much with Gordon Properties and CSI."  Tr. 8/23/2013 at 177.  The court cannot speculate on who was reasonable or unreasonable or the issues that prevented an earlier agreement.  All the court knows is that it takes two to settle a matter and until December 11, 2012, there was no settlement.

Properties than Ms. Brungart.  At the September 18, 2012 board meeting, Ms. Brungart reported to the board that the SLC had, despite the Administrative Resolution creating the SLC which prohibited employing Mr. Dingman, retained him to assist in the negotiations.  Ms. Gilliam defended the action.

Another action of Mr. Sells at the September 18, 2012 meeting merits comment. Immediately after Ms. Brungart's report and Ms. Gilliam's defense, Mr. Sells inquired about minutes of the SLC meetings.  UST Ex. 20 at 6.  At another time, in another context, it would likely pass without comment.  It would simply be a housekeeping detail.  But here, it gives the impression that Mr. Sells intended to let the committee know that he was keeping an eye on the committee. Gordon Properties had previously sued all of the directors.  Later at the same meeting, he raised the topic of suing the board members who were serving in 2010 when the 2010 annual meeting was canceled.  The motion was treated as if it passed.[30]  Suit was filed by FOA against six of the seven directors sitting on the board in September 2010.  Jt. Ex. 11.  The vote was three in favor, two opposed and one abstaining with the three Gordon Properties-affiliated directors voting in favor of the motion.  UST Ex. 19 at 11-12.

At the September 18, 2012 meeting, Mr. Sells raised the question of the statute of limitations running on claims against the members of the board of directors who had participated in the actions giving rise to the violation of the automatic stay.  Mr. Gilliam inquired whether this was a matter that the SLC should address.  Mr. Sells stated that this "was not one of the legal matters under the committee's jurisdiction."  UST Ex. 19 at 11.  Ms. Gilliam's question was apt.  The Administrative

---

[30]In fact, the motion failed.  The bylaws provide that "the acts of the majority of the Directors present at a meeting at which a quorum is present shall be the acts of the Board of Directors."  Bylaws Art. V, §14.  The requisite majority is the majority of the directors present, not of the directors voting.  The motion did not have a majority of the directors present.

Resolution defines "Litigation" to mean "all pending litigation, arbitration, and bankruptcy proceedings involving FOA, its current and former Board members, Gordon Properties, Gordon Residential, and CSI.  Jt. Ex. 3 at ¶H.  The board then delegated "all of the Board's power and authority . . . with respect to the Litigation, including . . . the power to . . . settle the Litigation."  The objective of the committee was to end all of the litigation.[31]  Commencing additional litigation on behalf of FOA relating to the same subject matters would, at first blush, appear to be within the purview of the Special Litigation Committee.

The minutes are unclear as to what was said about filing suit against the directors.  The minutes state that Mr. Sell reported that the Statute of Limitations would run in ten days and that to "secured the rights of FOA to be recompensed" a filing had to be made with the court "regarding the intent to undertake action on behalf of FOA against those members within two years."  He noted that this "does not mean that any action will be forthcoming, only that the rights of FOA have been recognized and reserved for possible action."  *Id.*  The minutes suggest that a filing – there is no mention of a lawsuit – must be made to "secure" the right to seek redress.  The filing, Mr. Sells

---

[31]Mr. Sells testified:

| JUDGE MAYER: | Now, when you appointed – the board appointed the special litigation committee, I understand from your testimony – tell me if I'm right – that it was intended that the committee would be solely responsible for the litigation? |
| [MR. SELLS]: | Yes, that was the intent. |

Tr. 8/23/2013 at 266.

| Ms. Brungart testified: |

| JUDGE MAYER: | And what did you understand your mandate, your instructions to be? |
| THE WITNESS: | That we were to try as best we could to work through a settlement with CSI and Gordon Properties to close down these 11 lawsuits hopefully and to stop the financial bleeding and to try to get our building on a more [solid] financial footing. |

Tr. 8/23/2013 at 174.

stated,  does not mean that a lawsuit would be filed, only that the rights of FOA would be "recognized and reserved."  The description is very muddled.  Either Mr. Sells, a graduate of Harvard College and Columbia Law School, was not candid with the board or his message was not understood.[32]  Tr. 8/23/2013 at 264.

January 15, 2013 Board Meeting.  The manner in which the board handled the approval of the settlement motion at its January 15, 2013 meeting is also flawed.  The written settlement agreement was not completed until the first week in January 2013.  It was presented to the unit owners at a Town Hall meeting at which Mr. Donelan answered all questions that were asked.  But there is no evidence that he met with the board of directors and, in particular, with the four disinterested directors.  He was not present at the January 15, 2013 regular board meeting or the executive session.  The board package emailed to all directors several days before the scheduled meeting had only two pages of the settlement agreement and none of the attachment, the 2013 budget.  The settlement agreement was raised in the executive session along with the proposed management agreement with CSI.  The executive session started at 9:15 p.m.  Jt. Ex. 7 at 8.  The minutes do not reflect when the executive session ended, but the meeting was adjourned at 9:30 p.m.

---

[32]This was not the only time that a problem with communicating the importance of a legal matter surfaced.  At the April 16, 2013 board meeting, Mr. Sells raised the issue of ratifying the appointment of the members of the second SLC.  The minutes state:

> Motion to Ratify the Appointment of Brungart, Hernandez and Reichenbach to the Special Litigation Committee
>
> President Sells noted that this is a relatively pro forma action on the part of the Board in that it appeared the original appointment of this group last October may not have been fully operative and needs to be reaffirmed.  He called for a motion and a Roll Call Vote.

Jt. Ex. 9 at 5.  The motion passed unanimously.  At this time, the motion for approval of the settlement agreement and the *Sobel* suit were pending in the bankruptcy court.  The *Sobel* suit challenged the board's action in creating the second SLC and sought reinstatement of the first SLC.  Gordon Properties was relying on the second SLC to avoid a conflicts of interest problem.  "Pro forma" carries with it the notion that a technical defect needed to be corrected, but that the matter was of little importance.  As reflected in the minutes, the need for ratification of the appointment of the second SLC was downplayed.

In that fifteen minutes the board met in executive session, reconvened in open session and approved

both the settlement agreement and the management agreement with CSI.  *Id.*  There is no record of

any discussion, of any reports received by the board, or any review of the terms of the settlement

agreement.  There is no record that the disinterested directors met outside the presence of the Gordon

Properties-affiliated directors or received legal or financial advice.  There is no evidence that the

SLC made a presentation to the board or to the other two disinterested directors or of private or

informal communications.  The two disinterested directors on the SLC – Mr. Reichenbach and Ms.

Hernandez – voted in favor of the settlement agreement.  Neither of the disinterested directors not

on the SLC voted in favor of the settlement agreement.  Mr. Halls abstained.  Ms. Hadley was

absent.

     <u>Open, Fair and Honest Standard.</u>  The process that FOA's board followed was not an open,

fair and honest process.  The Gordon Properties-affiliated directors interfered with FOA's ability

to choose counsel of its own choice by first firing Reed Smith and then precluding the SLC from

hiring Reed Smith to represent the SLC.[33]  The examiner concluded that "the Board's firing of long-

standing counsel eight days before the dispositive evidentiary hearing in the Arbitration and nine

days before oral argument on an important appeal was imprudent to the point of irresponsibility."

Report of Stephen E. Leach, as Examiner at 10 n23.  (Docket Entry 648).  The court concurs.

---

[33]Gordon Properties asserts that FOA's liability for the violation of the automatic stay was the result of Reed
Smith's malpractice and that FOA could not continue to be represented by such counsel.  It is far from clear that Reed
Smith's advice constituted malpractice.  It correctly identified the problems the board faced and recommended
postponement of the 2010 annual meeting while the matters were resolved through litigation.  While this court's prior
Memorandum Opinion could be interpreted as criticism of counsel's work, in fact, it only points out an alternative
analysis of the flyer issue and alternative ways in which the automatic stay issue could have been resolved.  Whether
failure to follow the court's alternatives constitutes malpractice is an entirely different issue.

     What is not explained by Mr. Sells' assertion is the dismissal of co-counsel, Redmon, Peyton and Braswell.
That firm had nothing to do with the 2010 annual meeting issues.  Mr. Marino was retained to assist in the bankruptcy
and was very involved in the substantive consolidation issue in this court.  There was no reason why he could not have
argued that appeal.

The court is troubled by this action for another reason.  In the June15, 2012 election order, the court intended that the board of directors manage FOA in the ordinary course of its corporate affairs without supervision of the court.  The court anticipated that a new and independent board might carefully consider FOA's counsel's performance and make an informed decision as to whether to continue with counsel or to replace counsel.  The parties had been in litigation for six years.  FOA had spent a significant portion of its reserves to fund the litigation.[34]  An early end to the litigation was not in sight.  A new and independent board might well have questioned where they had been, where they were going and whether old or new counsel would better serve their purposes.  While the Rules of Professional Conduct govern when a law firm may undertake representation and would likely disqualify most counsel who had previously represent Gordon Properties, the court wanted the additional assurance that if the new board replaced its counsel the new counsel would exercise its independent legal judgment.  To this end, the board was prohibited from retaining any counsel who had represented Gordon Properties, a related entity or owner within the prior 48 months.

In addition, the order sought to protect FOA's litigation position, including appeals.  The order  provided that:

> Without approval of this court on such notice as this court may require at that time, the Board of Directors may not discontinue, dismiss, fail to defend, fail to prosecute, or fail to commence any appeal or action and may not settle any action or claim involving Gordon Properties or CSI or any member or owner thereof.

Order entered 6/15/2012.

While the idea of an independent board committee to which the board could delegate the control and resolution of the litigation was a good idea, it was not properly exercised.  The two Special Litigation Committees did not satisfy the statutory requirements and could not exercise the

---

[34]This action had the effect of insulating the monthly condominium fee from an increase to fund the litigation.

powers of the board of directors.    The SLC and other board members proceeded under the

assumption that the SLC had the authority to direct and settle the litigation.    At the same time, Mr.

Sells knew that there were questions about the committee's authority.  Tr. 8/23/2013 at 266-268.

He did not share these concerns with the other directors.[35]

---

[35]Mr. Sells testified:

| | |
|---|---|
| JUDGE MAYER: | Now, when you appointed – he board appointed the special litigation committee, I understand from your testimony – tell me if I'm right – that it was intended that the committee would be solely responsible for the litigation? |
| THE WITNESS: | Yes, that was the intent. |
| JUDGE MAYER: | When you say that was the intent, was that intent effectuated? |
| THE WITNESS: | Well, I imagine that's a legal question, Your Honor. Mr. Donelan has always had some concerns about that issue. |
| JUDGE MAYER: | What are the concerns? |
| THE WITNESS: | About whether they have properly been delegated the full authority to settle. And we made changes to the resolution or at least Ms. Sarvadi suggested changes to the resolution to deal with those concerns. |
| JUDGE MAYER: | Were those suggested changes that were passed by the board? |
| THE WITNESS: | Well, they're incorporated into the October resolution. That's my recollection is I started with Jennifer's draft. And I don't remember, as I sit here today, if they were adopted in between. It could be that Jennifer's changes are administrative resolution 2012-05 but I don't know. But I have to say in all candor that there has always been an unanswered question about whether it was appropriate for nonboard members to have that authority over the association's pocketbook. And I researched that question on my own. I believe Mr. Donelan has researched that question, although he certainly wouldn't have shared his advice with me. And I don't think there is an answer to that question. |
| JUDGE MAYER: | Did you ever share that with the committee? |
| THE WITNESS: | I believe Mr. Donelan shared that with the committee. |
| JUDGE MAYER: | Did you? |
| THE WITNESS: | I shared it at the October 3rd meeting. |
| JUDGE MAYER: | With whom? |
| THE WITNESS: | With the members present. |
| JUDGE MAYER: | And what did you say? |
| THE WITNESS: | I pleaded with Mr. Halls to be on the committee because I thought it should be board members. |
| JUDGE MAYER: | And that's it? |
| THE WITNESS: | Yeah. |
| JUDGE MAYER: | You didn't tell him why you should be on the committee, because you had a question whether the committee should be exclusively board members? |
| THE WITNESS: | No, I seem to recall saying that I think it should be board members to eliminate any question. |

Tr. 8/23/2013 at 266-268.

The Gordon Properties-affiliated directors compromised the SLC's independence. It was involved in selecting the members of the first SLC and reconstituting the first SLC into the second SLC. The establishment of the second SLC was done at an organizational meeting after Mr. Sells had been advised by Ms. Sarvadi that the only action that should be taken at an organization meeting was the election of officers. The action was taken late at night in the absence of two disinterested directors. The two new members were Ms. Hernandez who was elected to the board with Gordon Properties' assistance and Mr. Reichenbach who was selected by Gordon Properties to serve on the board without his prior knowledge or consent.

No satisfactory reason has been given for the change in the committee. Ms. Brungart testified that she did not get a good reason why the first SLC was reconstituted, "except that we didn't get any results with the first committee but I don't have an answer because I have no idea why the first one was disbanded." Tr. 8/23/2013 at 175-176.[36] Had the SLC been converted into a board

---

[36]Ms. Brungart testified:

| JUDGE MAYER: | Now, was the first committee uncooperative in endeavoring to achieve this result? |
| THE WITNESS: | No, sir, no. We worked very well. The three of us worked very well together but we weren't able to accomplish much with Gordon Properties and CSI. |

Tr. 8/23/2013 at 174.

| JUDGE MAYER: | And what was your understanding as to why that was done? |
| THE WITNESS: | Why they reformed? |
| JUDGE MAYER: | Yes. |
| THE WITNESS: | I never got a good answer for that except that we didn't get any results with the first committee but I don't have an answer because I have no idea why the first one was disbanded. |
| JUDGE MAYER: | It was fully functioning? |
| THE WITNESS: | Yes, sir. We were meeting, talking on the phone. And there was no disagreement between the three of us. We worked very well together. It wasn't the – I didn't think it was the fault of the committee. |

Tr. 8/23/2013 at 175-176.

committee, there would have been a good reason to make the change, but Mr. Halls declined to serve and the effort was unsuccessful.

Gordon Properties kept alive is suit against the former directors, one of whom was still serving on the board and used it and the assertions in it as a reason not to appoint her to the SLC. It later voluntarily dismissed the suit, caused FOA to file its own suit on these matters and to voluntarily dismiss it.

Terms of the Settlement Agreement.  The terms of the settlement agreement are not fair to FOA.[37]  The objective so often repeated at the hearing was that FOA needed relief from the pending litigation.  The great benefit of the settlement was the end of the litigation and the attendant expense. Tr. 8/23/2013 at 189.  But, the settlement does not accomplish that.  While all pending litigation would be dismissed with prejudice, there are no release provisions in the settlement agreement.  Tr. 8/23/2013 at 275-280.  Gordon Properties did not intend to release any of the directors from its claims.  Directors are entitled, subject to certain limitations, to indemnification under Article 9 of the Virginia Nonstock Corporation Act, Va.Code (1950) §§13.1-875 to -883.  FOA's director's and officer's liability policy may not be available.  It denied coverage of the Gordon Properties-affiliated directors when they were sued by a group of unit owners. Jt. Ex. 6 at 71-74 (January 15, 2013 board package).  This means that FOA is exposed to defending the directors and satisfying any judgment that may be entered against them.  This is simply more of the same litigation through a different avenue.  The settlement agreement requires this court to vacate its order limiting Gordon Properties

---

[37]Mr. King, counsel for Gordon Properties, argued that approval of a settlement agreement does not require that the proposed settlement is fair to the other party.  The fairness analysis is solely on the debtor, the estate  and the creditors.  The issue here is whether the settlement agreement satisfies Va.Code (1950)§13.1-871(A)(3) which requires the transaction to be fair to the corporation, here, to FOA.  He confuses a §13.1-871 analysis with a Rule 9019 analysis, but even under Rule 9019, a settlement must be fair and equitable.  *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157 (1968).

to one seat on the board of directors.  Gordon Properties asserts that this is fair because any

individual unit owner can still bring a suit if he feels that Gordon Properties is disqualified from

having more than one seat on the board.  The court is satisfied beyond any doubt that if the court

vacates its prior order Gordon Properties will run multiple candidates for the board of directors.[38]

Either new suits will be  filed in state court or Gordon Properties will have absolute control of the

board.  The units it owns have about 19% of the total votes in the condominium association.  In the

last several years, FOA has had difficulty obtaining its 50% quorum requirement.  When the quorum

is met, Gordon Properties has, effectively, about 35% to 38% of the votes present at the annual

---

[38]Mr. Sells was very firm in his view that Gordon Properties was entitled to run as many candidates as it wants to run and have all the successful candidates sit on the board of director.  The passion and commitment with which he holds that view was evident from his testimony.   For example, he testified:
.

> A.    Well, I'm glad you asked that because it goes back to what I said earlier about the importance of small D democracy in a condominium.  We had campaigned on a very strong, very clear platform of changing the direction of FOA, including the litigation.  And we were elected, we got –
>
> Q.    You said that you campaigned on a platform of change.  I believe earlier you characterized it as a regime change.
>
> A.    Yes, I think that was an accurate characterization. The old board had held on through election fraud for six years.  We were elected.  I think it's fair to characterize that as a regime change.  But if I could finish my answer, we campaigned on a very clear, crystal clear platform of changing FOA's direction in the litigation, of changing FOA's direction entirely.  Because of further litigation by the previous board, the votes of the unit owners were disrespected in that my slate got six of the seven top seats but were not able to take – excuse me.  My slate got six of the seven highest votes but were not able to take their place on the board because of this litigation and so there were two people on the board, Mr. Zoghaib and – well, at this time, it was just Mr. Zoghaib because Dennis Howland [a Gordon Properties-affiliated individual] was still on the board at the time, who did not get the support of – sufficient support from the unit owners and they represented a platform that frankly did not have democratic support behind it.  So I've forgotten your question.
>
> Q.    My question was, why didn't you recuse yourself from votes involving FOA litigating against Gordon Properties?
>
> A.    Right. And why did I create a disinterested body [the Special Litigation Committee].
>
> Q.    No, why didn't you just recuse yourself?  Why create the SLC instead of just recusing yourself?
>
> A.    Because if I had recused myself, then the folks who would have been controlling FOA in this very important decision would have been the ones who did not have the democratic support, who had – I would have been letting down all those  people who voted for me and my slate.

Tr. 8/23/2103 at 236-237.

meeting.  There is a virtual certainty that the settlement agreement will not result in an end to litigation.

There is no inflexible rule to test the "fairness" of a transaction.  "It depends largely on the nature and circumstances of the business action."  *Willard,* 258 Va. at 155, 515 S.E.2d at 287.  A review of the fact and circumstances leading to the settlement agreement and the board's action on January 15, 2013, show that the process was not "open, fair and honest at the time it was consummated."  *Id.*  Gordon Properties exercised too much control over the organization and operation of the SLC which produced the settlement agreement – particularly in barring it from retaining Reed Smith – and there is insufficient evidence that the board adequately engaged in a good faith decision-making process.

## **B.  Rule 9019 Analysis**

A Rule 9019 review is not necessary because there is no contract that the court can approve.  However, if the parties resume negotiations, further comment may assist them.

First, the agreement must be clear.  There can be no ambiguities or uncertainties.  This draft is ambiguous on a material issue – releases.  The avowed purpose of the settlement was to end all litigation between the parties and, in particular, to end it with respect to FOA.  The first paragraph of the settlement agreement identifies FOA "together with its unit owners, officers, directors, Special Litigation Committee members, employees and agents" and Gordon Properties, Residential Holdings and CSI "together with their members, shareholders, officers, directors, employees, and agents." Jt. Ex. 1.  These descriptions suggest that there are or will be releases of the additional described parties.  This is reenforced by footnote 1 which expressly excludes six directors and the chair of the

63

2009 election committee from the term "directors."  However, there are no release provisions in the document itself, only the requirement to withdraw all appeals and dismiss all pending litigation with prejudice.  The description of the litigation contains case numbers, but also the introductory clause, "including, without limitation."  It is simply unclear to the court who, if anyone, is being released and the extent of the release.  Mr. Sells who is himself an attorney appeared uncertain on this issue, too.  This must be corrected before any agreement can be approved.

There is a requirement that FOA consent, support or not object to any chapter 11 plan that the debtors may propose or dismissal, if requested.  No plan has been proposed and no suggestion of its contents has been proffered.  There are other creditors who have been waiting patiently for almost four years since Gordon Properties filed bankruptcy.  In the circumstances of this case, this agreement raises concerns.

The settlement was professed to bring an end to all litigation.  This is important to the debtors' fresh start.  This settlement agreement will not bring an end to litigation.  The likelihood of further litigation is very high.  There is the problem with the number of seats that Gordon Properties or is related company, Residential Holdings, may hold on the board.  There is the threatened litigation against the directors who were carved out of what appears to be an uncertain release provision.  This is not in the best interests of the debtor or the creditors.

The court cannot approve the settlement because it requires this court to vacate its order determining the number of seats that a non-natural unit owner may have on the board of directors. That matter is on appeal to the District Court and this court generally cannot affect orders on appeal. That is the province of the District Court.  But even if this court could do so, it would not.  Gordon Properties argues that any unit owner will be free to bring a suit to object to the qualification of

64

another candidate, if he so chooses.  The context would be Gordon Properties  and Residential

Holding running seven candidates for the seven-person board of directors.  The court is satisfied that

Gordon Properties and Residential Holdings intends to do just that in October 2014.  It might have

happened next month if the settlement had been approved.  The three Gordon Properties-affiliated

directors are up for reelection.  Ms. Hadley is up for reelection.  One director, Mr. Halls, resigned

and his seat was filled by the board.  Bylaws Art. V, §6, Vacancies, provides that the term of the

director selected by the board to fill a vacancy expires when a successor is elected at the next annual

meeting.  There are five seats up for election next month.  Leaving this issue open is not fair or

equitable to FOA and its members.  They are at a distinct disadvantage in individually litigating

against Gordon Properties.[39]  Nor is it helpful to Gordon Properties in its fresh start to become

embroiled in further litigation that has costs so many so much.

The settlement agreement adopts the attached 2013 budget as a template to be used in the

future.  It is intended to have some precedential value.  However, there has been no evidence

presented to the court about its accuracy.  The testimony was that it was substantially prepared by

an employee of CSI who is presently acting as the building manager.  Without testimony, the court

cannot gives its imprimatur to the proposed template

Several of the provisions of the settlement agreement violate the Virginia Condominium Act.

It sets limits on condominium fees that maybe assessed against Gordon Properties' street-front

condominium unit.   The Condominium Act is quite clear that all unit owners must pay the

assessments as properly computed in accordance with the Condominium Act and FOA's documents.

 Va.Code (1950) §55-79.83(F).  Placing a cap on one unit may, in the future, result in an improper

---

[39]Mr. Sells suggests that FOA would not have standing to bring such a suit. The matter, he says, is a unit owner
grievance against another unit owner.

allocation of condominium assessments in violation of the Condominium Act or limit the total budget of the condominium. The parties argue that Gordon Properties or its successor cannot unreasonably withhold its consent to an assessment in excess of the cap. This does not cure the problem. There are other limitations on assessments which similarly cannot be approved.

## Conclusion

For the forgoing reasons and the reasons stated on the record, approval of the Joint Motion and Memorandum for Order Approving Settlement Agreement Between Debtors and First Owners' Association of Forty-Six Hundred Condominium, Inc., and for Related Relief (Docket Entry 498) will be denied.

Alexandria, Virginia
September 19, 2013

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

copies to:

Donald F. King
John T. Donelan
Joseph A. Guzinski

18750

66