# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| GORDON PROPERTIES, LLC, and CONDOMINIUM SERVICES, INC., | Case No.  09-18086-RGM (Jointly Administered) (Chapter 11) |
| Debtors. | |
| JUDY A. ROBBINS, UNITED STATES TRUSTEE, | |
| Movant, | Contested Matter (Motion to Appoint Chapter 11 Trustee Docket Entry 592) |
| vs. | |
| GORDON PROPERTIES, LLC, | |
| Debtor. | |
| STITES & HARRISON, PLLC, | |
| Movant, | Contested Matter (Motion to Convert Case to Chapter 7 Docket Entry 654) |
| vs. | |
| GORDON PROPERTIES, LLC, | |
| Debtor. | |

## MEMORANDUM OPINION

This case is before the court on the motion of Judy A. Robbins, United States Trustee, to

appoint a chapter 11 trustee, and the motion of Stites & Harbison, PLLC to convert the case to a

proceeding under chapter 7.  (Docket Entries 592 and 654, respectively).  The issues are the debtor's

management of the case, the continuing losses shown on its monthly operating reports, and its ability

1

to propose a feasible plan of reorganization that has a reasonable possibility of being confirmed within a reasonable period of time.

## Background[1]

The two principal creditors are First Owners' Association of Forty Six Hundred Condominium, Inc. ("FOA") and Stites & Harbison.  FOA is a Virginia non-stock corporation consisting of all of the condominium unit owners in Forty Six Hundred Condominium.  The condominium consists of 450 condominium units in three buildings, a high-rise building and two buildings fronting on Duke Street.  There are 396 residential units and 52 commercial units in the high-rise building.  The street-front units are used as a gas station and a restaurant.  Gordon Properties, the debtor, owned 31 residential units, nine commercial units and the restaurant street-front unit when it filed this case.[2]  It holds about 19.1% of the votes in the condominium unit owner's association of which about 11.32% appertain to the restaurant unit.  For the condominium as a whole, the votes appertaining to individual residential units varies between 0.1050% and 0.3421% and for commercial units averages 0.1917%.

The four members of Gordon Properties are Bryan Sells, Elizabeth S. Greenwell, Lindsay A. Wilson and Julia G. Langdon.  Ms. Langdon is an adult under a disability.  Her co-conservators are Richard S. Mendelson, an attorney who practices in Alexandria, Virginia, and Lindsay A. Wilson,

---

[1]The background of the case, the parties and the claims, is more fully discussed in *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* 2013 WL 5295246 at *1 - *3, 2013 Bankr.LEXIS 3902  at *1 - *18 (Bankr.E.D.Va. Sept. 19, 2013) (Motion to Approve Settlement).

[2]Gordon Properties sold two units early in the case.  It sold Unit 1319, a residential unit, for $199,000.  Order Granting Motion to Sell Real Property entered on October 29, 2009 (Docket Entry 33).  The unit was unencumbered. Motion for Approval of Sale of Real Property at ¶3 (Docket Entry 15).  The second unit was Unit 1220, also a residential unit, which sold for $175,250.  Order Granting Motion to Sell Real Property entered on December 17, 2009 (Docket Entry 54).  It was also unencumbered.  Motion for Approval of Sale of Real Property at ¶3 (Docket Entry 45).

her sister.  Mr. Sells and Ms. Greenwell are brother and sister and are the first cousins of Ms.

Langdon and Ms. Wilson.  Mr. Sells is the sole managing member of Gordon Properties.

The debtor owns Condominium Services, Inc. ("CSI"), a condominium and homeowner

management company that managed FOA for many, many years.  FOA's board of directors

terminated CSI's last management contract with the condominium association as of August 1, 2006.

CSI contested the termination.  Litigation followed.  FOA was awarded a $436,792 judgment against

CSI on November 18, 2009.  The judgment was affirmed by the Virginia Supreme Court on

April 21, 2011.  *Condominium Services, Inc. v. First Owners' Ass'n of Forty Six Hundred*

*Condominium, Inc.,* 281 Va. 561, 709 S.E.2d 163 (2011).


## I.  The Debtor's Management of the Case

The distinguishing feature of this case is that three of the seven directors on the creditor's

board of directors are owners of the debtor.  No director was affiliated with the debtor prior to

June 15, 2012.


## A.  The Decision to File Bankruptcy

Gordon Properties objected for many years to the condominium fees and charges FOA made

against Gordon Properties.  The most significant was a multi-year additional condominium fee made

by FOA's board of directors against the restaurant unit.  The board believed – and Gordon Properties

disputed – that the allocation of the assessment against the restaurant unit had been incorrectly

calculated since the late 1970s.  The board decided to correct the error and assessed the additional

amount, to the extent permitted by the statute of limitations, against the restaurant unit.  It claimed

$315,673 on its proof of claim, plus interest, or about $8,000 a month, an amount that exceeded the rent from the tenant of the restaurant unit under a lease made in 2002. Gordon Properties sued FOA in state court seeking a determination that it was not liable for the additional assessment and for additional relief. FOA filed a counterclaim seeking payment of the assessment. The court found on a motion for partial summary judgment that the additional assessment for the alleged prior under-assessments was premature "because no corrective assessment" had been made by the board. *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.,* Case No. CL08-1432 (Va.Cir.Ct. Jan. 30, 2009). After the court's adverse ruling, the board properly made an assessment to correct what it believed was the prior miscalculated assessments. The remaining claims in the case were decided by the state court by its order entered on July 27, 2009. Robert E. Scully, Jr., of Stites & Harbison, PLLC, represented Gordon Properties in the litigation. Michael S. Dingman of Reed Smith, LLP, represented FOA.

A Virginia condominium has several ways to enforce payment of condominium fees. It has the usual remedies of filing suit and enforcing the judgment. The Virginia Condominium Act also creates a lien for the unpaid condominium fees. A unit owners' association obtains a lien on a condominium unit for delinquent condominium fees by filing a memorandum of condominium lien. It enforces the lien by selling the unit at a nonjudicial foreclosure sale. Va.Code (1950) §55-79.84(I). A unit owners' association must follow a statutorily prescribed procedure to enforce the lien. It must first give the unit owner a written notice that specifies the debt secured by the lien and the action required to satisfy the debt secured by the lien; that advises the unit owner that he may satisfy the lien within 60 days; that failure to satisfy the lien within 60 days may result in the sale of the condominium unit; and that the unit owner has the right to bring a court action to assert the

nonexistence of the debt or any other defense to the sale.  Va.Code (1950) §55-79.84(I)(1).  If the

unit owner does not timely satisfy the lien, the unit owners's association may appoint a trustee to

sell the unit.  Va.Code (1950) §55-79.84(I)(2).[3]  The trustee must advertise the sale for a minimum

of five days, which may be consecutive days.  Va.Code (1950) §55-79.84(I)(5)(a).[4]  The sale may

be held on any day after the advertisement has been published, but not sooner than eight days after

the first advertisement, however, the unit owners' association must also give the owner and lien

holders at least 14 days notice of the sale.  Va.Code (1950) §55-79.84(I)(4).  Distilled to its essence,

a unit owners' association of a condominium located in a city cannot hold a nonjudicial sale earlier

than 75 days after the first required notice is given to the unit owner.

    In addition to these remedies, FOA's bylaws provide that a unit owner who is more than 30

days delinquent in the payment of his condominium fees may not vote at meetings of the unit

owners' association or sit on the board of directors.  Bylaws Art. IV, §7.  *See Gordon Properties,*

*LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties,*

*LLC),* 460 B.R. 681 (Bankr.E.D.Va. 2011) [hereinafter *"Gordon Properties* (Second Stay

Violation)"].  FOA has interpreted this bylaw to mean that if a unit owner owns more than one unit

and is delinquent in the payment of condominium fees as to only one unit, he may not cast a ballot

for any of the units he owns.  In the case of Gordon Properties, the additional assessment asserted

against the street-front restaurant, if valid, disqualified Gordon Properties from exercising the votes

appertaining to any of its units.

---

[3]The statute is explicit that the appointment of the trustee may only occur "[a]fter the expiration of the 60-day notice period."  Va.Code (1950) §55-79.84(I)(2).

[4]The general rule for advertising is once a week for four weeks unless the property is located in a city or in a county immediately contiguous to a city in which case the advertisement may run for five days, which may be consecutive days.  This condominium is located in the City of Alexandria.

Gordon Properties did not pay all of the legal bills submitted to it by Stites & Harbison who had represented it in the state court suit.  Mr. Scully, the lead attorney, wrote to Bryan Sells, the managing member of Gordon Properties, on March 9, 2009.  The firm, Mr. Scully stated, had advanced more than $20,000 in court costs and was owed $185,108 in attorney's fees, not including the "recent week long jury trial and upcoming post trial motions."  GP Ex. 20.  Mr. Scully wrote to Mr. Sells again on September 1, 2009.  The bill was then $237,341.42.  He requested a "firm commitment to a timetable for paying off Gordon Properties' debt" to the law firm and suggested a payment plan.  He concluded:

> We have been very patient in awaiting payment for our services.  If the foregoing payment plan is not acceptable this firm will have to consider other methods of collecting, including appropriate legal action.

GP Ex. 22.  Both letters were professional and respectful.

FOA filed a memorandum of condominium lien against the street-front unit, apparently in late July 2009, but in any event before August 5, 2009.  There was no evidence of any action taken by FOA to enforce the lien.

On October 2, 2009, Gordon Properties filed its chapter 11 petition.  Mr. Mendelson testified that Gordon Properties filed bankruptcy to give it immediate relief from two claims it could not pay in the ordinary course:  FOA's claim for the additional assessment and Stites & Harbison's claim for attorney's fees.  He also testified that Gordon Properties' condominium counsel, Mercer Trigiani, raised the question of whether the automatic stay, 11 U.S.C. §362(a), prevented FOA from enforcing Bylaws Art. IV, §7 which prohibited a delinquent unit owner from voting at a meeting of the unit owners.  Mr. Mendelson emphasized the value of the automatic stay with respect to FOA's and Stites & Harbison's claims.  He was concerned about FOA's ability to conduct a nonjudicial

6

foreclosure sale on short notice.  However, he was unable to explain the filing in light of the notice FOA was required to give before it conducted a nonjudicial foreclosure sale[5] and that Stites & Harbison had not filed a suit to collects its unpaid fee.

## B.  Voting Rights and Election to the Board of Directors

Despite the two threats Mr. Mendelson identified, Gordon Properties did not manage its chapter 11 case in a manner reflecting the importance of resolving them.  While it listed both claims as disputed on its schedules, it did not object to FOA's proof of claim for almost a year after the case was filed and to Stites & Harbison's proof of claim for almost four years after the case was filed. In the interim, it expended significant resources to secure its right to vote at the annual meetings and have its representatives elected to FOA's board of directors.

The time records attached to Mercer Trigiani's first fee application begin on July 1, 2009. The first mention of bankruptcy was on July 14, 2009, when Philip C. Baxa conducted "Legal research on issues related to automatic stay in bankruptcy."[6]  He conducted more research on the automatic stay on July 15 and July 17.  On July 15, he "Continue[d] research on issues related to automatic stay in bankruptcy [redaction]; review Virginia Condominium Act; read cases regarding automatic stay."  On July 17, he had a telephone conversation with David S. Mercer regarding bankruptcy and Mr. Mercer had a telephone conversation with Mr. Sells about bankruptcy. Donald F. King, Gordon Properties' bankruptcy attorney, was first mentioned on July 28, 2009.

---

[5]At trial, Mr. Mendelson assumed that Gordon Properties had at least 22 days notice before FOA could conduct a nonjudicial foreclosure sale.  In fact, it is 75 days.

[6]This was before the final order was entered in the state court on July 27, 2009; most likely before a memorandum of condominium liens was filed and before Mr. Scully's September 1, 2009 letter.  The matters were well known to Gordon Properties at this time.

Michael Zupan, an attorney at Mercer Trigiani, had a telephone conversation with Robert Diamond of Reed Smith who represented FOA on August 5, 2009, about a lien on the street-front unit.

Mr. King's time records start on October 1, 2009.[7]  The first entry is to "Draft injunction complaint and motion for preliminary injunction and expedited hearing." The petition was filed on October 2, 2009, together with all schedules and the statement of financial affairs.  The second pleading filed – also on October 2, 2009 – was a complaint seeking an injunction requiring FOA to allow Gordon Properties to vote at the annual meeting scheduled for October 7, 2009.  *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium Inc. (In re Gordon Properties, LLC),* Adv. Proc. No. 09-1304 (Bankr.E.D.Va. Oct. 2, 2009).  Mr. King's October 2, 2009 time record reflects a telephone call to counsel for FOA informing him of Gordon Properties' bankruptcy filing.  It stated "Communicate with Opposing Counsel [Robert] Diamond re: chapter 11 filing, automatic stay and FOA meeting."  The preliminary injunction was denied at a hearing held on October 7, 2009.

The annual meeting was convened on October 7, 2009.  There was no quorum and the meeting adjourned sine die without an election of directors.  Gordon Properties amended its complaint on November 3, 2009, and unsuccessfully asserted that the conduct at the October 7, 2009 annual meeting constituted a violation of the automatic stay.  *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* 435 B.R. 326 (Bankr.E.D.Va. 2010).

---

[7]Earlier time records were not filed with the court because they preceded the bankruptcy and were not subject to a fee application.  Mr. King first appears in Mercer Trigiani's time records on July 28, 2009.

The board of directors prepared to hold its 2010 annual meeting but postponed it shortly before the meeting was scheduled. It never rescheduled the meeting. On January 9, 2011, Gordon Properties sued FOA, its board of directors, and the individual directors asserting that the cancellation of the 2010 meeting violated the automatic stay. On September 20, 2011, this court held that FOA's conduct violated the automatic stay. *Gordon Properties* (Second Stay Violation).

The October 5, 2011 annual meeting was held under the supervision of the court. The court resolved all election controversies on June 15, 2012, and determined that a board including four Gordon Properties-affiliated directors was elected. Seven of the eight candidates with the most votes were affiliated with Gordon Properties. They received from 185.8605 votes to 244.4513 votes. There are a total of 1000 votes in the association of which about 599.5 were cast. Lucia Hadley, who was not affiliated with Gordon Properties, finished fourth with 196.8531 votes. The next five candidates received from 182.2494 to 185.3601 votes. Order Establishing Election Results, *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* Adv.Proc.No. 11-1020 (Bankr.E.D.Va. July 15, 2012)(Docket Entry 210) [hereinafter "*Gordon Properties* First Election Order"]. But for the votes of Gordon Properties, about 191 in all, none of the Gordon Properties' candidates would have been elected.

Gordon Properties designated two candidates as representatives of Gordon Properties itself, and five candidates as representatives of Gordon Residential Holdings, LLC ("Residential Holdings"), a limited liability company solely owned by Gordon Properties. Residential Holdings owned one residential unit. Each of the five designated candidates was an officer of Residential Holdings. Mr. Sells was qualified to sit on the board by virtue of his individual ownership of a residential unit. Gordon Properties asserted that it had the right to run multiple candidates. Its

position was that a non-natural entity – specifically Gordon Properties and Residential Holdings – could designate any number of officers as candidates for election to FOA's board and, if elected, that they could all serve.  Gordon Properties posed a special problem under the condominium's bylaws. The bylaws required at least one member of the board to be – but prohibited more than two from being – a commercial unit owner.  Gordon Properties recognized the argument – with which it disagreed – that Gordon Properties was limited to two representatives on the board because it was the owner of commercial units even though it also owned residential units.

Prior to the October 5, 2011 election, FOA filed suit in state court against Residential Holdings to enforce Policy Resolution 2009-03 which prohibited Residential Holdings from having more than one director on the board of directors.[8]  The Policy Resolution, passed by the FOA board of directors in the spring of 2009, limited Gordon Properties, Residential Holdings and Mr. Sells to a single seat on the board of directors by aggregating all related entities and individuals and limiting them to a single representative on the board of directors. The state court issued a preliminary injunction limiting Residential Holdings to one seat.  Gordon Properties then demanded, as it was entitled to do under the bylaws, that the validity of the Policy Resolution be determined by arbitration.  Its position was that the Policy Resolution was not a valid exercise of the board's power because the qualifications for directors were established by the bylaws and the board had no authority to alter those qualifications.  This court modified the automatic stay to permit Gordon Properties to be made a party to the suit and the arbitration.

In order to resolve the election contests, Gordon Properties agreed that it would be limited to two directors; Residential Holdings would be limited to one director; and Mr. Sells was qualified

---

[8]FOA did not join Gordon Properties as a defendant out of concern that by doing so it could violate the automatic stay.  Relief from the automatic stay was obtained later and Gordon Properties was added as a party defendant.

by virtue of his ownership of a condominium unit.  This concession was made only for the  purposes

of the 2011 election and while the validity of the Policy Resolution was being arbitrated.  It formed

the basis for this court's election order dated June 15, 2012.  FOA then raised the issue of whether

– without regard to the Policy Resolution – any non-natural entity could hold more than one seat on

the board of directors.  This court held on July 23, 2012, that a non-natural entity could not hold

more than one seat.  This altered the composition of the board.  Amended Order Establishing

Election Results, *Gordon Properties, LLC v. First Owner's Ass'n of Forty Six Hundred*

*Condominium, Inc. (In re Gordon Properties, LLC)*, Adv. Proc. No. 11-1020 (Bankr. E.D. Va. July 23,

2012) (Docket Entry 239) [hereinafter "*Gordon Properties* Second Election Order"].   The

reconstituted board consisted of three owners of Gordon Properties and four non-affiliated

individuals.  The organizational meeting of the board was held on June 17, 2012.  From June 17,

2012 through July 23, 2012, Gordon Properties held a majority on the board of directors.

The owners of Residential Holdings are the same as the owners of Gordon Properties.  Tr.

8/23/2013 at 285.  It owns Unit 1518 which was conveyed to it by Gordon Properties in 2007

without consideration.[9]  *Id.* at 282, 286.  The unit was unencumbered.  *Id.* at 286.  Mr. Sells, the

managing member of Gordon Properties, testified that the purpose of the transfer was to provide a

clear basis for Gordon Properties to hold three seats on FOA's board of directors.[10]  *Id.* at 282-284.

---

[9]Mr. Sells testified that the transfer was in 2007 but admitted that he was not certain of the date.  The Statement of Financial Affairs stated that the transfer was in August 2008 but identified the unit as unit 1515.  Only one unit was transferred.

| | |
|---|---|
| [10]JUDGE MAYER: | When did Residential Holdings acquire its unit? |
| THE WITNESS: | I don't remember as I'm sitting here today.  I think 2007.  But there are so many dates in this litigation. |
| JUDGE MAYER: | What was the occasion that it purchased the unit? |
| THE WITNESS: | I'm not sure. |
| JUDGE MAYER: | Why did you do it?  What occasioned the purchase? |

(continued...)

[10](...continued)

| | |
|---|---|
| THE WITNESS: | So that there would be an entity that owned only residential units. |
| JUDGE MAYER: | Why is that significant? |
| THE WITNESS: | Because there is a restriction in the documents on residential unit owners and commercial unit owners and the numbers of each that can serve on the board. |
| JUDGE MAYER: | What is that restriction? |
| THE WITNESS: | I think there has to be at least one and can only be up to two commercial owners. I don't remember the exact language. |
| JUDGE MAYER: | And it's your understanding that Gordon Properties would be a commercial landlord limited to one or two seats? |
| THE WITNESS: | Well, there is certainly a question about that because Gordon Properties owns residential and commercial so there is a question about whether it would, quote, unquote, count as a commercial unit owner even if the officer or agent of Gordon Properties ran sort of as the representative of one of Gordon Properties' residential units.  And Gordon Residential eliminates that confusion. |
| JUDGE MAYER: | So the intent on that particular issue was to assure that there would be at least two seats on the board and avoid the limitation on the commercial unit owners sitting on the board? |
| THE WITNESS: | Well, I would say at least three because commercial unit owners can have two. |
| JUDGE MAYER: | It's not one or two. It's two, to the best of your recollection? |
| THE WITNESS: | I think it's no more than two.  And I think there has to be one.  So a minimum of one and a maximum of two, I believe.  The gallery is nodding their heads so I have that right. |
| JUDGE MAYER: | So the purpose of the Residential Holdings acquiring a residential unit would be so that it, in its own right, could have a representative on the board of directors while Gordon Properties might be subject to the one or two restrictions arising from the commercial positions on the board? |
| THE WITNESS: | Might be, yes. |
| JUDGE MAYER: | And this was to eliminate that confusion and to assure that that could be done? |
| THE WITNESS: | Yes.  There may have – I'm sorry, Your Honor. There may have been other reasons as well but that's the one that I recall. |
| JUDGE MAYER: | And Residential Holdings is owned by the four of you, your sister and your two cousins? |
| THE WITNESS: | Yes. |
| JUDGE MAYER: | Who funded the purchase?  Where did the money come from? |
| THE WITNESS: | It's been so long, I don't recall but – |
| JUDGE MAYER: | Is it mortgaged? |
| THE WITNESS: | No, it is not. |
| JUDGE MAYER: | Did the cash come from Gordon Properties? |
| THE WITNESS: | Well, no.  Unit 1518 was previously owned by Gordon Properties. |
| JUDGE MAYER: | 1518 is the Residential one? |
| THE WITNESS: | Yes. |
| JUDGE MAYER: | And it was owned by Gordon Properties? |
| THE WITNESS: | Yes. |
| JUDGE MAYER: | And it was transferred in 2007 to Gordon Residential? |
| THE WITNESS: | Correct.  I think I have the year on that correct. |
| JUDGE MAYER: | So basically –  and the 1518 was unencumbered at that time so there was really no cash, you didn't need to go out for financing or anything like that? |
| THE WITNESS: | That's my recollection, Your Honor. |
| JUDGE MAYER: | And you own one unit yourself in your own name? |

(continued...)

12

Mr. Sells purchased Unit 703, a residential unit, in his own name to circumvent the delinquency provision in the bylaws and to provide an independent basis for him to serve on the board of directors.  Bylaws Art. IV, §7.  Tr. 8/23/2013 at 286-287.

After Residential Holdings acquired Unit 1518 and Mr. Sells acquired Unit 703, the board passed Policy Resolution 2009-03 which aggregated all related entities for purposes of membership on the board of directors and limited the aggregated entities to one seat on the board.  While there are several unit owners who own two units, the Policy Resolution was directed against Gordon Properties.

---

[10](...continued)

| | |
|---|---|
| THE WITNESS: | I do. |
| JUDGE MAYER: | And when did you acquire that? |
| THE WITNESS: | I think that was 2009.  It might have been 2008. |
| JUDGE MAYER: | And why did you acquire that? |
| THE WITNESS: | It was in part to own an asset and in part to further get around the – I think it was to get around the poison pill that had been adopted. Although I may actually have the timing on that incorrect. The poison pill may have been adopted in reaction to that. I'm not really sure. |
| JUDGE MAYER: | Well, there was a 2009 resolution you're referring to. |
| THE WITNESS: | Correct. |
| JUDGE MAYER: | Which restricted – aggregated all three of those types, individual, corporate, brother/sister companies or whatever? |
| THE WITNESS: | Correct. |
| JUDGE MAYER: | And that's the one that was repealed on a point of order and there is some question as to whether that was effective and the board, after you became president, plainly repealed it as the board of directors? |
| THE WITNESS: | Correct.  And of course there was also the other reason for me buying a unit and for 1518, now that I think about it – I haven't thought about this in a long time – but it's because the holdover board of FOA had this habit and that habit was every election, it would find some basis for finding that Gordon Properties was delinquent and therefore unable to vote.  And by having a regular old unit, both the 1518 and the 703, my own personal unit, it made it more difficult for them to do that. |
| JUDGE MAYER: | So in addition to the other issues, number of board seats, it got around the delinquency provision in the bylaws that we addressed in an earlier opinion? |
| THE WITNESS: | Right.  And I specifically remember I think it was the 2009 special meeting.  We asked for a special meeting in 2009 and had the special meeting and that's when the board composed those retroactive assessments that were the subject of the claim objection.  And even though the demand letter said they were due on I think it was the first of June and the special meeting was June 25th, the lawyer, FOA's lawyer at the meeting said that they were 30 days delinquent. |

Tr. 8/23/2013 at 282-288.

Mr. Sells endeavored to mitigate his August 23, 2013 testimony at the September 30, 2012 hearing.  He testified that one of the reasons for organizing Residential Holdings was to protect tenants from a suspension of condominium services in the event of a delinquency in paying condominium fees for another unit.  The condominium may suspend services, such as pool privileges, if a unit owner is delinquent in paying his condominium fees.  Mr. Sells testified that none of Gordon Properties' units was ever delinquent except for the asserted additional assessment against the street-front unit.  FOA's argument was that if Gordon Properties was delinquent in the payment of condominium fees as to any unit, no unit could vote and services could be suspended to all units.  By establishing Residential Holdings, Mr. Sells testified, the tenant of unit 1518 would not be subject to losing his condominium privileges.

The court gives greater weight to Mr. Sells' August 23, 2013 testimony as to the reasons for establishing Residential Holdings.  The creation of Residential Holdings protected only one tenant. If Gordon Properties was interested in protecting its tenants, it could have – under its approach – established a separate limited liability company for the street-front unit and thereby insulated all of the other residential and commercial units from the dispute over the payment of the additional assessment. The creation of Residential Holdings was to further Gordon Properties' efforts to obtain additional representation on the board of directors.  As the owner of a residential property, it was not counted as a commercial owner included in the limitation of the two commercial seats on the board.  It thereby enabled Residential Holdings to run multiple candidates for the board as occurred by the creation of five officers for Residential Holdings and running all of them for the board of directors at the October 5, 2011 annual meeting.

The significance of voting to Gordon Properties is also shown by the contract for sale of the restaurant unit dated October 13, 2010.[11] (Docket Entry 109). The sales price was $3 million. The contract acknowledged the dispute with the condominium with respect to the condominium assessment. It stated:

> After Closing, [Gordon Properties] shall endeavor to reach an agreement with [FOA] with regard to the Assessment Dispute, either through resolution of the proof of claim filed with the Bankruptcy Court, *through exercise of its rights in accordance with the Voting Agreement* or otherwise through negotiations with [FOA].

Motion for Approval of Sale of Real Property, Ex. A, Agreement for Purchase and Sale of Real Estate dated October 13, 2010, at 9 (Docket Entry 109-1) (emphasis added).

The Voting Agreement gave Gordon Properties the buyer's proxy for the street-front unit for any vote for the nomination, election or removal of any director or officer of FOA or any vote relating to condominium assessments for units owned or controlled by Gordon Properties. The voting agreement terminated on the earliest of the date when Gordon Properties no longer owned any unit at the condominium, the date the condominium was terminated, the date when Gordon Properties terminated its right to the proxy or 2021. *Id.* at 25.

The 2013 proposed settlement with FOA contained another indication of the importance of its voting rights to Gordon Properties, in particular, to holding multiple seats on the board of directors. The proposed settlement was conditioned upon this court vacating its prior order restricting non-natural entities to a single seat on the board of directors.

The court finds that Gordon Properties' efforts to obtain greater influence over – even control of – the FOA board began before the bankruptcy. The bankruptcy opened the opportunity to effectuate this plan without resolution of the assessment issue by use of the automatic stay. Gordon

---

[11]Gordon Properties objected to FOA's proof of claim on September 27, 2010. The 2010 annual meeting was scheduled for October 6, 2010.

Properties rearranged its holdings through Residential Holdings' and Mr. Sells' individual ownership in order to enable it to hold more than two seats on the board of directors. Counsel began researching the effect of the automatic stay on the enforceability of Bylaws Art. IV,§7 on July 14, 2009, more than ten weeks before the case was filed. The case was filed immediately before the annual meeting and, on minimal notice, Gordon Properties requested a preliminary injunction requiring FOA to allow it to vote notwithstanding the nonpayment of the additional assessment.

This finding is supported by the absence of an immediate need to file bankruptcy. The threats from the two claims were not imminent. The Stites & Harbison claim, which must be resolved in any event either in bankruptcy court or state court, could have been litigated in state court without interfering with Gordon Properties' operations or its financial affairs. Only part of the claim is contested and Gordon Properties would have had ample time to prepare to pay it. The economic cost of resolution of the underlying claim is likely to be substantially the same in either forum, but the bankruptcy forum adds additional costs in United States Trustee fees, reporting requirements, plan formulation expenses and the associated attorney's fees.

The FOA claim appeared more pressing because of the ability of FOA to hold a nonjudicial foreclosure sale. However, in light of the notice required for a nonjudicial sale, there was always ample time to file bankruptcy before a foreclosure sale. The underlying matter could have been resolved in state court. If during the pendency of the state court suit FOA sought to enforce its lien, Gordon Properties had the right to seek an injunction in state court. With a case pending and substantial arguments on its side, it is more likely than not that an injunction would have issued pending resolution of the matter. Gordon Properties had ample ability to post any required bond.

In any event, if Gordon Properties was unsuccessful in obtaining an injunction, bankruptcy remained an option.[12]

---

[12]Mr. Sells testified that there was an additional consideration for filing bankruptcy arising from FOA's claim. It was to assure that Gordon Properties could recover its attorney's fees in the assessment matter, if it were successful. Va.Code (1950) §55-79.53(A) provides for attorney's fees to the prevailing party in suits for the enforcement of condominium documents.  The statute in effect on October 2, 2009 stated:

> The declarant, every unit owner, and all those entitled to occupy a unit shall comply with all lawful provisions of this chapter and all provisions of the condominium instruments.  Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the unit owners' association, or by its executive organ or any managing agent on behalf of such association, or, in any proper case, by one or more aggrieved unit owners on their own behalf or as a class action. A unit owners' association shall have standing to sue in its own name for any claims or actions related to the common elements as provided in subsection B of § 55-79.80.  The prevailing party shall be entitled to recover reasonable attorneys' fees and costs expended in the matter.

Va.Code (1950) §55-79.53(A).

There was a disagreement as to whether the statute applied only if the condominium was the plaintiff but not if the unit owner was the plaintiff.  *See White v. Boundary Ass'n,* 271 Va. 50, 624 S.E.2d 5 (2006) (property owner may be awarded attorney's fees) (construing the comparable provision in the Virginia Property Owners' Association Act, Va.Code (1950) §55-515(A)).  *Cf. Gordon Properties, LLC v. Bd. of Dirs. of First Owners' Ass'n of Forty Six Hundred Condominium, Inc.,* 2008 Va.Cir LEXIS 203 (Va.Cir.Ct. Mar. 12, 2008) (condominium owners' association must be plaintiff) and *Farran v. Olde Belhaven Towne Owners' Ass'n.,* 2011 Va.Cir. LEXIS 114 (Va.Cir.Ct. Aug. 24, 2011) (either property owners' association or property owner may be plaintiff) (construing the comparable provision in the Virginia Property Owners' Association Act, Va.Code (1950) §55-515(A)).  The argument was that if Gordon Properties filed a suit to enjoin foreclosure of the memorandum of condominium lien or a suit to declare the assessment void, it might not be able to recover its attorney's fees in the proceeding because it, not FOA, was the plaintiff.  In bankruptcy, FOA would have to be the plaintiff.  This would occur, Gordon Properties argued, because Gordon Properties listed the claim as disputed thus requiring FOA to file a proof of claim.  While Gordon Properties would then be required to file an objection to the proof of claim, FOA – Gordon Properties argued – was the plaintiff because it initiated the action by filing its proof of claim.  Thus, Gordon Properties' claim for attorney's fees as prevailing party would be assured.  If Gordon Properties' right to attorney's fees was dependent on this argument, it would likely have been unsuccessful.  The argument does not take into account that a contested matter is commenced upon filing an objection to a proof of claim, not the filing of a proof of claim.  *In re TWL Corp.,* 712 F.3d 886, 892 (5th Cir. 2013); *Reid v. White Motor Corp.,* 886 F.2d 1462, 1469 n8 (6th Cir. 1989) *cert. denied* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939; 1983 Advisory Committee Note to Fed.R.Bankr.P. 9014 ("[T]he filing of an objection to a proof of claim . . . creates a dispute which is a contested matter."); Fed.R.Bankr.P. 3007; 10 Resnick and Sommer, *Collier on Bankruptcy,* ¶9014.01at 9014-3 (16th ed.2013).

As it turns out, the divergence of opinion as to whether §55-79.53(A) is available in all suits involving alleged violations of condominium documents or only those commenced by the unit owners association was recently indirectly, but likely persuasively, addressed by the Virginia Supreme Court when it held that the comparable provision in the Virginia Property Owners' Association Act, Va.Code (1950) §55-515(A), applies in all suits, whether commenced by the property owners association or the property owner.  *Manchester Oaks Homeowners Ass'n, Inc. v. Batt,* 284 Va. 409, 427-428, 732 S.E.2d 690, 701-702 (2012).  It appears likely that when the Virginia Supreme Court directly addresses this issue, it  will find that the Condominium Act and the Property Owners' Association Act provisions, §55-79.53(A) and §55-515(A), are identical, serve the same purpose and should be interpreted in the same manner and will hold that

(continued...)

Even given the threats that FOA and Stites & Harbison posed, Gordon Properties' schedules showed that it had adequate capital to operate and survive the threats. The schedules reported net equity of $9,603,113 which included $337,436.67 in a checking account. It had just sold an unencumbered condominium unit and would sell a second shortly. It financed the bankruptcy from loans from two members and could, presumably, have done the same while seeking to resolve the claims in state court. Moreover, Gordon Properties did not seek to resolve its most pressing problems when it filed. It did not object to FOA's proof of claim for almost a year and Stites & Harbinson's claim for almost four years. Gordon Properties had other matters on its mind, other objectives.[13]

## C.  Management of the Conflict of Interests

Gordon Properties' successful effort to be elected to FOA's board created a conflict of interests when dealing with the claims between FOA and Gordon Properties. Two particular issues, the proposed employment of CSI, Gordon Properties' wholly-owned subsidiary, to manage FOA and the proposed settlement with FOA, were addressed in prior opinions. *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* 2013 WL 1619941; 2013 Bankr.LEXIS 1545 (Bankr.E.D.Va. Apr. 15, 2013)(CSI Management Agreement); *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium,*

---

[12](...continued)
attorney's fees may be awarded to the prevailing party whether the suit was commenced by the unit owners association or the unit owner.

[13]This is not to suggest that debtors should only file bankruptcy when there is an imminent threat. Many debtors would be better served if they filed earlier. In this case, the reason given for filing on October 2, 2009 – the immediate threats to the operation and financial affairs from FOA and Stites & Harbison – are not supported by the facts.

*Inc. (In re Gordon Properties, LLC),* 2013 WL 4510582; 2013 Bankr.LEXIS 3426 (Bankr.E.D.Va.

Apr. 16, 2013) (Appointment of Examiner); *Gordon Properties, LLC v. First Owners' Ass'n of Forty*

*Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* 2013 WL 5295246, 2013

Bankr.LEXIS 3902 (Bankr.E.D.Va. Sept. 19, 2013) [hereinafter "*Gordon Properties* Settlement

Motion")].   Both the proposed management contract and the proposed settlement were rejected

because of the conflict of interests.[14]

    Closely related to the two conflict of interests transactions, the Gordon Properties-affiliated

directors took actions that affected the claims made by FOA.   Chief among these were the

management of the Special Litigation Committees and the termination of Reed Smith, FOA's long-

time counsel.    The former, the Special Litigation Committees, was addressed in a prior

Memorandum Opinion.   *Gordon Properties* Settlement Motion.   The latter was addressed in the

election order of June 15, 2012.   The order prohibited the Gordon Properties-affiliated directors from

interfering with the prosecution of any legal matter between Gordon Properties and FOA.   *Gordon*

*Properties* First Election Order.

    Gordon Properties violated the June 15, 2012 order.   The board of directors, while Gordon

Properties held four of the seven seats on the board, terminated Reed Smith and Redmon, Peyton

& Braswell on June 19, 2012.[15]   This had an immediate effect on pending litigation.   Reed Smith and

Redmon, Peyton & Braswell, principally through Mr. Dingman and Robert Marino, respectively,

were counsel for FOA in the overall bankruptcy case.   They were counsel in two appeals pending

---

[14]The management contract was not disapproved by the court.   The court could not approve the management
contract at the March 26, 2013 hearing because of conflict of interests considerations and continued the hearing to allow
FOA, CSI and Gordon Properties additional time to address the questions.   The motion was withdrawn without a further
hearing on September 9, 2013.

[15]Robert Marino of Redmon, Peyton & Braswell was bankruptcy counsel to FOA.

in the District Court,[16] the arbitration of Policy Resolution 2009-03 and the suit in state court in which the arbitration arose. Jennifer L. Sarvadi represented FOA in the adversary proceeding concerning the stay violation and the appeals from it.

FOA filed its brief in the substantive consolidation appeal to the District Court on June 1, 2012. Oral argument was scheduled for June 29, 2012. Briefs were due in the arbitration on June 22, 2012. The hearing was imminent. On June 19, 2012, before the board met and terminated counsel, this court set a hearing for June 27, 2012, on the issue of whether a non-natural entity could hold more than one seat on the board of directors and had not decided Gordon Properties' stay violation sanction's motion.

The impact of the termination was immediate. Reed Smith filed motions to withdraw in the District Court. Ms. Sarvadi's representation of FOA was expanded to seek a continuance of the argument of the District Court appeal. When this was denied, she was retained to argue the appeal, an endeavor in which she was successful. The arbitrator cancelled the deadline for filing briefs. Briefs were never filed and the hearing was never held. The hearing in this court was continued briefly. Motion to Continue Hearing, *Gordon Properties, LLC v. First Owner's Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC)*, Adv. Proc. No. 11-1020 (Bankr.E.D.Va. June 22, 2012) (Docket Entry 215); Order Granting Motion to Continue, *Gordon Properties, LLC v. First Owner's Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC)*, Adv. Proc. No. 11-1020 (Bankr.E.D.Va. June 27, 2012) (Docket Entry 223).

---

[16]One appeal was FOA's appeal of the denial of its motion for substantive consolidation of the Gordon Properties and the CSI bankruptcy cases. Substantive consolidation would assure FOA of full payment of its claim against CSI.

On July 27, 2012, this court awarded Gordon Properties its attorney's fees in the stay violation proceeding.  It is unclear what effect the termination of Reed Smith had on Ms. Sarvadi's arguments or presentation.  All three counsel, Mr. Dingman, Ms. Sarvadi and Mr. Marino, communicated about the cases although each had his or her own responsibilities.  Mr. Dingman had extensive knowledge of the relationship between FOA and Gordon Properties and the prior litigation which was immediately denied to Ms. Sarvadi.  Consultation between them at this time might well have brought to light the facts and their significance that were recently presented to the court and might have formed the basis for further action or a motion by Ms. Sarvadi that might have resulted in Gordon Properties being denied any attorney's fees in its successful suit enforcing the automatic stay.  Although FOA should not have violated the automatic stay, Gordon Properties' prosecution of the automatic stay issue in the bankruptcy might have been for ulterior motives and not have been in good faith.  In those circumstances, the award of its attorney's fees might have been different.  Other matters relating to the termination of Reed Smith were discussed in *Gordon Properties* (Settlement Motion).

The evidence taken as a whole shows that Gordon Properties set the stage to increase its representation on FOA's board of directors before it filed bankruptcy by organizing Residential Holdings and by Mr. Sells acquiring a residential unit and used the automatic stay, not so much to stop creditor action and obtain a respite while it resolved its financial problems, but to further its effort to increase its representation on the board.  It devoted much more of its attention to litigating automatic stay matters rather than objecting to the two proofs of claims that, it says, prompted it to file bankruptcy.  Once it obtained the right to vote, it sought almost total control of the board but

21

was prevented by two separate court orders.  It used its position on the board to create what it hoped would be a board more receptive to its terms of settlement.

## II.  Continuing Losses

One of the principal arguments of the United States Trustee in seeking a chapter 11 trustee and Stites & Harbison in seeking conversion to chapter 7 was the continuing financial loss of Gordon Properties and CSI.  There is no doubt that Gordon Properties and CSI have incurred substantial operating losses during the four years that they have been in bankruptcy.  Gordon Properties has lost over $1.2 million which has been funded principally by loans from two of the four owners.  Gordon Properties argued that most of the losses were legal fees incurred in the bankruptcy cases and related litigation.  Part of the loss, about $225,000, was the result of payment of the additional assessment during the pendency of this case.[17]  When these expenses are no longer necessary, Gordon Properties can, it asserts, operate profitably, although there would not be a substantial positive cash flow.

Gordon Properties' observations as to the nature of the continuing loss are generally correct. However, in fairness to the United States Trustee, her concern extends beyond the long-term viability of the rental business to the wisdom of spending such a large sum to contest claims of less than half of that amount.[18]

---

[17]This was necessary so the Bylaws Art. IV, §7 would not apply.  The automatic stay only affects enforcement of prepetition debts, not postpetion debts.  In addition to prohibiting a unit owner from voting, a delinquent unit owner may not sit on the board of directors.

[18]Even if FOA's $453,533 claim against CSI is included, Gordon Properties has still paid more in legal fees than all the claims combined.  The claim against CSI has been fully litigated and cannot be contested.  In addition, Gordon Properties acknowledges most of Stites & Harbison's claim.  It accepted $155,518.55 of the claim and objected to $82,236.58.  If only disputed amounts are counted, Gordon Properties spent more than three times in attorney's fees than
(continued...)

### III.  The Ability to Propose a Feasible Plan of Reorganization

Gordon Properties has not formulated a plan.  Mr. Sells testified as to some broad outlines of a plan, but nothing with any particularity.  His testimony leads the court to the conclusion that no serious thought has been given to formulating a chapter 11 plan.  One approach he suggested was to reach a settlement with FOA for both CSI and Gordon Properties and then dismiss the cases.

There are significant impediments to a dismissal without all claims being resolved. Dismissal would leave the Stites & Harbison claim unresolved.  Mr. Sells suggested that the claim could be resolved in state court after dismissal.  This was an odd suggestion because Mr. Mendelson thought that the claim was sufficiently threatening to be part of the reason for filing bankruptcy.  It would also be unfair to Stites & Harbison.  It has been held at bay for over four years and would be in the same situation in which it was before this case was filed.  There is a benefit to Stites & Harbison from the bankruptcy.  Once the claim is resolved, it will be paid without significant difficulty because all of Gordon Properties' assets are subject to the control of the court and are available to pay creditors.  Dismissal as to Stites & Harbison would be inequitable.

Dismissal overlooks the existence of administrative claims.  The contract for the sale of the restaurant unit did not close.  The debtor retained a $75,000 deposit which, Mr. Sells testified, the purchaser asserts should be refunded to it.  Nothing has happened to resolve this claim.  It is an administrative claim that should be resolved in this court.

Dismissal does not address the loans from the two members of Gordon Properties.  One lender is Mr. Sells.  The other is his disabled cousin.  The other two members testified that they were

---

[18](...continued)
the amounts in controversy.  This analysis does not take into account the value of the determination of the proper assessment methodology.

not in a position to make loans to the debtor.  The loans cannot be repaid from rental income within a reasonable period of time.  They are fully secured, bearing interest at 14%.

Confirmation of a non-consensual chapter 11 plan appears problematic.  The small number of creditors and the magnitude of their claims makes approval without their consent unlikely.  Any plan would likely involve either a new cash infusion or a sale of assets.  The cash infusion would likely need to be equity, not a loan because the cash flow of the rental operations is unlikely to be able to support the cash flow required to repay a loan.[19]  While the sale of the street-front unit was attempted and is a reasonable approach to funding a plan, there will be income tax consequences.  The debtor is a limited liability company that is taxed as a partnership, this is, the tax consequences of a sale flow through to the members individually.  It is not uncommon in such circumstances for the limited liability company to make a distribution to members so that they are in a position to pay the tax.  There may be a significant tax liability.  The condominium units were owned by the members' grandfather who died in the late 1970s.  He left them to a trust that terminated in 2002.  The trust transferred the real estate to Gordon Properties.  The units were rental units and subject to depreciation.  No analysis has been done to determine the prospective net proceeds of sale, the creditors' claims that must be paid, and the tax implications.

An impediment to confirmation of a chapter 11 plan is resolution of FOA's claim against CSI.  The judgment is final and cannot be contested.  FOA sought substantive consolidation of the two cases which would assure it of payment of its claim in full.  The District Court reversed this court's denial of the substantive consolidation of the two cases.  *Gordon Properties, LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC),* 2012 WL

---

[19]While a bridge loan to pay creditors in full is possible, it would likely be paid from the sale of units.

404944; 2012 Bankr.LEXIS 769 (Bankr.E.D.Va. Feb. 8, 2012) *rev'd and remanded First Owners'*

*Ass'n of Forty Six Hundred Condominium, Inc. v. Gordon Properties, LLC (In re Gordon*

*Properties, LLC),* 478 B.R. 750 (E.D.Va. 2012) (Substantive Consolidation).  The matter is before

the District Court on a motion to reconsider.  A great deal has changed and come to light since this

court first ruled on the substantive consolidation motion.  In addition to the District Court's ruling

and analysis, Gordon Properties contributed $328,200 in equity to CSI during the course of this

case.[20]  But for Gordon Properties' equity contributions, CSI would not have remained in business.

Gordon Properties unsuccessfully sought to have FOA employ CSI as its manager, a contract that

would have benefitted CSI directly as well as its parent, Gordon Properties.   Even without

substantive consolidation, there is a question of whether, given the circumstances of these cases,

a plan that does not propose to pay FOA's claim against CSI in full can be proposed in good faith

or, if there is an objection to the plan, whether the plan is fair and equitable.  11 U.S.C. §1129(a)(3)

and (b)(1).     A chapter 11 plan must take these matters into account.  At this point it looks as if

there are only two plans that can take all of the matters into account.  One is a consensual plan,

essentially a global settlement.  This remains a possibility.  The other is a 100% payment plan that

would likely require a partial liquidation of Gordon Properties' assets.  A trustee would be in a better

position to effectuate a liquidating plan than the debtor.  A trustee would refrain from creating a

conflict of interests and, while he would properly protect the rights of the estate, would have an

independent perspective.  A chapter 11 trustee would be preferable over a chapter 7 trustee because

Gordon Properties is an operating rental business.  Only a portion of its assets would likely need to

---

[20]Gordon Properties' Balance Sheet as of July 31, 2013 shows the "Invest[ment] in Condominium Services"
as $1,024,266.  Small Business Monthly Operating Report for July 2013 at 21 (Docket Entry 657).  Schedule B, Item
13 of Gordon Properties' petition shows the investment in CSI as $696,066 as of October 1, 2009 (Docket Entry 1 at 12.
The increase is $328,200.

be liquidated.  CSI is an operating property management company that would likely be better sold

as a single going concern.

## IV.  Conclusion

The three issues in this case – the debtor's management of the case, the continuing losses,

and the ability to propose a feasible plan of reorganization that has a reasonable possibility of being

confirmed within a reasonable period of time – suggest that a chapter 11 trustee should be appointed.

The debtor initially directed its attention to the automatic stay in an effort to recover its ability to

vote at the annual meeting.  When it achieved this objective, it sought to take control of the board

through its voting strength.  It achieved an absolute majority for 36 days and thereafter held three

of the seven seats.  During the 36 days it took actions detrimental to FOA and in violation of the

order of this court of June 15, 2012.  The manner in which the conflict of interests transactions were

managed after the board was reconstituted precluded the transactions from being approved by the

court.  The debtor used the automatic stay for a purpose for which it was not designed and in the

process failed to timely prosecute its claims objections.

The continuing losses are a concern to the court, however, once the bankruptcy is over, it is

likely that Gordon Properties' rental business can be successfully operated.  The large expenditure

of attorney's fees raises questions about the debtor's management of the case.

There is a possibility that the debtor may be able to reach a global settlement with its

creditors, however, in the absence of a global settlement, it is unlikely that there is a feasible plan

that can be proposed and confirmed within a reasonable time unless all creditors are paid in full and

property is liquidated.  The debtor's management of this case indicates that a chapter 11 trustee would be better suited to execute such a plan.

A chapter 11 trustee would usually  be appointed in the circumstances of this case.  The effect of the continuing loss in this case is mitigated by the fact that the loss was funded by the owners, not by creditors.  While there is never an assurance that an apparent equity case will not turn into an administrative insolvency, at present, there appears ample equity for the benefit of the equity owners.  In light of the condominium relationship between Gordon Properties and FOA which will continue for any units not liquidated, in this case, it is preferable that the equity owners reach a settlement agreeable to the creditors and to them than a chapter 11 trustee be appointed.  The parties report that negotiations are continuing and a short continuance of this matter is appropriate to permit them to pursue these negotiations.

In the interim, the conflict of interests can be mitigated by this court under 11 U.S.C. §1107(a) which permits this court to impose reasonable restrictions on the manner in which the debtor operates.  *See In re Lifeguard Industries, Inc.,* 37 B.R. 3 (Bankr.S.D.Ohio 1983) (holding that under §1107(a) the court can prevent elected management from taking control and restrict the board of directors' control over the day-to-day affairs of the company).  *See also In re Americana Expressways, Inc.,* 133 F.3d 752 (10th Cir. 1997) ("The debtor in possession is an officer of the court and subject to the bankruptcy court's power and control."); *In re Ralph C. Tyler, P.C., P.S., Inc.,* 156 B.R. 995 (Bankr.N.D.Ohio 1993) ("[T]he Bankruptcy Court has considerable authority to interfere with management of the DIP to protect creditors' interests.").

If a matter such as this were brought before a state court, it is likely that the state court, exercising its equitable powers, would limit Gordon Properties to one seat on the board of directors,

effectively preventing it from manipulating its ownership of its units in such a way as to obtain an

unfair advantage in the governance of the condominium association and minimizing the conflict of

interests.  This court, acting through 11 U.S.C. §1107(a), seeks the same result.  There have been

past problems with obtaining a quorum and it is questionable that any quorum can be achieved

without the debtor's attendance at the annual meeting.  Without a quorum, the incumbent directors

remain in office.  This occurred from 2006 through 2011.  Therefore, the debtor will attend the

annual meeting and be counted present for purposes of quorum.  In order to prevent the debtor from

benefitting from its actions in organizing Residential Holdings and in one owner purchasing a unit

in his own name so as to obtain additional seats on the board of directors, the debtor may only vote

for one Gordon Properties-affiliated candidate for director.   In the event that no election is

completed at the meeting, Gordon Properties will cause two of the three current Gordon Properties-

affiliated directors to resign upon adjournment of the meeting.  If a Gordon Properties-affiliated

candidate is elected as a director, he or she shall not serve as president of the association.  The

debtor will not vote for any write-in candidate.  To the extent that the debtor holds any proxies, the

same restrictions shall apply to voting the proxies except that an instructed proxy will be voted as

instructed.

     Stites & Harbison's motion to convert to chapter 7 will be denied.  The United States

Trustee's motion to appoint a chapter 11 trustee will be continued for 60 days to allow the parties

to attempt to settle all outstanding matters, however, the rights of the debtor to operate will be

restricted.

Alexandria, Virginia
October 22, 2013

/s/ Robert G. Mayer
Robert G. Mayer

28

United States Bankruptcy Judge

Copy electronically to:

Donald F. King
Joseph A. Guzinski
Robert E. Scully, Jr.

18793