# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

In re:

GORDON PROPERTIES, LLC, and
CONDOMINIUM SERVICES, INC.,

   Debtors.

Case No. 09-18086-RGM
Case No. 10-10581-RGM
(Administratively Consolidated)
(Chapter 11)

## MEMORANDUM OPINION AND ORDER

This case was before the court on January 20, 2015, on the Motion of Reed Smith LLP for Leave to Withdraw as Counsel for First Owners' Association of Forty Six Hundred Condominium, Inc. (Docket Entry 928). Michael S. Dingman, the individual attorney at Reed Smith who represented FOA and signed the motion, raised issues in the motion that question the propriety of FOA's action in dismissing the law firm and himself.

Mr. Dingman stated that he had represented FOA for the entire period of the litigation with Gordon Properties, a period that extends years before Gordon Properties filed its bankruptcy petition on October 2, 2009, except for a period after Gordon Properties obtained control of the Board of Directors and summarily discharged him. The facts relating to the prior dismissal are more fully set out in *In re Gordon Properties, LLC,* 515 B.R. 454 (Bankr.E.D.Va. 2013). As more fully discussed in that opinion, three members of Gordon Properties and a relative were elected to FOA's seven-member Board of Directors at the October 5, 2011 annual meeting, but because the election results were contested, were not seated until this court ruled on the objections in their favor on June 15, 2012. By an order entered on July 23, 2013, this court, on reconsideration, held that three, not four, Gordon Properties-affiliated directors were elected. However, in the interim, on June 17, 2012, at

the organizational meeting of the newly elected Board – which then consisted of four Gordon Properties-affiliated members – the Board summarily discharged Mr. Dingman and Reed Smith. Two non-affiliated board members were not present at the organizational meeting. No prior notice of a motion to discharge counsel was given to the non-affiliated members of the Board. *Id.* at 461-462. Ultimately, a settlement agreement concerning the litigation was presented to the court for approval. It was not approved because of the improper conduct of the Gordon Properties-affiliated directors. The court found that proper corporate process was lacking and the proposed settlement agreement was not fair to the association so as to overcome the conflict of interests of the Gordon Properties-affiliated directors. *Id.*

Mr. Dingman's motion sounds like a reprisal of the events of his earlier discharge. He stated that although no director is a member of Gordon Properties or a relative of a member of Gordon Properties, all four directors elected at the October 2014 annual meeting were "elected on the strength of the votes of Gordon Properties," noting that three were newly elected and one was re-elected. Motion at ¶2. He met with the new Board "to discuss the pending matters." *Id.* He was later advised that a Special Litigation Committee consisting of three directors, two of whom were newly elected and one – William Reichenbach – who was re-elected, had decided to discharge him and retain Philip J. Harvey.[1] Mr. Dingman continued:

> In light of the impact on FOA if RS [Reed Smith] were to be terminated, especially given the pending trial on FOA's Motion for Substantive Consolidation, RS requested that the FOA Board consider the issue of whether RS should continue as counsel. RS informed the Board that it was RS's legal advice that terminating RS would harm FOA and was not in the best interests of the members of FOA. RS

---

[1] Mr. Harvey represented FOA during the period when the settlement agreement was negotiated and presented to the court, a period when Mr. Dingman was not representing FOA. The Board that retained Mr. Harvey consisted of three Gordon Properties-affiliated directors. Mr. Harvey's employment ended after the settlement was not approved and when Mr. Dingman was re-employed. The latter actions was taken by a different Board.

suggested that the committee seek the advice of FOA's general counsel – Whiteford, Taylor & Preston – as to the termination of RS, but to the knowledge of RS, the committee did not seek such advice. John T. Donelan sent the FOA Board a letter on December 31, 2014 stating that he believed that the termination of RS was contrary to the best interest of FOA, and a potential violation of the Board's fiduciary obligations, and strongly advised against the termination of Reed Smith.

*Id.* at ¶4. Mr. Donelan also represents FOA.

In light of Mr. Dingman's statements, the court held a hearing on his motion to withdraw and ordered that the members of the Special Litigation Committee – William Reichenbach, Stella Quelch and Timothy Wolstoncroft – and the President of FOA, David Fochtman, appear at the hearing. Mr. Reichenbach is the chair of the Special Litigation Committee. All four were elected to the Board at the October 2014 annual meeting "on the strength of the votes of Gordon Properties," as Mr. Dingman put it. *Id.* at ¶2. Mr. Dingman was present. Mr. Donelan, co-counsel for FOA but not a member of Reed Smith, was present.[2] Mr. Harvey was present telephonically. A member of his firm was present in person. Counsel for Gordon Properties and Bryan Sells, the debtor's designee, and counsel for Condominium Services were present as was Bradley Jones, an attorney in the United States Trustee's office.

After hearing opening statements, the court held an ex parte hearing over the objection of Gordon Properties.[3] All parties and counsel were excluded from the courtroom except Mr. Donelan and Mr. Harvey, both counsel for FOA, and Mr. Jones of the United States Trustee's office. Three of the four FOA directors were excluded. The exception was FOA's corporate designee, William

---

[2]Mr. Donelan subsequently filed a motion to withdraw.

[3]A transcript of the ex parte hearing can be ordered, however, if ordered it will be filed under seal so that FOA may seek redaction of any portion that could impair its negotiations with Gordon Properties. The transcript will be available to the public after FOA has sought its redactions. At the conclusion of the case, unless good cause is shown, the entire transcript – without redactions – will be available to the public.

Reichenbach, chair of the Special Litigation Committee. The court examined each of the directors separately, starting with the corporate designee. Except for Mr. Reichenbach, FOA's corporate designee, the other directors were again excluded after their testimony. Mr. Jones also examined the four directors.

Mr. Dingman suggested in his motion that Gordon Properties voting for the four successful candidates was somehow improper or was evidence of Gordon Properties' improper influence over them. The suggestion that it was improper for Gordon Properties to vote at the annual meeting runs counter to the nature of a condominium association. A condominium association is like a mini-democracy. Control of various aspects of the community is vested in the members through a board of directors elected by the members – of whom Gordon Properties is one, although in voting strength a disproportionate member. The mere fact that Gordon Properties and the association are involved in litigation does not preclude Gordon Properties from voting at the annual meeting. In considering the settlement motion, the court was concerned with how the Gordon Properties-affiliated directors *exercised* their authority as directors so that it could decide whether the proposed settlement agreement should be approved. The examination of their election and Mr. Dingman's summary discharge assisted in resolving that matter.[4]

Mr. Dingman's second suggestion is that Gordon Properties has some improper or undue influence over the four directors. The court considered several aspects of the election in order to

---

[4] It is difficult to determine the effect of Gordon Properties' votes for the four directors on their election. Mr. Reichenbach testified that he believed that the top three vote getters – Mr. Wolstoncroft, Mr. Fochtman and himself – would likely have been elected even without the Gordon Properties' votes. It appears to be a reasonable conclusion. Another way to measure the impact of Gordon Properties' votes is to determine who would have been elected had Gordon Properties not voted, an analysis that itself suggests that there was some impropriety in Gordon Properties voting at all. Neither this analysis nor Mr. Reichenbach's conclusion can be fully tested without knowing the vote tallies of all the candidates. The vote tallies were not available to the court at the hearing.

evaluate this suggestion. The first was why the four directors ran for the Board and their campaigns. The four directors ran together as a ticket, canvassing the building and going door-to-door to gain votes for themselves. The common element of their campaign was their dissatisfaction with the ongoing litigation with Gordon Properties. They felt that the litigation had cost far more than it was worth and that a settlement should be given a higher priority.[5] They ran for other reasons as well. One reason was their concern about the physical condition of the building and their feeling that more resources needed to be directed to maintain it. This was related to the litigation because the attorney's fees were draining funds that could otherwise be used to maintain the building.

All denied that Gordon Properties recruited them to run for the Board, threatened them, pressured them or promised them anything. Each made the decision to run for the Board by himself or herself or at the urging of unit owners other than Gordon Properties.

Another area of potential undue influence was Mr. Dingman's discharge. In order to assess this concern, the court inquired about the decision to discharge Mr. Dingman. All four of the directors elected at the October 2014 annual meeting were present at the Board meeting held after the election that Mr. Dingman referred to in his motion. Mr. Dingman and his partner, Robert Diamond, attended the Board meeting to brief the new Board, which had three new members, on the status of the litigation. Each of the four directors left the meeting dissatisfied with Mr. Dingman and

---

[5]They questioned the benefit to the association of spending millions on legal fees in an effort to recover hundreds of thousands of dollars. They felt that the cost of the ongoing litigation had caused hardship throughout the building. Mr. Fochtman stated that he thought FOA's attorney's fees from the beginning of the litigation with Gordon Properties and Condominium Services – which began in the state courts years before the commencement of the bankruptcy cases – was more than $4 million. He stated that for the first two years he was not aware of the bankruptcy litigation and that there was little impact on the condominium fees because the attorney's fees were paid from the condominium reserve funds. When reserve funds were no longer available, condominium fees went up significantly. In his case, the condominium fee on his one-bedroom unit went up about $200 a month. While he could not allocate that between attorney's fees and other cost increases, he believed a significant portion was to fund attorney's fees. Some members, he felt, sold their units because the condominium fees were pressing their personal budgets. In addition, the funds available to operate the condominium were reduced to pay attorney's fees.

his presentation. They identified, in various ways, several concerns. They felt that Mr. Dingman was too emotionally involved in the litigation. This clouded his judgment about the "dollars and cents" of a settlement. Mr. Reichenbach who had served on the Board for the prior two years, felt that Mr. Dingman's relationship with Bryan Sells, the manager of Gordon Properties and the driving force of Gordon Properties' litigation, and with Gordon Properties' attorney had a negative impact on his ability to represent FOA. He felt that Mr. Dingman was counseling further litigation without sufficient attention to resolving the matters through settlement.

Mr. Fochtman reached the same conclusion. He remembered that the question of settling the litigation with Gordon Properties was raised at the meeting. His impression was that Mr. Dingman and Mr. Diamond wanted to talk about litigation, not settlement. He remembers them speaking of the next case and the next case after that; that the litigation could go on for another year or year and a half. He had no confidence that Mr. Dingman would be able to negotiate a settlement if instructed to do so. He felt that Mr. Dingman did not even want to talk about settlement.

Ms. Quelch also was disappointed. She felt that Mr. Dingman was too invested in the litigation to be able to negotiate a settlement. She remembered that when the question of attorney's fees was raised, Mr. Dingman said that Reed Smith would not charge any further fees. She took this as evidence of his emotional involvement in the litigation and a challenge to his independent professional judgment.[6]

---

[6] Ms. Quelch did not mention Mr. Dingman's involvement in *Sobel v. Sells (In re Gordon Properties),* 505 B.R. 703 (Bankr.E.D.Va. 2013) in which Mr. Dingman and his firm were disqualified as counsel for 11 unit owners who sued FOA, Gordon Properties and others. The suit was filed shortly after Gordon Properties reached a settlement with FOA which the plaintiffs opposed. The suit – removed to this court – endeavored to defeat the settlement by asserting, among other reasons, that the Board was improperly constituted, the Special Litigation Committee was improperly formed and the settlement agreement was not properly entered into by FOA. Mr. Harvey successfully prosecuted the disqualification motion on behalf of FOA in that case. Reed Smith represented the plaintiffs *pro bono*. *Id.* at n.2.

Mr. Wolstoncroft remembered that Mr. Dingman, in addition to other matters, told them that the Board also had the option to seek a settlement or to retain different counsel. Overall, he felt that the latter suggestion, new counsel, was best for FOA.

They listened to and acted on Mr. Dingman's advice to seek additional counsel from FOA's general condominium counsel, Whiteford, Taylor & Preston, before making a decision. When they sought advice from Whiteford, Taylor & Preston, the firm declined to advise them. As general condominium counsel, Whiteford, Taylor & Preston would presumably have been in a better position to advise them on the change in counsel than any other outside attorney.

The court did not attempt to determine exactly what happened at the Board's post-election meeting with Mr. Dingman and Mr. Diamond. The meeting was important because it informs the court that the new Board met with Mr. Dingman and Mr. Diamond, heard their presentation on the status of the litigation, heard their view of the anticipated litigation, heard their views on the relative merits of litigation and settlement and considered what they heard. They acted on Mr. Dingman's advice to obtain further advice from outside counsel but were unable to obtain it. Their testimony shows that they thoughtfully considered Mr. Dingman's presentation and lacked confidence in his further representation. The discharge decision was reviewed by the full Board of Directors.

Another area where Gordon Properties could have exercised undue influence was in the selection of Mr. Harvey, Mr. Dingman's successor. The court inquired as to the selection of Mr. Harvey as new counsel. Again, the testimony reflected that the decision was thoughtful. They knew Mr. Harvey from his prior representation of FOA. They knew that he was current on the litigation the year before and felt that he could become up-to-date quickly at a reasonable cost. They were

aware that he was previously retained by a Board that had three member who were affiliated with Gordon Properties. They considered this factor when retaining him.

The court also considered the creation and appointment of the Special Litigation Committee. The Special Litigation Committee consists of three of the four directors elected in 2014. It does not appear that any of the three incumbent board members were systematically excluded. Moreover, the committee's decisions are recommendation that the whole Board will review and approve, modify or reject.

Each director presented himself or herself as being independent of Gordon Properties and being able to make a decision on settlement and litigation independently of Gordon Properties. Each denied that he or she would settle on any terms available. Each stated that a settlement would have to be fair to FOA and its members. While there is significant dissatisfaction with the litigation, there is no indication that they will walk away from it and, it appears, will, if necessary, continue it to conclusion. Each director who was asked about his fiduciary duties acknowledged that he or she had to act in the best interests of FOA and to make informed decisions after reasonable investigation.

The question before the court is whether to permit Mr. Dingman and Reed Smith to withdraw as counsel for FOA. Counsel may only withdraw with the consent of the court. Ordinarily, a party should have the right to retain counsel of his choice. *Sobel v. Sells (In re Gordon Properties),* 505 B.R. 703, 706 (Bankr.E.D.Va. 2013). However, the court is concerned about the administration of the two bankruptcy cases and the progress of the litigation before it and would not permit counsel to withdraw if withdrawal would have a negative impact on the bankruptcy cases or the litigation. In light of the prior discharge of Mr. Dingman and Reed Smith, the court was concerned that withdrawal would result in undue delay in resolving the bankruptcy cases and the related litigation

8

and unnecessarily increase the high costs of litigation to all parties. If the withdrawal were merely a replay of the prior discharge, the court would give serious consideration to denying the motion or fashioning another appropriate remedy.

The court is well aware that an ex parte hearing differs significantly from a contested hearing. The adversary process assumes that each party is presenting its case in the light most favorable to itself and that the facts can best be determined from such a presentation. Those attributes are not present in an ex parte hearing. The purpose here, however, is not to finally resolve issues between adverse parties, but to determine whether counsel's motion to withdraw should be granted.

The testimony presented shows – at least facially – that proper corporate procedures were followed. Unlike the Gordon Properties-dominated Board, the decision to discharge Mr. Dingman and Reed Smith was made at a regularly scheduled Board meeting, not at an organizational meeting held in the middle of the night without notice to two non-Gordon Properties-affiliated directors. The Special Litigation Committee appears to have been properly constituted. In the prior instance, the Special Litigation Committee was not properly constituted. The decision here was made after Mr. Dingman's presentation, after an unsuccessful inquiry to another law firm, and after consideration which resulted in a decision for non-spurious, rational reasons that the members of the Special Litigation Committee could articulate. It was affirmed by the Board at a Board meeting.

The directors appear to be aware of their obligations to make decisions in the best interests of FOA and its members after having performed an appropriate and reasonable inquiry. They appear to have an honest desire to change the direction of the dispute with Gordon Properties in a rational and meaningful manner. Whether they will be successful cannot be known today.

All of these indicators are very different from the prior discharge of counsel and the unnecessary costs and delays that ensued. Mr. Harvey appears prepared to go forward without any prejudice to his new client and without any undue delay prejudicial to the administration of these bankruptcy cases.

The motion to withdraw will be granted.

## ORDER

It is ORDERED that:

1. The Motion of Reed Smith LLP for Leave to Withdraw as Counsel for First Owners' Association of Forty Six Hundred Condominium, Inc. (Docket Entry 928) is granted.

2. In the event that a transcript of the January 20, 2015 hearing is ordered, the court reporter, before the transcript is filed, will advise the Divisional Manager that the transcript is about to be filed with the court and will not deliver a copy to anyone except counsel for First Owners' Association of Forty Six Hundred Condominium, Inc., until the transcript has been redacted or the redaction period has expired. The clerk will restrict access to the transcript to everyone except counsel for First Owners' Association for a period of 21 days after it is filed. Before the end of the 21-day period, counsel for First Owners' Association shall prepare or cause to be prepared a redacted copy that redacts personal identifying information and may redact portions that may affect its negotiations of a settlement. The redacted copy will be available to the public as would any other transcript. If counsel for First Owners' Association determines that no redactions are necessary, the clerk will remove the restriction on the access to the filed transcript.

3. In the event that any party or counsel for any party obtains a copy of the unredacted transcript prematurely, the party or counsel will immediately deliver it to counsel for First Owners' Association without reading it.

4. The clerk will remove the restriction on access to the originally filed transcript after the case is closed and when no further appeals can be filed and no appeals are pending.

Alexandria, Virginia
February 11, 2015

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Donald F. King
Michael S. Dingman
John T. Donelan
Madeline A. Trainor
Phillip J. Harvey

19211