# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

In re:

GORDON PROPERTIES, LLC and
CONDOMINIUM SERVICES, INC.,

Debtors.

Case No. 09-18086-RGM
Case No. 10-10581-RGM
(Chapter 11)
(Jointly Administered)

## MEMORANDUM OPINION

This case is before the court on the motion of Gordon Properties, LLC, brought under 11 U.S.C. §107(b)(2) to seal eight letters filed by members of First Owners' Association of Forty Six Hundred Condominium, Inc., ("FOA") which the debtor asserts contain "scurrilous, if not defamatory, statements regarding . . . the managing member" of the debtor.[1]  Debtor's Motion to Seal Documents at ¶1.  Two unit owners who each submitted two letters objected to the motion.  The United States Trustee also opposed the motion.

Forty Six Hundred Condominium was formed in 1975 and consists of a sixteen-floor high-rise building and two separate structures fronting on a major street (the "street-front" units) – a gas station and a building previously used as a restaurant. There are a total of 450 condominium units. The high-rise building consists of 396 residential units and 52 commercial units. Each street-front structure and described land is a separate condominium unit.  The condominium is governed by First Owners' Association of Forty Six Hundred Condominium, Inc., a unit owners' association.  The debtor owned 41 condominium units in the high-rise building and the restaurant

---

[1] Section 107(b) states in relevant part:

On request of a party in interest, the bankruptcy court shall . . . protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

1

unit when it filed its petition on October 2, 2009. The debtor's aggregate interest in the common elements and its aggregate vote at the annual meeting was about 19.7%. On average, individual condominium units in the high-rise building held a 0.25% interest in the common elements and of the votes at the annual meeting.

Gordon Properties is a limited liability company with four members. All four members are related as siblings or cousins. The managing member, a practicing attorney, was the sole managing member and the member most involved in the day-to-day bankruptcy and litigation matters. *See,* Statement of Financial Affairs, Question 21b. Condominium Services, Inc. ("CSI") is a wholly-owned subsidiary of Gordon Properties and had managed FOA for most of the time since the mid-1970's. The real estate and CSI were owned by the four members' grandfather who died prematurely. He left the assets in a trust of which the four members were the residuary beneficiaries. Some time about 2004, the trust was dissolved and the properties were conveyed to Gordon Properties.

FOA and CSI entered into a two-year management contract for the term from November 1, 2005 to October 31, 2007. FOA terminated the contract as of August 1, 2006. CSI disputed the termination and insisted that it remained FOA's management agent. Gordon Properties continued to pay its condominium fees to CSI from which CSI paid its management fee. Litigation ensued. As to CSI,

> At the conclusion of all the evidence, FOA moved for summary judgment on its conversion claim. The circuit court granted FOA summary judgment on the conversion claim in the amount of $91,125. On the remaining issues, the jury returned a verdict in favor of FOA. With respect to the breach of contract claim concerning payroll administration and taxes, the jury awarded damages in the amount of $70,667. On the conversion claim, the jury awarded prejudgment interest beginning on October 1, 2007 and punitive damages in the amount of $275,000.

*Condominium Services, Inc. v. First Owners' Assoc. of Forty Six Hundred Condominium, Inc.,* 281 Va. 561, 570, 709 S.E.2d 163, 169 (2011).

The verdict was sustained on appeal to the Supreme Court of Virginia. *Id.*

To complicate matters, FOA's board of directors determined that the association had made a mistake in allocating condominium fees with respect to the restaurant unit. It recalculated the condominium fees and sought to collect those that were not barred by the statute of limitations. The amount was substantial, $279,984. Litigation ensued. The circuit court determined the correct allocation for reserves but denied FOA's claim for the recalculated condominium fees because the board had not properly assessed them. The board promptly assessed them. Gordon Properties, ostensibly fearing that FOA would enforce its lien rights against the restaurant unit, filed its petition in bankruptcy in this court.

To further complicate matters, the condominium documents provide that any unit owner in arrears in the payment of his condominium fees cannot vote at the annual meeting. Gordon Properties did not pay the recalculated condominium fee and was, prepetition, denied its right to vote at annual meetings. Gordon Properties asserted that the automatic stay prevented FOA from enforcing the provision and that it had the right to vote at post-petition annual meetings. When FOA did not allow Gordon Properties to vote at a post-petition annual meeting, Gordon Properties filed an adversary proceeding alleging that FOA had violated the automatic stay. Litigation ensued. *Gordon Properties LLC v. First Owners Ass'n.* (*In re Gordon Properties*), 460 B.R. 681 (Bankr.E.D.Va. 2011).

To further complicate matters, FOA passed a rule that limited owners of multiple units to only one seat on the seven-person board of directors. The managing member had purchased a residential unit in his individual capacity and was not delinquent in the payment of his condominium

3

fees.[2] The members of Gordon Properties organized Residential Properties which owned one residential condominium unit.[3] FOA's rule limited the managing member, Residential Holdings and Gordon Properties to a single seat on the board of directors. Gordon Properties disputed FOA's authority to pass the resolution. Litigation ensued.

This court found that FOA had violated the automatic stay by denying Gordon Properties its right to vote at the 2010 annual meeting. *Id.* Gordon Properties was awarded its attorney's fees and the court supervised the election of directors at the next annual meeting. The court also held that FOA's rule limiting Gordon Properties and its related entities to one seat on the board of directors exceeded its authority. At the next annual meeting, four directors who were members or relatives of members of Gordon Properties were elected as directors of FOA. On further consideration, this court found that only three could serve. During the brief period when four members of the board of directors were affiliated with Gordon Properties, the board fired FOA's counsel who had represented FOA in all of the prior litigation and was representing FOA in an appeal in the district court that was scheduled to be argued in the very near future. The order resolving the election issues prohibited CSI from entering into a management contract with FOA without court approval.

FOA's managing agent resigned after the election. FOA which was effectively controlled by Gordon Properties sought to hire Joe Riviere as a temporary manager on the same terms and conditions as the resigning manager. Riviere was an employee of CSI. FOA was represented by counsel appointed by FOA's insurance company as a result of the claims made by Gordon Properties against FOA. Counsel was independent of Gordon Properties and recommended that CSI be

---

[2] In fact, the only delinquent condominium fee was the recalculated assessment against the street-front unit.

[3] Residential Holdings acquired its unit from Gordon Properties in August 2008 for no consideration. *See,* Statement of Financial Affairs, Question 10.

permitted to have its employee, Riviere, act as FOA's temporary manager while a permanent replacement was sought. The court granted the motion. Riviere commenced a search process for a permanent managing agent and obtained several bids, one of which was from CSI. The board selected CSI. CSI filed a motion to approve the contract.

At the same time, another judge of this court mediated a settlement between FOA, CSI and Gordon Properties and a motion was filed to approve the settlement.

A number of unit owners opposed the CSI management contract and the settlement. The court was concerned with the potential conflicts of interest because of the Gordon Properties' affiliated directors. The United States Trustee requested that an examiner be appointed. Gordon Properties opposed the appointment and after the appointment sought to limit the examiner's investigation by limiting funds that would be available to pay him, by limiting the scope of the investigation, and by demanding to be present at every interview that he conducted. *In re Gordon Properties LLC,* 2013 WL 4510582 (Bankr.E.D.Va. 2013). All of the efforts were rebuffed and the examiner submitted a comprehensive report in which he opined that there were conflicts of interest that vitiated the settlement agreement. The settlement was not approved. *Gordon Properties LLC v. First Owners Ass'n. (In re Gordon Properties LLC),* 515 B.R. 454 (Bankr.E.D.Va. 2013).

The letters in question were written to the court during the period when the CSI contract and the settlement were pending. Seven of the eight letters in question were filed from March 11, 2013 to April 22, 2013. The eighth letter was filed on September 3, 2013, immediately before the 2013 annual meeting and election of directors.

Other letters were also filed by unit owners. Gordon Properties has not sought to seal them. In light of the number of letters being filed with the court and to establish the use of the letters in

the context of the hearings, the court entered an order on May 10, 2013. The order identified the two matters before the court and acknowledged that the letters were intended by the unit owners to address their concerns with respect to the two motions. The order clearly stated that the letters were not evidence but would be considered as if they were arguments of counsel or of an amicus curiae. It also directed the unit owners to the United States Trustee if they had concerns other than the two matters then before the court.

The order addressed requests of some of the unit owners to restrict public access to their letters. The order stated:

> Some of the more recent letters request that the letters be restricted from public access. The court does not favor restricting access to documents filed in a case. Courts are public institutions. Confidence in them is strengthened when any member of the public can examine a court file to see what decision the court reached and the papers and proceedings the court relied on in making its decision. When papers are withheld from public view, people will naturally wonder what was in the paper and how it affected the court's decision. This natural curiosity can lead to suspicion which in turn undermines the public's confidence in the court's decisions.

*Id.* at 2. Since that order – except for the present motion – no one has asked for the letters to be sealed. They have remained available to the public for more than two years without complaint.

The seven letters all address the condition of the condominium and were related to the CSI contract or the proposed settlement. Some are more closely related to the subjects at issue, but all are relevant.[4] They related to the management of the condominium and sometimes specifically Riviere's management. They wrote of the physical condition of the condominium while pointing

---

[4]The court could be more specific in the discussion that follows but will, instead, only refer to the comments in the letters in a generalized manner. It should not be particularly difficult to match the comments in the letters with the court's discussion if the letters are read. Gordon Properties and FOA have not hesitated to appeal decisions of this court. That is their right and is of no concern to the court. However, if the court were to be reversed, it would be a Pyrrhic victory if the particulars that should have been redacted were included in the court's decision. Out of respect for the judicial process and the parties, the court will keep its discussion general.

out what one unit owner felt was an unnecessary expense. They wrote of the amount of the condominium fee, the increases in the fees, the hardship that the increases caused, and the lack of action to collect significant arrearages from other unit owners. These comments primarily related to CSI's proposed contract. One letter addressed the pressure the author felt she was under and her disappointment in the managing member's leadership. The author had supported the managing member's election to the board. There were comments on the prolonged litigation, its expense, and the adverse effect on the condominium. These comments and comments about the managing member's leadership – he was president of FOA – related to the conflicts of interest. There were substantive comments on the settlement agreement. One substantive comment was the absence of releases for former directors. Another was the fairness of the settlement to FOA, an element in considering the validity of a contract when there were conflicts of interest on the board of directors when a contract is approved by the board.

In considering FOA's side of the settlement agreement, the court made clear that it was doing so to determine whether there was a contract properly ratified by all the parties that, if approved by the court, would be binding on all the parties. If FOA's approval of the settlement agreement or the management contract was tainted by a conflict of interests that vitiated the settlement agreement or the management contract, the court could not approve it. There would be no agreement for the court to approve. It was in this context that the actions of FOA's board, with Gordon Properties' members and affiliates as members, became relevant and important.

*Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1 (1st Cir. 2005) analyzes 11 U.S.C. §107. It first discussed the common law presumption of access to judicial records and a court's inherent "supervisory power over its own records and files." It noted that

"access has been denied where court files might have become a vehicle for improper purposes." *Id.* at 6 (quoting *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597-598, 98 S.Ct. 1306, 1312 (1978).

The Court of Appeals then directed its attention to 11 U.S.C. §107. Section 107 consists of three parts or subsections. The first, §107(a), establishes a broad right of access to papers filed in a bankruptcy case. It provides that "paper[s] filed in a case under [title 11] . . . are public records and open to examination by an entity at reasonable times without charge." The statute is plain, unambiguous and broad. Together with §107(b) and (c) which provide exceptions to the right of access, *Gitto* held that §107 supplants the common law presumption of access.[5] *Id.* at 8 ("Because §107 speaks directly to the question of public access . . . it supplants the common law for purposes of determining public assess to papers filed in a bankruptcy case.").

The rest of §107 establishes exceptions to the rule of public access. Section 107(b)(2) is the applicable provision in this case.[6] It states:

> (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may . . . protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under [title 11].

*Gitto* held:

> We therefore conclude that material that would cause a reasonable person to alter his opinion of an interested party triggers the protections of §107(b)(2) based on a

---

[5] "The common law requires the court to determine whether the document at issue is a 'judicial record' subject to the presumption of public access, and, if so, to 'balance[ ] the public interest in the information against privacy interests.' *In re Boston Herald,* 321 F.3d 174, 109." *Gitto,* 422 F.3d at 9.

[6] Neither §107(b)(1) nor 107(c) which relate to trade secrets, confidential research, development, or commercial information and information that creates an undue risk of identity theft or other unlawful injury are not applicable to this motion.

8

>showing that either (1) the material is untrue, or (2) the material is potentially untrue and irrelevant or included within a bankruptcy filing for an improper end.

The Court of Appeals discussed the untruthfulness prong. *See Gitto,* 422 F.3d at 11. It noted that while some parties might be able to "demonstrate untruthfulness solely on the basis of the papers filed with the court, such situations will be rare." It continued:

>It would be unrealistic to require the bankruptcy court to resolve these factual disputes at a preliminary stage of the proceedings. The untruthfulness requirement would add an enormous burden to the bankruptcy courts' already heavy docket by turning motions for protection under §107(b)(2) into an occasion for mini-trials. We therefore emphasize that although a bankruptcy court may grant protection under §107(b)(2) based on a showing of untruthfulness, protection on this basis is available only in the rare case where the untruthfulness is readily apparent. Bankruptcy courts are under no obligation to resolve questions of truthfulness presented by a §107(b)(2) motion where doing so would require discovery or additional hearings, or would be otherwise burdensome.

*Id.*

The second prong of the test is potential untruthfulness. While potentially untrue statements also are covered by §107, the Court stated that "given the relative ease of showing potential untruthfulness, such a showing, standing alone, cannot be enough to trigger the exception." *Id.* at 11. It would simply be too easy for a party in interest to assert the untruthfulness of a statement or allegation and conclude that he had, therefore, shown the assertion to be "potentially untrue." The Court held that:

>a party may seek protection under §107(b)(2) based on potentially untrue information that would alter his reputation in the eyes of a reasonable person. To obtain protection, however, an additional showing must be made.

*Id.* at 11-12. The additional showing is that the potentially untrue statement also be irrelevant or be included for an improper end.

An examiner's report was at issue in *Gitto*. The Court assumed that the statements that the parties found offensive were potentially untrue and proceeded to consider the relevance of the statements and whether they were included for improper ends. The Report addressed "precisely" the types of allegations described in §1104(c).

> While these allegations may affect the reputations of those at whom they are directed, that possibility, standing alone, does not render them defamatory within the meaning of §107(b)(2). The information in the Report is directly relevant to the Report's purpose, which the Examiner describes in his brief as creating "a base of information sufficient [for creditors] to assess whether they may have claims against management, shareholders, or others who have worked with the corporation." The fact that the Report will be used by creditors and shareholders to assess their claims, rather than by the court to adjudicate a dispute, does not make the material included therein any less relevant to the bankruptcy case.

*Id.* at 16.

Nor was there an improper end. The examiner was disinterested and there was no indication that he drafted the Report in bad faith or with an ulterior motive.

*Gitto* has been well-received in most, but not all jurisdictions. *See United States v. Coney,* 689 F.3d 365, 379-380 (5th Cir. 2012); *In re Neal,* 461 F.3d 1048 (8th Cir. 2006); *In re City of Detroit,* 2014 WL 8396419 (Bankr.E.D.Mich. 2014); *In re Copeland,* 2010 WL 4683941 (Bankr.N.D.Okla. 2010); *In re North Bay General Hospital, Inc.,* 404 B.R. 429 (Bankr.S.D.Tex. 2009); and *In re Wyatt,* 368 B.R. 99 (Bankr.N.H. 2007).

The principal case rejecting *Gitto* is *Father M v. Various Tort Claimants (In re Roman Catholic Archbishop of Portland in Oregon,* 661 F.3d 417 (9th Cir. 2011). In this case, Father M sought to seal the portions of the record alleging his sexual abuse of children. The Court of Appeals agreed with *Gitto* that §107 supplanted the common law right of access to judicial records. However, it rejected *Gitto's* test. *Id.* at 431. The Court stated:

> Instead of relying on the interpretative aids adopted in *Gitto Global* and *Neal,* we must apply our standard tools of statutory analysis. And "[a]s with any statutory interpretation, we start with the plain meaning of the statute's text." *United States v. Wright,* 625 F.3d 583, 591 (9th Cir.2010) (internal quotation marks omitted). As the Supreme Court has reminded us, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). The statute does not define "scandalous," so we turn to its ordinary, dictionary meaning. *See Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa Cnty.,* 627 F.3d 1268, 1270 (9th Cir.2010). The Oxford English Dictionary defines "scandalous" as, among other things, "bringing discredit on one's class or position" or "grossly disgraceful." Oxford English Dictionary 575 (2d ed. 2001). Other dictionaries offer similar definitions. *See, e.g.,* Webster's New World College Dictionary 1279 (4th ed.2005) ("offensive to a sense of decency or shocking to the moral feelings of the community; shameful"). Under ordinary usage, then, matter is "scandalous" if it disgraceful, offensive, shameful and the like.

*Id.* at 432. The Court held that the allegations of child sexual abuse were scandalous and granted the motion to seal.

*Gitto* furthers the historic practice in American courts of maintaining almost unlimited public access to court records as expanded by Congress in bankruptcy proceedings. If potentially defamatory allegations were sufficient grounds for sealing court records, the publicly available court records would look like Swiss cheese. As *City of Detroit* notes:

> The difficulty with this view [determining whether a matter is scandalous without examining its relevance] is that many papers and pleadings in bankruptcy allege conduct that is arguably disgraceful, offensive or shameful – fraud, bad faith, willful and malicious injury, to name only a few – but which courts would not consider striking because those allegations are relevant to the legal claims that must be resolved. As the First Circuit observed in *Gitto Global,* "Many, if not the vast majority, of these papers will include material that is likely to affect an individual's reputation in the community." [*Gitto,*] 422 F. 3d at 8 - 9.

11

*In re City of Detroit,* 2014 WL 8396419 at *6. The American practice has been to allow public access to court papers alleging embarrassing and derogatory, even defamatory, matters. The records are not sealed, even if the defendant is ultimately successful in his defense.[7]

But, American courts have also protected litigants against scandalous allegations. Courts recognize that some allegations are so damaging to a litigant's reputation that even if he were to prevail in the litigation and prove the allegations false, it would take years or even be impossible to overcome the damage of the allegation. The allegations in *Roman Catholic Archbishop of Portland* fall within that category. Allegations of sexual misconduct by a priest with children are extremely toxic, particularly in the present environment where numerous such allegations have been made worldwide and many sustained. *Gitto* would not seal a paper with this type of allegation if it were relevant to the matter in the litigation.

*Gitto* and *Roman Catholic Archbishop of Portland* can be reconciled. Each addresses a different type of offensive statement. Section 107(b)(2) directs the court to protect persons against a scandalous *or* defamatory matter contained in a paper filed with the court. *Gitto* concerned defamatory matters. "The primary issue on appeal is the definition of 'defamatory' as that term is used in 11 U.S.C. §107(b)(2)." *Gitto,* 422 F.3d at 6. The matters the parties sought to seal were in an examiner's report that "catalogs precisely the types of allegations described in 11 U.S.C. §1104(c) – namely, 'irregularit[ies] in the management of the affairs of the debtor . . . of or by . . . former management of the debtor." *Id.* at 15-16. The Court recognized that the allegations "may affect the reputations of those at whom they are directed," but that alone did not render them defamatory within the meaning of §107(b)(2). *Id.* at 16. A further examination of the relevancy to

---

[7]*City of Detroit* found that the allegations were patently false and sealed the references involved. The determination was made from other matters of record and not through a separately conducted mini-trial.

the proceeding was necessary and, the Court concluded, they were central to the administration of the bankruptcy estate. As noted in *City of Detroit,* these types of allegations appear in many papers filed with a bankruptcy court. *City of Detroit,* 2014 WL 8396419 at *6.

*Roman Catholic Archbishop of Portland* concerned scandalous allegations. It noted that *Gitto* addressed defamatory statements. *Id.* at 432 ("*Gitto Global* focused only on the 'defamatory' exception in § 107(b)."). It did not apply the *Gitto* analysis for a defamatory statement to the scandalous statements in its case. It looked for the plain meaning of scandalous. *Id.* at 432. It then held that if the statement was scandalous, the analysis came to an end and the statement should be sealed. *Id.* at 433.

Both *Gitto* and *Roman Catholic Archbishop of Portland* seek to define terms used in §107(b)(2). *Gitto* sought to define defamatory; *Roman Catholic Archbishop of Portland*, scandalous. They are not synonymous. Nor have they been treated historically in the same manner in American courts. The protections afforded the different types of statements are different.

In this case, none of the statements complained of are defamatory. While some may be critical of the managing member or his conduct, they do not rise to the level of defamation. More importantly, it is not possible from the record to determine, as the court in *City of Detroit* did, that they are false. They may be potentially false, but the court would need to conduct a hearing to determine that they are false. In any event, they were relevant to the two motions pending before the court, the motion to authorize CSI to enter into a contract with FOA and the motion to approve the settlement. A few statements could be considered scandalous. The court applied *Roman Catholic Archbishop of Portland* and redacted them. To be sure, they were not nearly as scandalous

as those in *Roman Catholic Archbishop of Portland,* but if found to be scandalous, the court is required to protect the parties involved.

The motion will be granted in part and denied in part. The original letters with the scandalous statements will be sealed and redacted copies will be filed.

Alexandria, Virginia
September 4, 2015

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

copies to:

Donald F. King
Bradley Jones

19221